UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x
                      :

MARTIN LEVION,                  :

                Plaintiff,     :

                      :       09 CV 5800 (RJS)

   -   against -         :

SOCIÉTÉ GÉNÉRALE,      :

               Defendant.   :

                      :
——————————————————————— x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SOCIÉTÉ GÉNÉRALE'S MOTION FOR SUMMARY JUDGMENT

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 AVENUE OF THE AMERICAS   NEW YORK NY 10036

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF FACTS ................................................................................. 1

    A.   Levion's Employment With and Resignation From SG ........................... 3

    B.   SG's Discretionary Bonus Policy and Practices ..................................... 4

    C.   The Nature and Terms of Levion's Asserted Contract ............................ 4

    D.   Levion's Claim for a 2007 Pro Rata Bonus ............................................. 5

    E.   Levion's Claim that SG Revoked Bonuses Already Earned ................... 6

    F.   Levion's Claim for Additional Compensation on the TOBP ................... 7

    G.   Levion's Claim for Additional Compensation on NDFs .......................... 8

ARGUMENT .................................................................................................... 9

I.    LEVION'S CONTRACT CLAIMS FAIL BECAUSE OF SG'S
    DISCRETIONARY BONUS POLICY ....................................................... 9

II.    LEVION'S CONTRACT CLAIMS FAIL BECAUSE HE IS
    AN AT-WILL EMPLOYEE ..................................................................... 12

III.    LEVION'S CONTRACT CLAIMS FAIL BECAUSE SG HAD
    DISCRETION TO DECIDE NET P&L UNDER THE DFP FORMULA ........ 15

    A.   The RIC and Fred Transactions ........................................................... 17

    B.   The TOBP ............................................................................................ 17

    C.   The NDF Transactions ........................................................................ 19

IV.    LEVION'S NEW YORK LABOR LAW CLAIMS FAIL
    BECAUSE HIS BONUSES DO NOT CONSTITUTE WAGES ................... 22

V.    LEVION'S CLAIMS FOR BREACH OF THE IMPLIED
    COVENANT OF GOOD FAITH AND FAIR DEALING
    AND UNJUST ENRICHMENT FAIL AS A MATTER OF LAW ................. 23

CONCLUSION ................................................................................................. 25

KL3 2799568.1

TABLE OF AUTHORITIES

Page

Cases:

*Aledia v. HSH NordbankAG,*
No. 08 Civ. 4342, 2009 WL 855951 (S.D.N.Y. Mar. 25, 2009) ............................................23

*Allen v. J.P. Morgan Chase & Co.,*
No. 06 Civ. 8712 (JYK), 2009 WL 857555 (S.D.N.Y. Mar. 31, 2009) ................................24

*Arrouet v. Brown Bros. Harriman & Co.,*
No. 02 Civ. 9061 (TPG), 2005 WL 646111 (S.D.N.Y. Mar. 18, 2005) .....................12, 14, 16

*Barker v. Time Warner Cable, Inc.,*
No. 016438/08, 2009 WL 1957740 (N.Y. Sup. Ct. Jul. 1, 2009) ...........................................24

*Bottini v. Lewis & Judge Co.,*
211 A.D.2d 1006 (3d Dep't 1995) ...............................................................................14, 15

*Broyles v. J.P. Morgan Chase & Co.,*
No. 08 Civ. 339 (WHP), 2010 WL 815123 (S.D.N.Y. Mar. 8, 2010) ...................................22

*Compagnie Financiere de CIC et de L'Union Europeenne*
*v. Merrill Lynch, Pierce, Fenner & Smith Inc.,*
232 F.3d 153 (2d Cir. 2000) .................................................................................................16

*DeSantis v. Deutsche Bank Trust Co. Am.,*
501 F. Supp. 2d 593 (S.D.N.Y. 2007) ...................................................................................25

*Ferrand v. Credit Lyonnais,*
No. 2 Civ. 5191 (VM), 2003 WL 22251313 (S.D.N.Y. Sept. 30, 2003) ...........................10, 11

*Ferrari v. Keybank Nat'l Ass'n,*
No. 06-cv-6525, 2009 WL 35330 (W.D.N.Y. Jan. 5, 2009) ..................................................23

*Frishberg v. Esprit de Corp.,*
778 F. Supp. 793 (S.D.N.Y. 1991) ..................................................................................12, 15

*Giannone v. Deutsche Bank Secs., Inc.,*
392 F. Supp. 2d 576 (S.D.N.Y. 2005) .............................................................................14, 15

*Grieve v. Barclays Capital Sec. Ltd.,*
No. 602820/1998, 1999 WL 1680654 (N.Y. Sup. Ct. Sept. 10, 1999) ..................................13

*Hall v. UPS,*
76 N.Y.2d 27 (N.Y. 1990) ......................................................................................9, 23 n.9

KL3 2799568.1

TABLE OF AUTHORITIES
(continued)

Page

*Int'l Paper Co. v. Suwyn,*
  951 F. Supp. 445 (S.D.N.Y. 1997) ...................................................................12, 13

*JPMorgan Chase Bank, N.A.. v. IDW Group, LLC,*
  No. 08 Civ. 9116 (PGG), 2009 WL 321222 (S.D.N.Y. Feb. 9, 2009) ...................................23

*Jeffreys v. City of N.Y.,*
  426 F.3d 549 (2d Cir. 2005) ...........................................................................20

*Kaplan v. Capital Co. of Am.,*
  298 A.D.2d 110 (1st Dep't 2002) .......................................................................9

*M/A-Com Sec. Corp. v. Galesi,*
  904 F.2d 134 (2d Cir. 1990) .........................................................................24 n.10

*MSF Holding Ltd. v. Fiduciary Trust Co. Int'l,*
  435 F. Supp. 2d 285 (S.D.N.Y. 2006) ..................................................................16

*Nunez v. A-T Fin. Info., Inc.,*
  957 F. Supp. 438 (S.D.N.Y. 1997) ....................................................................24

*Tischmann v. ITT/Sheraton Corp.,*
  882 F. Supp. 1358 (S.D.N.Y. 1995) ...................................................................22

*Truelove v. Northeast Capital & Advisory, Inc.,*
  95 N.Y.2d 220 (N.Y. 2000) ..........................................................................22, 23

*Zaitsev v. Salomon Bros.,*
  No. 92 Civ. 9394 (LLS), 1994 WL 361463 (S.D.N.Y. Jul. 8, 1994) .............................25 n.11

Statutes:

N.Y. C.P.L.R. § 213(2) ..............................................................................10 n.2

KL3 2799568.1

Defendant Société Générale ("SG") respectfully submits this memorandum of law in support of its motion for summary judgment, dismissing the Complaint ("Compl.") of plaintiff Martin Levion ("Levion").

## PRELIMINARY STATEMENT

Levion's claims for additional compensation are all predicated on his contention that he had a "Contract" with SG providing him with an entitlement to a "non-discretionary bonus." (Compl. ¶¶ 19-23). The undisputed evidence belies this allegation and SG should be awarded summary judgment on all of his causes of action.

The supposed signed "Contract" is a statement of "compensation principles" for the Derivatives and Financial Products group ("DFP"), which Levion managed, and is addressed to, among other issues, how DFP's compensation pool should be calculated. It is a signed version of what SG calls a "local formula," a set of guidelines used for calculating group bonus pools. Only one provision governs Levion's individual compensation — in contrast to DFP as a whole — and on its plain terms, that provision was limited to 1994-95. Nowhere does this or any other document provide Levion with the right to a recurring, nondiscretionary bonus.

Because he did not have a written bonus guarantee under the "Contract" for the years in dispute, Levion was subject to SG's bonus policy, which confers on management absolute discretion whether to pay bonuses and, if so, in what amounts. This policy further requires that a bonus recipient be employed by SG and not have given notice of resignation on the day the bonus is paid. Based on this clear policy, Levion's claims for additional bonus compensation and a pro rata bonus for his last year of employment are barred as a matter of law.

The purported "Contract" on which Levion relies contains no fixed duration other than the expired 1994-95 term. Levion testified that the document's "compensation principles" applied to him indefinitely — that is, "for the rest of [his] time" with SG — confirming that, as a

matter of law, he was an at-will employee and SG was free to modify the terms of his compensation at any time. In fact, Levion himself conceded that the manner in which he was compensated was "modified" and "evolved" throughout his employment, and that SG "imposed" changes on DFP's "compensation system." By accepting his bonus payments each year and remaining in SG's employ, Levion was deemed to accept his compensation and is precluded from challenging his remuneration now on a contract theory.

Even if Levion's claims for "underpayment" were available to him as a matter of law, and they are not, SG still should be awarded summary judgment. The "Contract" calls for the application of certain percentages to DFP's "Net P&L" in order to derive DFP's bonus pool. Levion does not contend that SG misapplied any of those percentages. Rather, the gravamen of his Complaint is that the base against which they were applied failed properly to account for certain DFP transactions. But Levion conceded that SG "had final say" over the calculation of Net P&L, and so there can be no genuine factual dispute that SG had ultimate discretion over his compensation under the "Contract." Moreover, the undisputed facts belie his theories as to why he purportedly is owed additional compensation for particular DFP transactions.

Levion's remaining claims likewise fail as a matter of law. His New York Labor Law cause of action is not viable because his discretionary bonuses are not considered "wages" under that statute. His assertion that SG violated the implied covenant of good faith and fair dealing fails both because it does no more than parrot his allegations in support of and seek the same relief as his breach of contract claims, and is not available to an at-will employee. His unjust enrichment claim is not available to him as a matter of law given that SG's bonus policy and his asserted "Contract" cover the same subject matter as this cause of action. Levion's Complaint should be dismissed in its entirety, with prejudice.

-2-

## STATEMENT OF FACTS

**A.    Levion's Employment With and Resignation From SG**

Levion began his employment with SG in 1990.  Levion was the manager of DFP, a group that was involved in a number of financial activities, including "providing . . . interest rate product," the "arbitrage [of] municipal bond[s]," and "some activities linked to tax structuring."  DFP was one of several business lines that reported to SG's Debt and Finance Division ("DEFI"), which is known locally as "DEFI Americas" and is part of SG's Corporate and Investment Banking Division ("SGCIB").  (St. ¶¶ 1, 4-6).[1]

In January 2007, SG relocated DFP from Connecticut to SG's New York headquarters, where all of SG's U.S. trading desks are located, as well as its Compliance Department and other important functions.  As Mr. Mustier explained to Levion, "Having an office completely separate from our main office, and apart from our control infrastructure, without having any clear business justification for such a separation is simply not good governance."  Not content with the move, Levion resigned his employment in March 2007, making a number of demands for allegedly owed compensation.  SG refused those demands and Levion thereafter commenced this action.  (St. ¶¶ 3, 9-16).

---

[1]     "St." refers to SG's Statement of Material Facts Pursuant to Local Civil Rule 56.1.  Pierre Schroeder and Paolo Taddonio led DEFI Americas in 1999-2003 and 2004-08, respectively.  Jean-Pierre Mustier led DEFI globally in 2001-02 and SGCIB globally in 2003-08.  (St. ¶¶ 7-8).  None of these former managers are currently employed by SG.

B.     SG's Discretionary Bonus Policy and Practices

      SG's bonus policy, which is part of the firm's Employee Handbook, provides that "[p]erformance bonuses are discretionary and depend on, among other factors, SG's earnings. Senior management decides each year whether to pay bonuses and, if so, how much is available." Consistent with this policy, bonus determinations for DFP employees were "business line management decisions" made by Messrs. Mustier, Schroeder and Taddonio.   The sole exception was when SG had provided a written bonus guarantee, most commonly in the case of new hires. For example, Levion's offer letter provided him "with a Bonus for 1990 performance, payable in early 1991." Apart from this circumstance, SG follows its policy for bonus awards. (St. ¶¶ 2, 17, 22, 25).

      In calculating the pools from which individual bonuses are paid, SG management sometimes utilizes "guidelines" known as "local formulas."   While they provide "an indication of what [SG] should pay out if everything [is] working well everywhere," management has discretion to deviate from them "depending on overall constraints."   DFP had a local formula that "'included items such as net revenue on an accounting basis . . . operating costs . . . . [and] tax gross-up items,' which were considered in the generation of its 'bonus base,' as well as 'a range of percentages that could be applied to that bonus base that would be . . . up to the discretion of the trading managers.'"   (St. ¶¶ 19-24).

C.     The Nature and Terms of Levion's Asserted Contract

      Levion's asserted "Contract" is grounded in a June 22, 1994 local formula that was signed by Levion and SG management (the "DFP Formula") and provides a "[c]ompensation pool calculation," including certain percentages to be applied to a base "Net P&L" in order to arrive at the DFP bonus pool. Section II.E of the DFP Formula provides, "The

-4-

Manager of SGNY IRD [the predecessor acronym for DFP] will receive 25% of the amounts given by the preceding formulas, plus any additional discretionary amount, for 1994 and 1995." Section II.E is the only provision that expressly applies to Levion. (St. ¶¶ 26-31, 38-39).

DFP's Net P&L was derived through a process of reconciliation between DFP and SG management. Because a significant component of the Net P&L reflected not actual revenues, but rather an estimate of SG's aggregate tax deductions that were attributable to certain DFP transactions (*see* pp. 8 & 17-18 below), the determination of Net P&L was not straightforward and was inherently discretionary. Annually, DFP would put forth its proposed P&L numbers and then compare them to those computed by SG's Accounting Department. When the numbers did not match, a "period of reconciliation" transpired. The Accounting Department would submit bonus base calculations to the head of DEFI Americas — either Mr. Schroeder or Mr. Taddonio depending on the year — who, with Anson Grover of SG's Accounting Department, would negotiate directly with Levion. If there were significant discrepancies in the bases calculated by DFP and SG, Messrs. Schroeder and Taddonio "might try to resolve [them] and get more information" from Mr. Grover and Levion. On other occasions, they would ask Mr. Grover to negotiate directly with Levion. Once the numbers converged, "the Accounting Department would propose the official [Net P&L] numbers to management." Levion conceded that "in instances where there was an irresolvable dispute in the number" SG's Accounting Department "had final say" in calculating DFP's Net P&L. (St. ¶¶ 32-37).

**D.      Levion's Claim for a 2007 Pro Rata Bonus**

Levion's resignation letter and Complaint (at ¶¶ 32-35) demand a pro rata portion of his 2007 bonus. SG does not pay pro rata bonuses. Rather, SG's bonus policy provides:

> The amount of any discretionary bonus is determined primarily by
> your job performance and the performance of your department and

> the Firm *for the calendar year*. Typically, you'll be informed of your bonus award some time before March *following the end of the performance year.... To receive a bonus, you must be employed by SG on the day it's paid and not have given notice of a pending resignation.*

Levion received annual notices of his compensation in a document called a "Compensation Advice," which, consistent with this policy, stated that his "cash bonus is payable only if ... [he is] actively employed by SG ... on the payment date specified in this Advice [and he had] not given notice of termination on or prior to" that date. (St. ¶¶ 17, 50-53 (emphasis added)).

### E.    Levion's Claim that SG Revoked Bonuses Already Earned

Levion's resignation letter and Complaint (at ¶¶ 25-31) demand the "[r]eturn of the $3.5 million that was improperly deducted from [his] 2006 bonus, ostensibly on the basis of SG's intention to reach a future settlement with the IRS in connection with the RIC and Fred transactions." In RIC, which dates to 1996-97, SG stripped out coupons for certain bonds and sold their corpus at "a substantial discount ... to a variety of insurance companies," taking the difference between their face value and sale price as a tax deduction. Fred dates to 2001 and was "a balance sheet transaction" that "changed a deferred tax asset into a permanent tax savings." In 1997 and 2002, Levion received bonuses that included remuneration for the value of RIC and Fred as claimed by SG on its tax returns. (St. ¶¶ 61-62, 65-66, 68, 70).

The IRS subsequently "disagreed with the tax position that SG had taken with respect to [RIC and Fred]." During the course of many years of audits and appeals, SG management discussed the potential "impact of the requalification of RIC and Fred by the IRS on the compensation of people that were paid" on these deals, including Levion. The IRS ultimately offered and SG accepted a settlement (the "IRS Settlement"), under which RIC and Fred were requalified and SG paid a penalty. (St. ¶¶ 71-74).

-6-

In early 2007, the IRS Settlement was complete in principle.  Accordingly, the financial impact of the requalification was factored in the calculation of Levion's bonus. Because Levion and two other "founders of DFP" had been "the main beneficiaries in the past" on RIC and Fred, SG decided that these three should "pay the price for" the requalification. Minutes of a January 9, 2007 meeting reflect management's view that "[s]ince SG is now planning to settle with the IRS, it is in the SG shareholders' interests that these bonus amounts will be re-captured. . . ."  Mr. Taddonio performed a calculation to determine the "success rate" of RIC and Fred — that is, the difference between the tax benefit originally expected and on which DFP was paid, and the actual tax benefit per the IRS Settlement.  The impact on Levion's 2006 bonus "correlated with [] the success of [the RIC and Fred] transactions, taking into account the settlements paid to the IRS," and represented only a "partial" amount of SG's reduced tax benefit on these deals.  (St. ¶¶ 75-81).

**F.      Levion's Claim for Additional Compensation on the TOBP**

Levion's resignation letter demanded — in the alternative to money "improperly deducted" because of the IRS Settlement — that SG "pay [him for] $260 million in tax benefits that the DFP Group generated for SG over the last 5 years" on account of the Tender Option Bond Program ("TOBP"), for which Levion claimed DFP was "not compensated."  Levion included this demand as a separate claim in the Complaint (at ¶¶ 45-47).  Under the TOBP, SG established trusts through which it "convert[ed] . . . long term municipal issuance [bonds] into a short-term money market instrument."  The TOBP's "economic purpose" was "to generate positive cash flows through [] synthetic ownership of fixed rate bonds and financing it on a short-term basis while also generating some [] tax-preferential items."  (St. ¶¶ 84-87).

"One of the elements of [Levion's] compensation related to the impact on [SG's] tax situation as a result of DFP [transactions]," including the TOBP. DFP received "a net revenue gross-up to be credited to the desk in their bonus base calculation" (the "Tax Gross Up"). The Tax Gross Up derived from a "calculation that was made to assess the value of [the TOBP] to SGCIB [and] was an estimation of the [] value that [the TOBP] was bringing to the [] tax return of the bank." Levion conceded that SG had sole discretion "[i]n determining [its] positions" on its tax returns, which formed the basis of the Tax Gross Up. (St. ¶¶ 89, 92-93, 95).

### G.   Levion's Claim for Additional Compensation on NDFs

Levion's Complaint alleges (at ¶¶ 36-39) that DFP's P&L should have received a $400 million credit for several Non-Deliverable Forward ("NDF") transactions executed in the 1990s. Levion's resignation letter made no mention of any money due on the NDFs. (St. ¶ 127).

SG executed one side of the NDFs with a number of different hedge funds (the "Hedge Funds") and the other side as a hedge with its Russian affiliate, Banque Société Générale Vostok ("Vostok"). Levion claims that the respective NDF contracts were "constructed in such a way that the bank could keep money that it otherwise would have to pass through and pay out to the Hedge Funds because of [an] asymmetry in the [manner in which these] respective contracts" were written. The Complaint alleges that management advised Levion that SG would include $400 million in DFP's Net P&L at the conclusion of litigation between SG and the Hedge Funds (the "NDF Litigation"), but instead wrote off the $400 million at the conclusion of the litigation in 2004. Levion contends "had DFP been allowed to execute the documents as written, [SG] would have been in a position to have collected the $400 million. . . . based on the asymmetry between the contracts." (St. ¶¶ 105, 108-13).

-8-

In direct contravention of the allegations in the Complaint, Levion swore out two affidavits during the NDF Litigation in which he did not mention SG's supposed $400 million profit on account of this "asymmetry." To the contrary, he affirmed under oath that the respective contracts were "materially identical" and "placed the same payment restrictions" on the SG-Hedge Funds and SG-Vostok trades. Levion also affirmed that SG's "sole profit" on the NDFs was "small 'spread'" representing a "premium earned for acting as a credit intermediary." SG's contemporaneous accounting of the NDFs reflected only this spread. (St. ¶¶ 106, 115-16, 121-22).

## ARGUMENT

### I.  LEVION'S CONTRACT CLAIMS FAIL BECAUSE OF SG'S DISCRETIONARY BONUS POLICY

It is well-settled law that "[a]n employee's entitlement to a bonus is governed by the terms of the employer's bonus plan." *Hall v. UPS*, 76 N.Y.2d 27, 36 (N.Y. 1990); *see also, e.g., Kaplan v. Capital Co. of Am.*, 298 A.D.2d 110, 111 (1st Dep't 2002) ("Given the clearly expressed [discretionary bonus] policy of the company . . . plaintiff has no sustainable claim that defendant company entered into an enforceable agreement entitling him to bonus compensation."). As set forth above (at p. 4), SG's bonus policy provides that "[p]erformance bonuses are discretionary" and "[s]enior management decides each year whether to pay bonuses and, if so, how much is available." (St. ¶ 17). Levion has cited no language in the DFP Formula or anywhere else exempting him from this discretionary policy for the years in dispute and his breach of contract claims therefore fail as a matter of law.[2]

---

[2]   Any allegedly owed compensation could not predate June 24, 2003 in light of the applicable six year statute of limitations. *See* N.Y. C.P.L.R. § 213(2).

Nor can Levion successfully rely on the conduct of the parties to show that he had any implied right to receive a bonus because the evidence confirms its discretionary nature. Mr. Mustier testified that absent a clear "legal commitment" to pay a "minimum guaranteed bonus" to an individual employee, the allocation of bonus awards was within the "pure discretion" of management. (St. ¶ 25). The evidence shows that Levion had such a "legal commitment" for a "minimum guaranteed bonus" as a newly hired employee based on his offer letter, which provided for "a Bonus for 1990 performance, payable in early 1991 of not less than $100,000." (St. ¶ 2). Levion had no similar guarantee for other years. His reliance on the DFP Formula as support for his entitlement to a bonus is misplaced. As more fully discussed below (at pp. 12-13), read in a light most favorable to Levion, the DFP Formula at best provided him a minimum guaranteed bonus for 1994-95. Further, as explained above (at p. 4) SG's local formulas were guidelines for the calculation of bonus *pools* of groups within DEFI Americas. (*See also* St. ¶¶ 19-25). This is distinct from the process of allocating bonuses from those pools to individual employees, which is governed by SG's discretionary bonus policy.

This case has parallels to *Ferrand v. Credit Lyonnais*, No. 2 Civ. 5191 (VM), 2003 WL 22251313 at *1 (S.D.N.Y. Sept. 30, 2003). There the plaintiff received bonuses of $875,000 for 1998 and $750,000 for 1999. When she received a $50,000 bonus in 2000, she alleged an implied-in-fact contractual bonus claim. The court awarded summary judgment to the employer, principally because its bonus policy vested management with discretion over bonus determinations. *Id.* at *12. The court found it irrelevant that the policy was published in an Employee Handbook, noting that "the non-contractual nature of a handbook does not render inapplicable an employer's policy of giving bonuses on a discretionary basis in determining whether it is feasible that an implicit course of conduct of nondiscretionary, nonforfeitable bonus

-10-

allotment existed." *Id.* at *13.  Like here, "the discretionary nature of the bonuses paid" to the employee was "clearly set forth in both the Employee Handbook" and underscored by "the fact that there [were] two means of earning [bonuses] at the Bank, through a guaranteed bonus and an explicitly discretionary bonus." *Id.* at *12.  Yet another similarity was that the plaintiff's offer letter, like Levion's, provided a minimum guaranteed bonus for the first year of employment. *Id.* at *1.  The court observed that the fact the plaintiff "did have a contractual right to a guaranteed bonus" in 1998, rendered her claim for an implied contractual right to a larger bonus in subsequent years "even more specious." *Id.* at *13.  The same is true here.

> In addition to foreclosing Levion's complaints about the amounts of bonuses already received, SG's discretionary bonus policy renders his claim for a 2007 pro rata bonus untenable.  The policy contains no provision for pro rata bonuses, which are not paid by SG. Rather, it states that to receive an annual bonus, an employee "must be employed by SG on the day it's paid and not have given notice of a pending resignation." (St. ¶ 17).  The DFP Formula does not contain any provision deviating from this policy.  (St. ¶¶ 54-55).  Indeed, Levion acknowledged that he never paid anyone in DFP "a partial bonus based on a pro rata percentage of profits for a year when they left the bank." (St. ¶ 57).  Apart from the terms of a deferred compensation arrangement that is not at issue in this litigation, Levion conceded that he knows of "no written document" that provided for payments to be made to him following the separation of his employment with SG. (St. ¶ 56).  Further, his Compensation Advices make clear that he was required to be employed as a condition of receipt of his bonus. (St. ¶ 52).  He has no contractual right to any 2007 bonus payment, pro rata or otherwise.[3]

---

[3]     In any event, SG incurred significant losses in 2007 and it is undisputed that DFP's Net P&L was negative and its bonus pool zero that year.  Bonuses were awarded to certain

-11-

In the face of SG's discretionary bonus policy and Levion's failure to adduce any evidence that he had a bonus guarantee for the relevant years, SG should be awarded summary judgment on his breach of contract claims.

## II.    LEVION'S CONTRACT CLAIMS FAIL BECAUSE HE IS AN AT-WILL EMPLOYEE

It is established under New York law that "unless the duration of an employment contract is set forth explicitly, the employment is at-will and can be terminated by either party at any time." *Int'l Paper Co. v. Suwyn,* 951 F. Supp. 445, 448 (S.D.N.Y. 1997) (citations omitted); *see also Arrouet v. Brown Bros. Harriman & Co.,* No. 02 Civ. 9061 (TPG), 2005 WL 646111, at *4 (S.D.N.Y. Mar. 18, 2005) ("An employee is an at-will employee if the employment contract does not establish a fixed duration."); *Frishberg v. Esprit de Corp.,* 778 F. Supp. 793, 801 (S.D.N.Y. 1991) (citation omitted) (where letter agreement did "not contain a term or duration of employment . . . the relationship it established is one of indefinite duration, and is therefore terminable at will."). The DFP Formula contains no unexpired durational element, and as such Levion was an at-will employee. Under settled principles of at will employment, his breach of contract claims fail.

The uncontested evidence demonstrates that Levion does not have an employment contract of fixed duration. At best, Levion could contend his employment was fixed for his first year of employment because his offer letter provided guaranteed compensation for 1990 (St. ¶ 2), and for years 1994-95 based on Section II.E of the DFP Formula providing he would "receive

DFP employees who had been provided written bonus guarantees following Levion's departure. (St. ¶¶ 58-60). Because he had no such guarantee, Levion could not have been expected to have received a 2007 bonus had he remained employed by SG.

25% of the amounts given by the preceding formulas, plus any additional discretionary amount, for 1994 and 1995" (St. ¶ 38). The plain and unambiguous terms of the offer letter and DFP Formula show that they expired and no longer govern Levion's employment relationship, rendering it at-will.[4] *E.g.*, *Grieve v. Barclays Capital Sec. Ltd.*, No. 602820/1998, 1999 WL 1680654, at *2 (N.Y. Sup. Ct. Sept. 10, 1999) (employee deemed at-will where original contract expired and no new contract was signed). Moreover, Levion denied that Section II.E of the DFP Formula contains a fixed durational term and instead took the position that it applied indefinitely — for "the rest of [his] time" with SG. (St. ¶¶ 40-41). This testimony makes even clearer that Levion is an at-will employee because he did not have an employment contract of fixed duration.

"The hallmark of an employment-at-will relationship is that the employer is 'free to modify the terms of the [employee's] employment, subject only to [the employee's] right to leave his employment if he found the new terms unacceptable.'" *Int'l Paper Co.*, 951 F. Supp. at

---

[4]   That Levion and SG contemplated executing subsequent written contracts confirms that these prior agreements had expired. For example, in 2004 Levion attempted "to try to put into standard-looking text part of [DFP's] agreement" with respect to compensation, but ultimately that "exercise [] was abandoned." Levion also conceded that he discussed with Mr. Taddonio entering into a compensation agreement around 2004, and even reviewed a draft agreement, but none was executed. (St. ¶¶ 48-49). If the DFP Formula had not expired, there would be no need to consider executing such agreements.

-13-

448.[5]   Levion admitted that his compensation arrangements with SG were not fixed in accordance with the DFP Formula and regularly were "modified over the course of [his] employment." (St. ¶¶ 42-43). According to Levion, "over the course of time the contract evolved as [DFP's] business evolved," and he had "the ability to have discussions with the bank of [DFP's] evolving business and the appropriate way that [DFP's] overall compensation agreement would apply to that evolving business." (St. ¶¶ 44-45). Levion further testified that his "contract is written and was implemented" in a manner "to encompass a business that at its founding was based on the idea of an evolving market and evolving instruments and an evolving business plan." (St. ¶ 46). Levion even complained in 2003 about modifications to DFP's "compensation system" that had been "imposed" by management and threatened to resign because of those unilateral changes, but chose not to do so. (St. ¶ 47). This evidence is consistent with an at-will rather than a contractual relationship. By continuing his employment with SG, Levion is "deemed to have assented to [these] modification[s]." *Bottini v. Lewis & Judge Co.,* 211 A.D.2d 1006, 1008 (3d Dep't 1995). *See also, e.g., Arrouet,* 2005 WL 646111, at *4.

Critically, by accepting a bonus and not terminating his employment in each of the years in which he now contends he was undercompensated, Levion is deemed to have consented to the compensation he received and cannot now sustain his breach of contract claims as a matter of law. For example, in *Giannone v. Deutsche Bank Secs., Inc.,* 392 F. Supp. 2d 576

---

[5]   This basic precept of law is consistent with Mr. Mustier's testimony that SG's local formulas, including the DFP Formula, were not "legally binding" and could be modified at management's sole discretion. (St. ¶¶ 23-24).

-14-

(S.D.N.Y. 2005), the plaintiff — an at-will employee who was terminated in 2002 — sought to pursue a bonus claim for what was alleged to be an insufficient 1999 bonus. The court rebuffed her claim, holding that "[b]ecause [she] remained in Defendant's employ after receiving a reduced bonus for 1999, she ratified the $175,000 bonus and forfeited her ability to pursue a breach of contract claim." *Id.* at 593. *See also Frishberg*, 778 F. Supp. at 802-03 (rejecting claims that employer's "periodic reductions in [his] commission rate and its removal of two large accounts from his portfolio constituted a breach of the terms of his [written] contract, which set a commission rate and the boundaries of his sales territory"; "since it is undisputed that [employee] remained at [employer] after each of the pre-1989 alterations he complains of, he ratified those changes as a matter of law and there was no breach of contract."); *Bottini*, 211 A.D.2d at 1006 (affirming award of summary judgment for employer against employee who resigned and brought action seeking additional past commission based on written employment contract; "because the . . . contract did not establish a fixed duration, plaintiff's employment relationship was a hiring at will, terminable at any time by either party . . . Having remained in defendant's employment, . . . plaintiff is deemed to have assented to the modification" to employer's unilateral reductions to commission rate provided in his written employment agreement).

### III.   LEVION'S CONTRACT CLAIMS FAIL BECAUSE SG HAD DISCRETION TO DECIDE NET P&L UNDER THE DFP FORMULA

Even if the DFP Formula modified the terms of SG's discretionary bonus policy or changed Levion's at-will employment status, neither of which is the case, summary judgment still should be granted to SG. The local formula used to calculate DFP's compensation pool consistently applied "a range of percentages that could be applied to [a] bonus base" in order to arrive at the group bonus pool. (St. ¶ 21). The DFP Formula references this base as "Net P&L," which is stated to be defined "per the attached spread sheet and the following rules." (St. ¶¶ 30-

31).  No such spreadsheet or rules are contained in the DFP Formula, however, rendering the definition of "Net P&L" ambiguous.  On summary judgment, "[a] court may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary."  *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157-58 (2d Cir. 2000).  *See also MSF Holding Ltd. v. Fiduciary Trust Co. Int'l*, 435 F. Supp. 2d 285, 302-03 (S.D.N.Y. 2006) (awarding summary judgment for defendant where extrinsic evidence, including plaintiff's admissions, was so one-sided as to dispel genuine dispute of fact concerning meaning of ambiguous term in contract).

Here, the uncontested evidence shows that the bonus base was determined each year through a process of negotiation between DFP and SG, and Levion conceded that "in instances where there was an irresolvable dispute," SG "had final say" over the calculation of Net P&L.  (St. ¶¶ 36-37).  Thus, by Levion's own admission, SG had discretion over both DFP's bonus pool and his compensation because the percentages contained in the DFP Formula all were applied to Net P&L.  Levion does not allege that SG failed to apply the specified percentages set forth in the DFP Formula.  His dispute is instead that SG failed to properly account for certain DFP transactions in the calculation of the bonus base itself.  But the DFP Formula does not contain any provisions specifically addressed to these transactions, and Levion's concession that SG had ultimate discretion over the calculation of Net P&L is fatal to his breach of contract claims.  "An employee cannot establish that an employer breached a contract to pay a particular amount of bonus compensation where the employer retains discretion regarding the amount of bonus compensation to be awarded."  *Arrouet*, 2005 WL 646111, at *4 (holding that "[e]ven if plaintiff could prove that his end-of-year compensation was to be based on a formula, [because]

-16-

plaintiff has conceded that his supervisors possessed the discretion to reduce his end-of-year compensation. . . . Defendant did not breach plaintiff's employment contract . . . .").

Undisputed facts concerning the transactions for which Levion complains he is owed additional money further demonstrate why SG should be awarded summary judgment:

### A.     The RIC and Fred Transactions

Apart from the absence of any reference to RIC or Fred in the DFP Formula (St. ¶¶ 63; 67), the evidence shows these deals were not intended to be included in the routine calculation of Net P&L under the DFP Formula. Levion conceded that he "was stupid for not negotiating [DFP's] compensation prior to execution of the [RIC] trade," and that Fred was a "special project," the remuneration for which would be subject to negotiation on a "case by case basis." (St. ¶¶ 64; 68). Levion even wrote, "perhaps we need to have a written compensation contract in place prior to the execution of the second part" of Fred, but never executed one. (St. ¶ 69). In any event, based on Levion's testimony that SG had final discretion to determine Net P&L, SG could account for losses to be incurred as a result of the IRS Settlement. As explained above (at p. 7), the impact on Levion's compensation correlated to the losses that SG expected to incur. Levion conceded that he does not have information to contest the accuracy of the relationship between his reduction in pay and the losses sustained by SG from the IRS Settlement. (St. ¶ 82).

### B.     The TOBP

Levion's testimony makes clear that the DFP Formula did not govern his compensation on the TOBP. The document does not mention the TOBP (St. ¶ 88) and the 25% contemplated in Section II.E to be used in determining Levion's pay was not used for his TOBP compensation; rather, he testified that at least for some years a 40% figure was used (St. ¶ 91).

-17-

He also conceded that "there were modifications over time with respect to how [he] received compensation that was attributed to the TOBP." (St. ¶ 90).

The uncontradicted evidence shows that DFP's Tax Gross Up was predicated on SG's positions on its tax returns, as determined in its business judgment. Levion disagreed with SG's method of evaluating "tax-sensitive transactions" for P&L purposes, and maintained that "how aggressive or unaggressive the bank wanted to be with regard to how it filed its taxes should not have an impact on . . . [DFP's] compensation." (St. ¶¶ 96-97). But Levion points to no evidence to establish that he had any right to dictate the way in which SG determined tax savings derived from the TOBP or how the Tax Gross Up should be calculated, and he had no such right.[6]  Further, he conceded that SG had sole discretion "[i]n determining the positions" that it would take on its tax returns subject only to whether or not the IRS agreed. (St. ¶ 94). Thus, not only did SG have ultimate discretion of DFP's overall Net P&L, it also specifically had discretion to calculate DFP's Tax Gross Up.

Finally, Levion's theory of underpayment on the TOBP is discredited by undisputed facts.  Levion contends that by DFP's calculation, the TOBP generated over $231 million in tax benefits that SG claimed were not used and for which DFP was not paid. He theorizes that SG "overstated its deductions significantly" on its returns by improperly taking "extremely large tax deductions" under Treasury Regulation 864 ("R.864") and that SG, by taking "those extremely large deductions . . . claimed that it was not using the benefits generated

---

[6]    As noted above (at pp. 14-15), by remaining in SG's employ Levion was deemed to consent to its calculations of compensation owed on the TOBP.  He also expressly consented to those calculations during the Net P&L reconciliation process. (St. ¶ 94).

under the [TOBP] program." (St. ¶¶ 98-99). However, there can be no genuine fact dispute that the IRS closed these tax years without any material "disagreement or disallowance" concerning SG's "exclusion of income under [R.]864," with the exception of one particular transaction that yielded a "successful conclusion for SG." (St. ¶ 100). Levion's own tax expert, David Rosenbloom, testified that it is "inconceivable … the IRS would look at a particular manifestation of a general issue [here, R.864 as applied to one transaction] and not consider that issue in other contexts," and that any issue of whether SG should have accounted for certain transactions differently under R.864 is "settled by the conclusion of the audit[s]." (St. ¶¶ 102-03). In short, the IRS endorsed SG's interpretation of R.864, rendering Levion's theory of underpayment untenable even if he had a right to dictate how Tax Gross Up was calculated, which he did not. As Dr. Rosenbloom testified, "[o]nce tax years are closed, they're closed."[7] (St. ¶ 103).

C.    **The NDF Transactions**

Levion does not have any writing reflecting a supposed representation by management that DFP's P&L would be credited with $400 million at the conclusion of the NDF Litigation. (St. ¶¶ 123-24). He also could not recall any meeting at SG in which he claimed entitlement to $400 million on account of the NDFs. Nor do Messrs. Mustier and Taddonio have a recollection of Levion asserting a right to further compensation on the NDFs. (St. ¶¶ 125-26). Other than Levion's bald assertion, there is no evidence that he is owed money on the NDFs, and

---

[7]    Levion cannot dispute these facts since he conceded he does not know whether or not the IRS questioned SG's interpretation and application of R.864 on its tax returns, or whether an agreement was reached between SG and the IRS concerning R.864. (St. ¶ 101).

summary judgment should be awarded to SG. *See Jeffreys v. City of N.Y.*, 426 F.3d 549, 551 (2d Cir. 2005) ("[W]here [plaintiff] relied almost exclusively on his own testimony[,] the District Court did not err in concluding, in the course of determining whether there were any 'genuine issues of material fact,' that no reasonable jury could have credited [plaintiff's] testimony.")

Apart from this, an analysis of the NDFs and Levion's sworn admissions in the NDF Litigation shows that SG was not owed $400 million on those transactions. The NDFs are comprised of an industry-standard International Swap Dealers Association Master Agreement — executed between SG and the Hedge Funds and between SG and Vostok, respectively — and separate "Confirmations" for each individual transaction. (collectively, the "NDF Contracts"). The NDF Contracts with the Hedge Funds were structured to reflect that SG's obligation, if any, to pay them would be contingent upon SG's ability to obtain payment from Vostok in the event of a major market disruption. The Complaint alleges (at ¶¶ 38-39) that SG's contract with Vostok "did not include the same carve-out for a major market disruption" as the contract with the Hedge Funds, so that when such a disruption occurred, Vostok "was contractually obligated to pay [SG] approximately $400 million." Because of this supposed asymmetry in the contracts, Levion asserts that SG was not contractually obligated to pay the Hedge Funds this $400 million. (St. ¶¶ 107-12). Contrary to these allegations, the NDF Contracts show and Levion affirmed that the Confirmations between SG and the Hedge Funds were "*materially identical*" to those between SG and Vostok, and "*placed the same payment restrictions*" on the SG-Hedge Fund trades that existed on the SG-Vostok trades. (St. ¶¶ 115-16) (emphasis added).

The Confirmations contained defined terms — collectively known as "Disruption Events" — including a "Non-Transferability Event," an "Inconvertibility Event," and a "Nationalization Event." Political events in Russia in the late 1990s triggered these Disruption

-20-

Events provisions. SG first declared a Non-Transferability Event in August 1998, and thereafter determined that both an Inconvertibility Event and a Nationalization Event also had occurred.[8] Under the Confirmations, "[u]pon the occurrence of a 'Disruption Event' due to an 'Inconvertibility Event' or a 'Nationalization Event,' an 'Additional Termination Event' shall have occurred." Levion affirmed that upon the occurrence of the Additional Termination Event, SG could "account for its losses from related hedges when determining its payment obligations," and that "SG's obligation to the Hedge Funds was zero or close to zero, *because SG's losses from its hedge transactions with Vostok were approximately identical to its obligations to [the Hedge Funds]*." Further, Levion affirmed that "upon the occurrence of a Nationalization Event, Vostok's [payment] obligation . . . 'shall be subject to the ability of such party to access its assets" and "*[i]f Vostok cannot access sufficient assets, its obligation to pay SG was cancelled* . . . [and] SG's obligation to [the Hedge Funds] would be zero." (St. ¶¶ 117-22) (emphasis added).

The NDF Contracts and Levion's sworn affidavits belie his allegation that a contractual "asymmetry" resulted in a $400 million windfall to SG. Instead, Levion averred that because the contracts were "materially identical," Vostok owed "zero or close to zero" to SG under the NDF Contracts, just as SG owed "zero or close to zero" to the Hedge Funds. These admissions defeat the NDF claim even if there otherwise was any genuine evidence of an agreement to credit DFP's Net P&L at the conclusion of the NDF Litigation, which there is not.

---

[8]   It would not have been "valid for [SG] to have declared a Disruption Event only with respect to [its] obligations to the Hedge Funds but not with respect to Vostok." (St. ¶ 119).

-21-

## IV.    LEVION'S NEW YORK LABOR LAW CLAIMS FAIL BECAUSE HIS BONUS DID NOT CONSTITUTE WAGES

It is axiomatic that discretionary bonus payments that are "contingent and dependent, at least in part, on the financial success of the business enterprise," and based on factors "outside the scope of the employee's actual work," are not "wages" within the meaning of New York Labor Law § 193. *Truelove v. Northeast Capital & Advisory, Inc.*, 95 N.Y.2d 220, 223-25 (N.Y. 2000). *See also, e.g., Broyles v. J.P. Morgan Chase & Co.*, No. 08 Civ. 339 (WHP), 2010 WL 815123, at *4 (S.D.N.Y. Mar. 8, 2010) (granting summary judgment on New York Labor Law claim where evidence showed "any incentive award [was] left to discretion of JPMorgan"). As discussed above (at p. 4), the calculation of Levion's bonus was within SG's sole discretion. Further, his bonus was predicated on SG's earnings and DFP's Net P&L, not merely his performance, and was therefore "outside the scope of [his] actual work." *See, e.g., Tischmann v. ITT/Sheraton Corp.*, 882 F. Supp. 1358, 1370 (S.D.N.Y. 1995) (awarding summary judgment to employer where discretionary bonuses were based on "both achievement of your own individual objectives and contribution as a team member toward overall [employer] objectives"). Levion accordingly has no viable claims under the New York Labor Law.

We anticipate that Levion will contend that his RIC and Fred claim concerns "wages" under the Labor Law because he already received bonuses for these deals. That argument is unavailing. Levion was not required to return any money. Rather, SG used its discretion to account for future losses related to these deals under the IRS Settlement. Levion admits that his RIC and Fred claim is not for bonuses "already earned and *paid*," but rather "already earned and *approved*." (St. ¶ 83). Any assertion that he is entitled to receive the sum that Mr. Taddonio allegedly communicated to him in 2007 and then reduced, even if true, fails as a matter of law. *Truelove*, 95 N.Y.2d at 223-24 (where employer announced bonus amount of

-22-

$160,000 and paid first installment of $40,000, remaining three bonus installments not deemed "wages" under Labor Law).[9]  Levion's New York Labor Law claims should be dismissed.

## V.  LEVION'S CLAIMS FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AND UNJUST ENRICHMENT FAIL AS A MATTER OF LAW

"[A] claim of breach of the implied covenant of good faith and fair dealing based on the same facts as a breach of contract claim asserted in the same complaint is redundant and must be dismissed . . . " *Aledia v. HSH NordbankAG,* No. 08 Civ. 4342, 2009 WL 855951, at *4 (S.D.N.Y. Mar. 25, 2009).  Levion's breach of implied covenant claim (Compl. ¶¶ 91-94) should be dismissed because it does not add any new allegations, but merely "repeats and realleges" the factual support for his breach of contract claims.  *See JPMorgan Chase Bank, N.A.. v. IDW Group, LLC,* No. 08 Civ. 9116 (PGG), 2009 WL 321222, at *6 (S.D.N.Y. Feb. 9, 2009) (dismissing implied covenant claim that merely "restates [the] allegations" of contract claim).  Further, where the requested relief is "'intrinsically tied to the damages allegedly resulting from [the] breach of contract,' there is no separate and distinct wrong that would give rise to an independent claim" for breach of an implied covenant.  *Ferrari v. Keybank Nat'l Ass'n,* No. 06-cv-6525, 2009 WL 35330, at *10 (W.D.N.Y. Jan. 5, 2009) (quoting *Alter v. Bogoricin,* No. 97 Civ. 0662 (NBM), 1997 WL 691332 at *8 (S.D.N.Y. Nov. 6, 1997)) (dismissing implied

---

[9]  Levion's breach of contract claim predicated on these same facts is equally unavailing. *See Hall,* 76 N.Y.2d at 36-37 (1990) (rejecting contract claim because, "although plaintiff had been approved for" and informed of bonus payment amount, "employer retained the right not to make any such payment").

covenant claim where plaintiff sought "identical" relief ("unpaid incentive compensation") as for contract claim). Here, Levion likewise improperly seeks identical relief.

Moreover, as set forth above (at pp. 12-13), Levion was an at-will employee, and "well-settled New York law holds that no implied obligation of good faith and fair dealing attaches to at-will employment contracts." *Nunez v. A-T Fin. Info., Inc.*, 957 F. Supp. 438, 443 (S.D.N.Y. 1997) (rejecting view that implied covenant is present with respect to issues other than termination of at-will relationship because "[t]o impose such an obligation with respect to issues other than discharge would be equally inconsistent with the employer's unrestricted right of termination."). *See also Barker v. Time Warner Cable, Inc.*, No. 016438/08, 2009 WL 1957740, at *6 (N.Y. Sup. Ct. Jul. 1, 2009) (dismissing implied covenant claim relating to at-will employee's commission and bonus payments because "no covenant of good faith and fair dealing is implied to any aspect of Plaintiff's relationship with the Defendants").[10]

Finally, "[i]t is a well-settled principle of New York law that quasi-contract claims such as . . . unjust enrichment ordinarily are not available where there is a valid agreement between the parties covering the same subject matter." *Allen v. J.P. Morgan Chase & Co.*, No. 06 Civ. 8712 (JYK), 2009 WL 857555, at *15 (S.D.N.Y. Mar. 31, 2009). Here, SG's written bonus policy precludes Levion's unjust enrichment claim, as does the DFP Formula to the extent

---

[10]   In any event, an implied covenant does not "undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract." *M/A-Com Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990). There is no evidence from which a reasonable jury could conclude that in calculating Net P&L, SG did anything other than act in its and its shareholders' interests.

it is considered a valid "Contract." *See, e.g., DeSantis v. Deutsche Bank Trust Co. Am.*, 501 F. Supp. 2d 593, 601 (S.D.N.Y. 2007) ("Given the express language of the Bank's bonus policy and [plaintiff's] lack of a contractual right to a bonus, [plaintiff] has not established an issue of material fact with respect to his quasi-contract claims.").[11]

## CONCLUSION

SG respectfully requests that the Complaint be dismissed, with prejudice.

Dated:   New York, New York
         October 19, 2010

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By: _____
Kevin B. Leblang
Norman C. Simon
Jade A. Burns

Attorneys for Defendant Société Générale

---

[11] This claim also fails because Levion has not shown that the excess of $30 million he received between 2003 and his resignation (St. at Exh. 10A) was inadequate compensation for "the reasonable value of his service" to SG. *See Zaitsev v. Salomon Bros.*, No. 92 Civ. 9394 (LLS), 1994 WL 361463, at *4 (S.D.N.Y. Jul. 8, 1994) (dismissing unjust enrichment claim on summary judgment where plaintiff "provide[d] no evidence from which a reasonable jury could conclude that his $100,000 salary did not constitute the reasonable value of his service as a senior consultant/trader").