Thomas E. L. Dewey (TD-6243)
Keara A. Bergin (KB-0831)
Ariel P. Cannon (AC-5082)
DEWEY PEGNO & KRAMARSKY LLP
220 East 42nd Street
New York, NY 10017
(212) 943-9000
*Attorneys for Plaintiff Martin Levion*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARTIN LEVION,

                            Plaintiff,

            - against –                                        No. 09 Civ. 5800 (RJS)

SOCIETE GENERALE,

                            Defendant.

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT OF HIS MOTION TO STRIKE**

## TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................... iii

Preliminary Statement ........................................................................ 1

Summary of Material Facts .................................................................. 2

    A.    The DFP Group .......................................................... 2

    B.    Levion's Compensation Structure .............................. 2

    C.    SG's Efforts to "Break DFP" ..................................... 4

        1.    The NDF Transactions ................................... 4

        2.    The TOBP Program ....................................... 6

        3.    The RIC and Fred Trades .............................. 7

    D.    Levion's Departure and the Collapse of DFP ............. 8

Argument ........................................................................................... 10

I.     SUMMARY JUDGMENT STANDARD ................................. 10

II.    LEVION HAD A CONTRACT WHICH SG BREACHED ....... 10

III.   SG'S EFFORTS TO JUSTIFY ITS BREACHES FAIL .......... 13

    A.    SG's Purported "Bonus Policy" Does Not Preclude Levion's Claims ................. 13

    B.    The At-Will Employment Doctrine Does Not Preclude Levion's Claims ........................................................ 15

    C.    SG Did Not Have Discretion to Determine the Net P&L ..... 17

        1.    Confiscation of 2006 Bonus Payment ........... 19

        2.    The NDF Claim .............................................. 20

        3.    The TOBP Claim ............................................ 21

        4.    The 2007 Compensation Claim ..................... 22

i

*Page*

IV.   LEVION'S LABOR LAW CLAIMS SHOULD NOT BE DISMISSED..........................24

V.    LEVION'S UNJUST ENRICHMENT AND IMPLIED COVENANT
      CLAIMS SHOULD NOT BE DISMISSED........................................................................24

VI.   SG SHOULD BE PRECLUDED FROM RELYING ON A PURPORTED
      WRITTEN BONUS POLICY......................................................................................25

      A.    The Screen Shot Was Responsive to Plaintiff's Document Requests
            and Should Have Been Produced..............................................................26

      B.    SG's Failure to Produce the Screen Shot Was Not Substantially
            Justified................................................................................................27

      C.    Levion Was Prejudiced By SG's Withholding Tactic ...........................28

      D.    The Four Factors Mandate Preclusion ................................................29

Conclusion .......................................................................................................30

## TABLE OF AUTHORITIES

*Cases*                                                                                  *Page(s)*

*A.H.A. Gen. Constr., Inc. v. N.Y. City Housing Auth.,*
    92 N.Y.2d 20, 677 N.Y.S.2d 9 (N.Y. 1998) ......................................................23

*Barry v. Liddle, O'Connor, Finkelstein & Robinson,*
    98 F.3d 36 (2d Cir. 1996)................................................................................15

*Beacon Enters., Inc. v. Menzies,*
    715 F.2d 757 (2d Cir. 1983)..........................................................................10

*Carol B. v. Sanford B.,*
    54 A.D.3d 653, 865 N.Y.S.2d 194 (1st Dep't 2008) ......................................12

*Chase Manhattan Bank, N.A. v. Keystone Distrib., Inc.,*
    873 F. Supp. 808 (S.D.N.Y. 1994) ................................................................25

*Contrast Soto v. Federal Express Corp.,*
    No. 06-cv-5413, 2008 WL 305017 (E.D.N.Y. Feb. 1, 2008) ...........................13

*Culver v. Merrill Lynch & Co., Inc.,*
    No. 94 Civ. 8124 (LBS), 1995 WL 422203 (S.D.N.Y. July 17, 1995) .............15

*Currier v. United Technologies, Corp.,*
    No. Civ. 02-107-PH, 2003 WL 22799669 (D. Me. Nov. 21, 2003) ..................29

*Curtis Properties Corp. v. Greif Cos.,*
    236 A.D.2d 237, 653 N.Y.S.2d 569 (1st Dep't 1997) ......................................25

*Cutlass Prods. Inc. v. Bregman,*
    682 F.2d 323 (2d Cir. 1982)..........................................................................13

*Design Strategies, Inc. v. Davis,*
    228 F.R.D. 210 (S.D.N.Y. 2005) ...................................................................27

*Dreyfuss v. eTelecare Global Solutions-US, Inc.,*
    No. 08 Civ. 1115 (RJS), 2010 WL 4058143 (S.D.N.Y. Sept. 30, 2010).....................11, 16

*Enercomp, Inc. v. McCorhill Publ'g, Inc.,*
    873 F.2d 536 (2d Cir. 1989)..........................................................................10

*Ferrand v. Credit Lyonnais,*
    No. 02 Civ. 5191 (VM), 2003 WL 22251313 (S.D.N.Y. Sept. 30, 2003).........................15

*Cases*                                                                                      *Page(s)*

*Fiorenti v. Central Emergency Physicians, P.L.L.C.,*
    187 Misc. 2d 805, 723 N.Y.S.2d 851 (N.Y. Sup. Ct. Nassau Co. 2001)..........................24

*Foster v. Kovner,*
    44 A.D.3d 23, 840 N.Y.S.2d 328 (1st Dep't 2007) ..........................................................25

*Gallegos v. Top RX, Inc.,*
    No. 04-CV-773A, 2008 WL 4279526 (W.D.N.Y. Sept. 15, 2008) ............................11, 21

*Gebhardt v. Time Warner Entm't-Advance/Newhouse,*
    726 N.Y.S.2d 534 (4th Dep't 2001)...................................................................................16

*Gerlach v. The Horn & Hardart Co.,*
    683 F. Supp. 342 (S.D.N.Y. 1988) ...................................................................................18

*Giannone v. Deutsche Bank Secs., Inc.,*
    392 F. Supp. 2d 576 (S.D.N.Y. 2005)...............................................................................16

*Giannullo v. City of New York,*
    322 F.3d 139 (2d Cir. 2003)...............................................................................................10

*GPA Inc. v. Liggett Group Inc.,*
    No. 94 Civ. 5735 (AGS),1996 WL 337288 (S.D.N.Y. June 18, 1996) ..............................18

*Gualandi v. Adams,*
    385 F.3d 236 (2d Cir. 2004)...............................................................................................18

*Guggenheimer v. Bernstein Litowitz Berger & Grossman LLP,*
    11 Misc. 3d 926, 810 N.Y.S.2d 880 (Sup. Ct. N.Y. Co. 2006) .........................................12

*Heyman v. Commerce & Indus. Ins. Co.,*
    524 F.2d 1317 (2d Cir. 1975)............................................................................................10

*India.com, Inc. v. Dalal,*
    No. 07-09440-cv, 2009 WL 1119612 (2d Cir. Apr. 28, 2009)..........................................25

*Knowlton v. Viktron Ltd. P'ship,*
    994 F. Supp. 128 (E.D.N.Y. 1998) ...................................................................................17

*Knudsen v. Quebecor Printing (U.S.A.) Inc.,*
    792 F. Supp. 234 (S.D.N.Y. 1992) ...................................................................................25

*Ladau v. Hillier Group, Inc.,*
    No. 02 Civ. 4703 (LAP), 2004 WL 691520 (S.D.N.Y. Mar. 31, 2004) ............................19

*Cases*                                                                              *Page(s)*

Lesser v. Wildwood,
    No. 01 Civ. 4209 (RWS), 2003 WL 22228757 (S.D.N.Y. Sept. 29, 2003)......................27

Lion Foods Ltd. v. Daarnhouwer (New York) Inc.,
    654 F. Supp. 79 (S.D.N.Y. 1987) .................................................................................10

McPherson v. Coombe,
    174 F.3d 276 (2d Cir. 1999).........................................................................................10

Mirchel v. RMJ Secs. Corp.,
    205 A.D.2d 388 (1st Dep't 1994) ................................................................................12

Nosal v. Granite Park LLC,
    No. 07 Civ. 1977 (FM), 2010 WL 3257912 (S.D.N.Y. July 2, 2010) ...............................29

Rabus v. Silentradio,
    No. 90 Civ. 5037 (JFK), 1992 WL 84586 (S.D.N.Y. Apr. 13, 1992)...............................23

Randolph Equities, LLC v. Carbon Capital, Inc.,
    648 F. Supp. 2d 507 (S.D.N.Y. 2009)...........................................................................17

Reichenheim v. Sotheby's, Inc.,
    No. 91 Civ. 5787 (MBM), 1993 WL 330462 (S.D.N.Y. Aug. 24, 1993).........................19

Reilly v. Natwest Markets Group, Inc.,
    181 F.3d 253 (2d Cir. 1999).........................................................................................15

Ronan Assocs., Inc. v. Local 94-94A-94B, Int'l Union of Operating Eng'rs, AFL-CIO,
    24 F.3d 447 (2d Cir. 1994)...........................................................................................12

Schutty v. Pino,
    No. 95 CIV. 1526 (LMM), 1997 WL 363812 (S.D.N.Y. July 1, 1997) ...........................24

Spanos v. Skouras Theatres Corp.,
    364 F.2d 161 (2d Cir. 1966).........................................................................................23

Texas Instruments Inc. v. Powerchip Semiconductor Corp.,
    No. 06 Civ. 2305 (SHS)(RLE), 2007 WL 1541010 (S.D.N.Y. May 24, 2007)................27

Truelove v. Northeast Capital & Advisory, Inc.,
    95 N.Y.2d 220, 715 N.Y.S.2d 366 (N.Y. 2000) ..........................................................24

Wakefield v. Northern Telecom, Inc.,
    769 F.2d 109 (2d Cir. 1985).........................................................................................25

*Cases*                                                                                                  *Page(s)*

*Weiner v. Diebold Group, Inc.*,
    173 A.D.2d 166, 568 N.Y.S.2d 959 (1st Dep't 1991) ......................................................20

*Xu v. J.P. Morgan Chase & Co.*,
    No. 01 Civ. 8686 (WHP), 2003 U.S. Dist. LEXIS 27894 (S.D.N.Y. Sept. 24, 2003).......13


*Statutes & Other Authorities*

Fed. R. Civ. P. 16............................................................................................................................25

Fed. R. Civ. P. 37.......................................................................................................................25, 27

## **Preliminary Statement**

To an astonishing degree, Societe Generale's ("SG's") summary judgment motion simply ignores the avalanche of evidence that plaintiff Martin Levion ("Levion") had a compensation agreement which SG breached. On this record, if any party is entitled to summary judgment, it is Levion.

SG's central claim is that Levion had no compensation agreement. (Memorandum of Law in Support of Defendant Societe Generale's Motion for Summary Judgment ("SG Br.") 1 (asserting that Levion had no "right to a recurring, nondiscretionary bonus").) Yet *every* SG senior executive with direct oversight of Levion repeatedly recognized, from 1994 through 2006, *both* SG's "compensation agreement with Martin Levion" and that Levion's compensation was a "minimum" that was "guaranteed"; the agreement was memorialized in signed documents and emails; testimony from *both* Levion and the SG Managing Director who executed the compensation agreement for SG confirms that "binding agreement"; and, until SG decided to "break DFP," apparently due to the "strong animosity towards the DFP team," SG itself recognized, and performed under, that agreement.

SG is therefore reduced to relying on even *less* plausible arguments. For example, SG tries to claim that the transactions at issue were not covered by the parties' compensation agreement—though SG in fact approved these transactions, profited from them, paid in full on one of those transactions (only to improperly claw back that compensation at the 11th hour), paid some (but not all) of the compensation due on another claim and represented that it would pay on the third claim (only to default).

This is not remotely a case for summary disposition. SG's motion must be denied.

**Summary of Material Facts**

**A.      The DFP Group**

Levion headed SG's Derivatives and Financial Products Group ("DFP") from 1990

through 2007.  (Levion's Opposition to SG's 56.1 Statement ("56.1 Opp.") ¶ 130)  DFP traded a

wide variety of financial products and also executed tax-driven trades.  (56.1 Opp. ¶ 135)  DFP

generated net profits of over $3 billion for SG during Levion's tenure and was recognized

internally at SG as a "highly successful team."  (*Id.*; *see also* Declaration of Ariel P. Cannon

dated December 1, 2010 ("Cannon Decl.") Ex. 1C) (Documents quoted herein shall be

designated as "Ex." or "Exs.," which are exhibit(s) to the Cannon Declaration.)

From 1994 to 2004, Levion reported to Pierre Schroeder, an SG officer, Managing

Director and ultimately head of SG's Debt and Finance Group ("DEFI") in the Americas; and

from 2004 until 2007 to Paolo Taddonio.  Schroeder and Taddonio, in turn, ultimately reported

to Jean-Pierre Mustier.  Before his termination and subsequent French conviction on insider

trading charges, Mustier was global head of DEFI (of which DFP was a part), and then headed

SGCIB (SG's investment banking division, which included both DEFI and DFP).  (56.1 Opp.

¶ 133)

Though originally based in SG's New York offices, in 2000 SG and Levion agreed that

DFP would move to Greenwich, CT, near the homes of many DFP group members.  (56.1 Opp.

¶ 157; Exs. 1D (noting "move to Greenwich" was part of "entire agreement with DFP"); 1E

(same))

**B.      Levion's Compensation Structure**

In 1990, Levion and SG agreed to Levion's bonus/incentive compensation (in addition to

his salary, signing bonus and other benefits).  (56.1 Opp. ¶ 136)  This agreement provided that

Levion would be paid 40% of the DFP bonus pool. It also set forth the method for calculating the bonus pool. (*Id.*) In 1994, SG and Levion updated their compensation agreement. The 1994 "Compensation Principles" signed by Levion and his supervisor, Schroeder, confirmed the framework for Levion's compensation, and provided greater detail concerning DFP's bonus computation methodology. (56.1 Opp. ¶ 137; Ex. 1A) This agreement, as amended, governed the parties' relationship for more than a decade—long after its purported expiration (SG Br.12-13), as both Levion and Schroeder affirm on this motion. (56.1 Opp. ¶ 137; Declaration of Martin Levion dated December 1, 2010 ("Levion Decl.") ¶ 2; Declaration of Pierre Schroeder dated November 24, 2010 ("Schroeder Decl.") ¶¶ 4-5) Specifically, between 1994 and 2000, SG agreed to pay DFP 12% of DFP's "Net P&L," plus an additional "discretionary" 2%, calculated in accordance with an accompanying spreadsheet. SG and Levion agreed that Levion would be paid 25% of the DFP bonus pool, approximately 3% of DFP's Net P&L. (56.1 Opp. ¶ 138)

In or about 2000, as DFP continued to produce record profits for SG (56.1 Opp. ¶ 142; Ex. 26), the parties modified the agreement's applicable percentages: SG agreed to pay 14% "minimum guaranteed on pool base" plus "0 to 1 % discretionary," and Levion would be paid "3[.]25% guaranteed." (56.1 Opp. ¶ 142; Exs. 1E, 1G (DFP bonus rate is "prescribed as 14% to 15%"))

SG's accounting department ("ACFI") worked with DFP and the records of the operations department ("OPER") to ensure that SG's records were accurate and to compute the official P&L numbers confirmed by DFP. (56.1 Opp. ¶ 147) ACFI used instructions that tracked almost verbatim the Compensation Principles to compute the DFP bonus pool, as well as the allocation between the 14% non-discretionary, minimum guaranteed bonus amount and the

0-1% range subject to SG's discretion.  (*Id.* ¶ 148)  Levion would then apply his percentage to the pool, determine DFP bonuses, and provide DEFI with the bonus amounts.  (*Id.* ¶ 151)

Throughout Levion's tenure, SG never disputed or sought to change (until 2007) the bonus amounts allocated to Levion under the parties' agreement, or this process.  (*Id.* ¶ 149)

**C.    SG's Efforts to "Break DFP"**

DFP's success ultimately bred significant resentment towards Levion and DFP, including outright animosity towards DFP among senior Paris-based SG executives.  Contemporaneous internal SG emails state (for example) that "I think all of us can admit that both in ACFI and DEVL there is a strong animosity against the DFP team" and that "the objective to penalize DFP taints most of the [compensation] discussions." (56.1 Opp. ¶¶ 159-161; Exs. 6A, 10B, at SG 00003569 (noting that a senior French executive "should worry about other things than the bonus of Martin" and that he "clearly has Martin 'in the nose'"))  Ultimately, Mustier decided to "break DFP" by stripping DFP of its staff, moving its worksite, and breaching SG's obligations under its compensation agreement with DFP, as set forth below.  (56.1 Opp. ¶ 161; Ex. 6B)

**1.    The NDF Transactions**

DFP routinely traded with other SG units, and recognized profits and losses on those trades.  (56.1 Opp. ¶ 164)  In 1997, DFP, on behalf of SG's New York Branch ("SGNY"), executed non-deliverable forward ("NDF") transactions with various hedge funds ("Hedge Funds").  (*Id.* ¶ 162)  DFP also executed hedging contracts with SG's Russian subsidiary, Banque Societe Generale Vostok ("BSGV" or "Vostok"), a legally distinct entity, under which Vostok had to pay DFP if the ruble lost value.  (*Id.* ¶ 162)  Due to the Russian currency crisis in 1997-98, a "Disruption Event" had occurred.  Based on SGNY's right as Counterparty A and as

Calculation Agent in *both* contracts, SGNY declared a "Disruption Event" under both its contract with Vostok and its contract with the Hedge Funds. (56.1 Opp. ¶ 165)

DFP contracted for SGNY's right, at *DFP's* election, after such Disruption Event, to declare SGNY's obligation to pay the Hedge Funds terminated while requiring Vostok pay SGNY under different provisions set forth in the contracts—the asymmetry referenced in the Complaint and relevant to Levion's claims here. The fact that SGNY had this capability was *not* material by the time the Hedge Fund litigation referenced by SG was underway (rendering SG's reliance on pleadings from that case misplaced). (56.1 Opp. ¶ 168) This asymmetry in options on a Disruption Event created a $400 million gain to DFP in the Net P & L. (56.1 Opp. ¶ 168)

Because Vostok (due to its precarious status) would have required a $400 million payment from SG-Paris in order to pay SGNY, SG-Paris intervened and instead terminated Vostok's obligation to SGNY. In this way SG-Paris retained a $400 million benefit in Paris, which avoided taxable earnings entering the U.S. and inflated the SG-Paris bonus pool by the amounts not being paid to DFP. (56.1 Opp.¶ 169; Exs. 13A, 13B) SG-Paris had never intervened in a DFP trade in this fashion. (56.1 Opp. ¶ 170) Because the Hedge Funds thereafter sued SG for $1 billion due, in part, to its termination and cancellation of SGNY's payment obligations, SG asked Levion to wait until the litigation concluded (in 2004) to compute compensation credit to DFP and otherwise assist in the litigation. (56.1 Opp. ¶ 172) SG ultimately reneged on its compensation commitment after Schroeder left, despite recognizing that Levion had done "an excellent job negotiating a documentation which has effectively protected SG's interests." (56.1 Opp. ¶ 171; Ex. 13D ("Internal Economic Allocation"), at SG 00005676))

### 2.     *The TOBP Program*

Certain DFP transactions provided U.S. and French tax benefits for SG.  These transactions were rigorously reviewed by DFP, by internal and external tax counsel, and by senior SG management in Paris before execution.  (56.1 Opp. ¶ 176; Ex. 8F)  For compensation purposes, on tax-driven transactions the parties used a "gross up"—a mathematical calculation requiring no exercise of discretion—to provide a pre-tax dollar equivalent value for transactions measured in tax savings.  (56.1 Opp. ¶ 177)

One such program was the Tender Option Bond Program ("TOBP") initiated in the 1990s, and later increased from $2 billion to $5 billion.  (56.1 Opp. ¶¶ 179, 180; Ex. 7A)  The TOBP involved the purchase of long term tax free municipal bonds with fixed interest rates, financed by floating-rate debt in the form of tender option bonds.  (56.1 Opp. ¶ 178)  This arrangement generated substantial tax savings for SG, over $616 million pre-tax equivalent dollars over a several year period.  SG repeatedly recognized the value, and global significance, of DFP's TOB program.  (*Id.*; *see* Ex. 7C, at SG 00003674 ("TOBP creates significant value for the Bank."); Ex. 8G, at SG 00001566 (as of 2001, "TOBP has now been successfully operating for 6 years and the bank has made a total LTD profit on this program of USD 450 Mio."))

Consistent with the parties' agreement, SG initially credited DFP fully for the TOBP tax savings, grossed up to equate to pre-tax dollars.  Because of Levion's substantial personal involvement in TOBP, SG paid Levion 40%—not just 25%—of the bonus pool attributable to TOBP.  (56.1 Opp. ¶ 181; Ex. 1E)

 No later than 2003, however, SG told Levion that due to factors including its purportedly anticipated long-term AMT status, it would not be "using" all the TOBP tax benefits and sought to limit DFP's TOBP compensation.  SG provided Levion with no independent way

to verify these representations, or to correlate his TOBP compensation with any tax savings "usage." (56.1 Opp. ¶¶ 183, 195; Schroeder Decl. ¶ 8; Levion Decl. ¶ 36)

However, SG was indeed using *all* the TOBP tax savings; its representations to the contrary were false; and the Net Operating Losses ("NOLs") generated by DFP had and have substantial value. (56.1 Opp. ¶¶ 6, 187, 188; Exs. 9A, 7D, 9B) SG's reduction of DFP TOBP compensation was a means secretly to redistribute compensation to others at SG, pursuant to an undisclosed "deal" between SGCIB and DEVL (SG's finance division). (56.1 Opp. ¶¶ 192, 194; *e.g.* Ex. 8B ("we should consider various ways anyway to reduce the benefits of TOBP in DFP bonus pool anyway (while keeping it in defi"); Ex. 8A ("We have not disclosed to DFP the way the remuneration of the TOBP is agreed between us to keep flexibility on the issue."))

### 3.    *The RIC and Fred Trades*

In 1996 and 2001, respectively, DFP executed two transactions called RIC and Fred. The trades were approved at SG's highest levels, after thorough vetting from inside and outside counsel and tax advisors. (56.1 Opp. ¶ 196; Ex. 8F, SG 00003559 (Mustier noting that "we have a 'should opinion' for the 97 [RIC] deal, this should be a strong garanty [sic]")) DFP was compensated under the agreed formula for both of these trades. (56.1 Opp. ¶ 197)

In June 2004, the IRS challenged SG's tax treatment of RIC and, later, of Fred. (56.1 Opp. ¶ 198) SG senior management discussed—though not with Levion—plans to ensure that ACFI (rather than DFP) would control discussions with the IRS, and to withhold compensation from DFP based on a potential "requalification," *i.e.*, IRS disallowance of the trade. (56.1 Opp. ¶ 199; Ex. 10D) At that time, however, SG internally concluded that any such reduction would be improper under the parties' agreement. (56.1 Opp. ¶ 200; Ex. 10C (Taddonio writing "we

have not seen any such 'rule' [providing that requalification loss should affect DFP bonuses] and question the fairness (and feasibility) of such an alternative"))

### D.   <u>Levion's Departure and the Collapse of DFP</u>

By 2005, Mustier internally noted that "we need to study an alternative to put in place by end of March where we could break DFP and probably sack M. Levion," noting that "HR needs to review the contract of Levion…to assess the cost of firing [him]."  (Ex. 6B)  However, SG senior management realized that if it simply fired Levion, most DFP employees would also depart, leaving SG to manage (in Connecticut) an operation involving hundreds of billions of dollars of complex financial instruments.

In 2006, seeing a "good moment" (Ex. 12C) and a "window of opportunity" (Ex. 12B), SG therefore decided to move DFP back to New York—contrary to its 2000 agreement with Levion—knowing the move likely would precipitate his departure but also enabling it to more easily absorb DFP's ongoing operations.  (56.1 Opp. ¶¶ 157, 207-210; Ex. 12C)  SG purported to base the move on "regulatory concerns" though DFP had had no regulatory "issues in the past" (Ex. 12D)—DFP had just passed both an internal SG inspection and a Federal Reserve review—and Mustier ultimately admitted that the move was "personal[]."  (Ex. 12A)  Moreover, DFP was to be located next to the GIC desk at SG's New York office—a desk under federal criminal investigation, creating a significant reputational issue for the DFP municipal business. (56.1 Opp. ¶ 213; http://mobile.bankinvestmentconsultant.com/articles/202884895)

Before the move, Levion and SG calculated DFP's 2006 bonus pool.  (56.1 Opp. ¶ 215) The bonus amounts for the DFP team, including Levion, were discussed and approved by Taddonio and accrued for by SG.  (56.1 Opp. ¶ 215)  However, SG then decided to confiscate 2006 bonus amounts from Levion and two DFP colleagues for the (still unconsummated) RIC

and Fred settlements, without discussing the matter with him.  (56.1 Opp. ¶¶ 215-17; Ex. 9B, SGE 000001159 ("Have discussed with Martin today without mentioning the RIC/FRED issue"))  SG did not "dock" other SG personnel involved in those trades, including the Fred trade's tax architect.  (56.1 Opp. ¶ 220)  No IRS settlement had been finalized or approved; SG would not have *any* tax impact (or penalty) until a settlement was finalized in 2008—18 months later (56.1 Opp. ¶¶ 205, 223-24; Ex. 11B); and the impact was not an outlay of any cash—just a reduction in net operating loss carry-forwards, which DFP itself had created (and in some years a refund).  (Ex. 9C, SGE 00009415 (Shapiro noting that any tax gain upon IRS's requalification of RIC/FRED "should be able to be offset")).  Levion's compensation had never been based on a speculative future event—the P&L, of course, included only profits/losses that had occurred— and there is no evidence that SG ever engaged in similar confiscation from others.  (56.1 Opp. ¶ 218)

On March 19, 2007, Levion notified SG of his departure.  He requested compensation for 2007, based on the (substantial) profits DFP had already earned that year.  In particular, because many DFP transactions were multi-year transactions where the profits were recognized over the transaction's life, profit was taken into the P&L on the first business day of each relevant year (56.1 Opp. ¶ 227) and SG—while refining its plan to "break DFP" (Ex. 6B)—internally had recognized that a "pro rated" bonus would be required.  (56.1 Opp. ¶ 228; Ex. 8I)  Nonetheless, SG refused Levion's request.  Over the many months that SG left DFP's management positions unfilled after Levion's departure, the remnants of DFP apparently lost substantial amounts of money.  (56.1 Opp. ¶ 226)

This lawsuit followed.

<u>**Argument**</u>

## I.   SUMMARY JUDGMENT STANDARD

Summary judgment "is a drastic device since its prophylactic function, when exercised, cuts off a party's right to present his case to the jury." *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir. 1975); *see also McPherson v. Coombe,* 174 F.3d 276, 279-80 (2d Cir. 1999). The "fundamental maxim" of a summary judgment motion is that "the court cannot try issues of fact; it can only determine whether there are issues to be tried." *Heyman,* 524 F.2d at 1319-20. "It is the movant's burden to show that no genuine factual dispute exists," *Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir. 2003) (internal citations omitted), and the Court must "resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought." *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 762 (2d Cir. 1983) (internal quotation marks and citation omitted). Similarly, "summary judgment cannot be granted in a contract case where there is a legitimate factual dispute regarding the interpretation of the contract's terms." *Lion Foods Ltd. v. Daarnhouwer (New York) Inc.,* 654 F. Supp. 79, 81 (S.D.N.Y. 1987). When the parties' intent as to contract formation "cannot be conclusively determined as a matter of law from the terms of the agreement at issue, a factual question arises that must be resolved by a jury." *Enercomp, Inc. v. McCorhill Publ'g, Inc.,* 873 F.2d 536, 549 (2d Cir. 1989).

## II.   LEVION HAD A CONTRACT WHICH SG BREACHED

The evidentiary record—including the parties' agreements, contemporaneous documents, the parties' conduct, and the sworn testimony—confirms that Levion had an enforceable agreement which SG breached. Tellingly, SG simply ignores virtually all this evidence.

*First*, the parties' writings expressly confirm that DFP was to receive 12% (later modified to 14%) of its Net P&L and that Levion was to receive 3% (later 3.25%) of that amount, with a small additional "discretionary" component.  These principles were originally set forth in the signed Compensation Principles, and were repeatedly memorialized thereafter in SG's own documents.  (56.1 Opp. ¶¶ 136-146; Exs. 3A, 3B)  *See Dreyfuss v. eTelecare Global Solutions-US, Inc.*, No. 08 Civ. 1115 (RJS), 2010 WL 4058143, at *4 n.9 (S.D.N.Y. Sept. 30, 2010) (Sullivan, J.) ("An enforceable employment agreement may take many forms. . . .").

*Second*, notwithstanding SG's post-hoc efforts to gainsay the obvious, SG executives repeatedly recognized this agreement.  (Exs. 5B (in 2007 Mustier invoking "our agreement" with Levion); 2D (in 2004 Mustier referring to DFP "bonus formula"); 6B (in 2005 Mustier refers to Levion's "contract"); *see also* Exs. 1F, 2B (in 2002 Schroeder noting "formula-based employment agreements" were "what we have agreed upon with Martin" and "payout percentage" "remains unchanged between 14% (minimum) and 15% (=1% discretionary)"; Ex. 4D (in 2007 Taddonio refers to "their [DFP] 14% rate")); *Gallegos v. Top RX, Inc.*, No. 04-CV-773A, 2008 WL 4279526, *1 (W.D.N.Y. Sept. 15, 2008) ("[T]here is clearly sufficient evidence for a jury to find that a valid employment contract existed and that plaintiff performed her part of the agreement for approximately 13 years.  The fact that no single document encompasses all of the terms of the plaintiff's employment is inconsequential.").

*Third*, for 17 years SG's accounting department, ACFI, together with DFP, painstakingly calculated DFP's Net P&L and Levion's compensation, using a document that tracked nearly verbatim the Compensation Principles.  (56.1 Opp. ¶ 148; Ex. 3A) These documents show the consistent application of the 14% guaranteed plus 0-1% discretionary formula for 2000 forward.  (56.1 Opp. ¶ 142; Ex. 4C (referencing bonus calculations for "DFP @ 14% or higher"); Ex. 1G,

SGE 00003060 (DFP "bonus rate...prescribed as 14% to 15%")).  *See generally Carol B. v. Sanford B.*, 54 A.D.3d 653, 654, 865 N.Y.S.2d 194, 194 (1st Dep't 2008) ("The parties' course of conduct under a contract is persuasive evidence of their agreed intention"); *see also Guggenheimer v. Bernstein Litowitz Berger & Grossman LLP*, 11 Misc. 3d 926, 931-32, 810 N.Y.S.2d 880, 886 (Sup. Ct. N.Y. Co. 2006) ("course of dealings...evinces an implied promise that plaintiff would receive a bonus as part of her compensation..."); *cf. Mirchel v. RMJ Secs. Corp.*, 205 A.D.2d 388, 390 (1st Dep't 1994) (same).

*Fourth, both* Levion and the executive who signed the Compensation Principles for SG, Schroeder, have affirmed that SG had a binding compensation agreement with Levion throughout Schroeder's tenure (1994-2004).  (*See* Schroeder Decl. ¶ 6 ("SG was obligated to pay Levion pursuant to the terms of his agreement"); Levion Decl. ¶¶ 12-13).

*Fifth,* SG's throw-away efforts to justify its breaches are unavailing.  Thus, SG's contention that ACFI controlled the multi-billion dollar DFP Net P&L, and were perfectly free to include or not include whatever they wanted (SG Br. 5, 16) is flatly belied by the testimony of SG's own witnesses (Ex. 14A, Grover Dep. at 15:5-13; 21:19-22:13), SG's own documents (Ex. 6A, SGE 00015304 (DFP compensation was "certainly not [decision of] ACFI")), and the applicable law.  Similarly, SG's claim that the individual transactions were not specifically "covered" by Levion's agreement (SG Br. 16) is nonsense:  that agreement "covered" *all* DFP trades.

In summary, this record arguably compels summary judgment *for* Levion; yet, at a minimum, the Court must deny summary judgment to SG.  *E.g., Ronan Assocs., Inc. v. Local 94-94A-94B, Int'l Union of Operating Eng'rs, AFL-CIO*, 24 F.3d 447, 449 (2d Cir. 1994) ("[u]nder traditional principles of contract law, questions as to what the parties said, what they intended,

and how a statement by one party was understood by the other are questions of fact...."); *Cutlass Prods. Inc. v. Bregman*, 682 F.2d 323, 324 (2d Cir. 1982) (existence and terms of oral contract were jury questions); *Xu v. J.P. Morgan Chase & Co.*, No. 01 Civ. 8686 (WHP), 2003 U.S. Dist. LEXIS 27894, at *8 (S.D.N.Y. Sept. 24, 2003) (denying summary judgment where "the central factual issue in this case—whether [plaintiff's managers] orally agreed to pay [the plaintiff] a bonus pursuant to a certain formula—is disputed.") (attached hereto in Appendix of Unpublished Cases).

## III.   SG'S EFFORTS TO JUSTIFY ITS BREACHES FAIL

### A.   SG's Purported "Bonus Policy" Does Not Preclude Levion's Claims

Relying on an unauthenticated two-paragraph screen shot purportedly from SG's "EntreNet," entitled "Performance bonuses," SG contends that "Levion's Contract Claims Fail Because of SG's Discretionary Bonus Policy." (SG Br. 9). SG is wrong.

*First,* purely as an evidentiary matter, SG's efforts to establish such a policy fail. There are no authenticating or substantive affidavits attesting to the policy, no evidence that any SG employee was aware of or agreed to the policy, and no testimony as to how the policy was applied. *Contrast Soto v. Federal Express Corp.,* No. 06-cv-5413, 2008 WL 305017, at *2 (E.D.N.Y. Feb. 1, 2008) (citing evidence that different editions of employee handbook were circulated on specific dates, and plaintiff recalled receiving the first edition and signed acknowledgments of all editions). And the snippets of testimony that SG cites are at best equivocal. *See, e.g.,* Ex. 15 (Mustier Dep. 52-53 (there was "a guarantee [to DFP] that we would, you know, pay 14% if everything was fine everywhere but I could be paying less if I was forced by events that were unforeseen [sic]") and even Mustier would not agree that he could pay Levion nothing ("to pay nothing is theoretical")). In short, if SG—a global bank with 120,000

13

employees and a €30 billion market cap—actually had a discretionary bonus policy, it could have proved that policy by competent evidence.

*Second,* evidence from SG's own files indicates that there *was* no such policy. For example, a 2006 memo from Taddonio concerning "BONUSES" shows that SG internally distinguished between "discretionary" groups and "formula" groups, such as DFP—with the obvious inference that compensation for "formula" groups was non-discretionary:

> it will be essential in this process to differentiate those bonuses that come from a "formula pool" and those that come from a discretionary pool....I need to provide you with a clear list of those names that will be paid under formula...To give you an idea, the teams under formula are:  DFP.....

(Ex. 4B)

*Third,* even SG concedes that it made exceptions to its purported policy (SG Br. 7)—and it had just such a separate compensation arrangement with Levion.  (*E.g.,* Exs. 1F, 4B (SG considered the DFP Group to be a "team[] under formula," which had "formula-based employment agreements," rather than a "discretionary team")) This is unsurprising, since the purported bonus policy provides that "[p]erformance bonuses are discretionary and depend on, among other factors, SG's earnings," while Levion's compensation was deliberately tied *not* to SG's firm-wide results, but to DFP's profit.  (Levion Decl. ¶ 14; Schroeder Decl. ¶ 5)

*Fourth,* SG's own documents (again) conclusively rebut its current argument that Levion's bonus was entirely discretionary:  these documents state that DFP was entitled to 14% with 1% "discretionary"—a senseless distinction if the *entire* 15% were, as SG now argues, entirely discretionary, and Levion's compensation is consistently referred to as "guaranteed." (*See* Ex. 2F, SGE 000019286 ("What happens with the bonuses?  We have to decide (among other things) how to impact the DFP-type desks *that can't be reduced by [more than] 1%?*"))

Courts routinely have upheld claims for bonuses with both guaranteed and discretionary components. In *Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253, 265 (2d Cir. 1999), for example, the Second Circuit affirmed a jury verdict for an employee, finding that his "pay was guaranteed under the Percentage Bonus formula to be a percentage of the revenues he generated, and was not left to [defendant's] discretion." *See also Barry v. Liddle, O'Connor, Finkelstein & Robinson,* 98 F.3d 36, 40 (2d Cir. 1996) (upholding formula-based compensation agreement providing for "[m]inimum of 50% of pre tax revenues associated with Strategic Financing Group less full costs"); *Culver v. Merrill Lynch & Co., Inc.,* No. 94 Civ. 8124 (LBS), 1995 WL 422203, at *3 (S.D.N.Y. July 17, 1995) (contract with formula-based compensation and method for determining desk pool, and providing distribution of the pool would be determined by the "Division Director," did not provide discretion to not award bonus).[1]

**B.      The At-Will Employment Doctrine Does Not Preclude Levion's Claims**

*First*, SG asserts that Levion was an at-will employee because he allegedly lacked "an employment contract of fixed duration." (SG Br. 13) Yet SG's own documents belie the claim. (Exs. 2A, SGE 00010009 (Schroeder outlining "BONUS SYSTEM" for "2003, 2004 and 2005"), 2B (discussing bonus "paiement" for years "2000 to 2002"), 2D ("Compensation Agreement

---

[1] *Ferrand v. Credit Lyonnais*, No. 02 Civ. 5191 (VM), 2003 WL 22251313 (S.D.N.Y. Sept. 30, 2003) (SG Br. 10-11), is inapposite. The *Ferrand* plaintiff lacked a contract and admitted receiving an employee handbook providing that all bonuses were discretionary. The court held that any course of dealing would necessarily incorporate the terms of the handbook that both employer and employee understood applied. Here, Levion had a contract with the Bank, and there is no evidence he received, much less agreed to, the purported "bonus policy."

with DFP for 2003 and 2004")) And if, as SG appears to concede (SG Br. 12-13), there was a compensation agreement, the "at-will" doctrine would not permit SG flagrantly to disregard it.

*Second*, the at-will doctrine (at most) permits an employer *prospectively* to change a term of employment. In *Dreyfuss v. eTelecare Global Solutions-US, Inc.*, No. 08 Civ. 1115 (RJS), 2010 WL 4058143 (S.D.N.Y. Sept. 30, 2010), this Court rejected the defendant's attempt retroactively to change the plaintiff's commission structure. "[A]n employer may terminate an at-will employee, but he cannot retroactively change the terms of the employment agreement he entered into with that employee." *Id.* at *4. Instead, the employer can only change the terms of employment *prospectively* "subject to the [employee's] right to leave the employment if the new terms [are] unacceptable." *Id.* (quoting *Gebhardt v. Time Warner Entm't-Advance/Newhouse*, 726 N.Y.S.2d 534, 535 (4th Dep't 2001)).[2]

Here, Levion plainly did not consent to SG's claw back of a portion of his 2006 bonus— he left SG weeks later—or its failure to pay his 2007 bonus, which did not occur until *after* he left SG. And Levion was told that compensation for the NDF trades *would be* included in the Net P&L when the hedge fund litigation concluded. (56.1 Opp. ¶¶ 171-72), SG's failure to pay was retroactive and impermissible.

Finally, while Levion knew that SG had begun to reduce TOBP compensation, SG blatantly misrepresented the factual bases for its actions, including (for example) its claim that it was not "using" DFP's NOLs. Levion cannot have waived his right to compensation under

---

[2] SG's cases (SG Br.13-15) are consistent with *Dreyfuss*—in those cases the employee was told of the prospective change in his compensation structure, and, upon consideration, continued with employment (while the court in *Giannone v. Deutsche Bank Secs., Inc.*, 392 F. Supp. 2d 576 (S.D.N.Y. 2005) provided no rationale for its decision at all).

these circumstances. (56.1 Opp. ¶¶ 183-191) *Randolph Equities, LLC v. Carbon Capital, Inc.*, 648 F. Supp. 2d 507, 515, 517 (S.D.N.Y. 2009) ("intent to waive a contractual right is generally a matter of fact" and denying summary judgment given "factual questions on whether Carbon waived its contractual…rights" through course of conduct); *Knowlton v. Viktron Ltd. P'ship*, 994 F. Supp. 128, 132 (E.D.N.Y. 1998) (evidence did not establish as a matter of law that employee had consented to changed commissions structure where "there were issues of fact as to whether plaintiff's continued employment with defendant was dependent upon his acceptance of the reduced commissions.") And, conversely, the evidence shows that when SG and Levion could *not* agree on specific compensation for a particular transaction, DFP did not execute that transaction. (56.1 Opp. ¶ 155) Far from demonstrating an employment relationship in which SG dictated everything, the parties' acts here "evidence" their core agreement.

### C.   SG Did Not Have Discretion to Determine the Net P&L

SG concludes its brief by including a hodge-podge of half-hearted arguments that either make no sense, conflict with other SG arguments, or both.

*First,* SG argues that because these individual transactions were not specifically mentioned in the Principles (conspicuously ignoring the incorporated spreadsheet from each year) Levion cannot seek compensation for them. (SG Br. 16) This is nonsense: the parties agreed that Levion would receive a percentage of DFP's *entire* Net P&L, reflecting *all DFP* transactions, including the TOBP (Ex. 7E, SGE 00005671 ("SG as a group committed to a certain level of remuneration [for TOBP] regardless of the tax situation evolution of the SG NY Branch")), the NDF transactions (Schroeder Decl. ¶ 9), and RIC and Fred (Exs. 4A, 10B); and SG in fact either paid or committed to pay on *all* these deals (only to walk away from its commitment).

*Second,* SG argues, based on a snippet from Levion's deposition, that because ACFI supposedly had "ultimate discretion over the calculation of Net P&L," SG was free to include (or not include) DFP transactions in the DFP Net P&L.[3]  (SG Br. 16)  SG's own documents refute this proposition (Ex. 6A (DFP compensation was "certainly not [decision of] ACFI")); the ACFI representative disclaimed any such responsibility (Ex. 14A, Grover Dep. 15:5-13; 21:19-22:13); and Levion did *not* testify that SG had final say over "the calculation of the Net P&L" for his agreement.  (SG Br. 16)  He simply noted ACFI's role in making bonus *calculations,* while *denying* that SG had "ultimate discretion" in "determining [his] net P&L" (Ex. 15A, Levion Dep. 139) (of course conceding that he could not prevent SG from breaching the agreement);

In any event, this argument is a repackaged version of SG's baseless "discretion" argument.  The parties negotiated detailed "rules" concerning construction of the Net P&L—the Compensation Principles state that "[d]efinition of Net  P&L [will be determined] per the attached spread sheet and the following rules."  (Ex. 1A, SG 00003815)  The next pages of the Principles describe those "rules," recognized also in subsequent iterations of the parties' agreements (and by conduct).  Any "interpretation" of those rules that would permit SG to calculate the Net P&L as it unilaterally decided, retroactive to earlier trades, renders the agreement meaningless.  *See, e.g., GPA Inc. v. Liggett Group Inc.,* No. 94 Civ. 5735 (AGS),1996 WL 337288, at *4 (S.D.N.Y. June 18, 1996) ("a court shall not interpret an agreement in a way which leaves a part meaningless or ineffectual.") (internal quotation marks and citation omitted); *Gerlach v. The Horn & Hardart Co.,* 683 F. Supp. 342, 344 (S.D.N.Y. 1988) (rejecting

---

[3] SG's curious "ambiguity" argument (SG Br. 15-16) is entirely misguided, since an analysis of ambiguity and parol evidence only applies where there is an integrated writing with an unclear term.  *See Gualandi v. Adams,* 385 F.3d 236, 241 (2d Cir. 2004).

defendant's claimed discretion over severance payments and finding that "to give [the provision at issue] that interpretation here would be to render the three precisely drawn clauses annexed to it meaningless."); *see also Ladau v. Hillier Group, Inc.*, No. 02 Civ. 4703 (LAP), 2004 WL 691520, at *5 (S.D.N.Y. Mar. 31, 2004) (denying summary judgment on claim for additional bonus payments under formula); *Reichenheim v. Sotheby's, Inc.*, No. 91 Civ. 5787 (MBM), 1993 WL 330462, at *6 (S.D.N.Y. Aug. 24, 1993) (disputed contract language "coupled with [plaintiff's] representations as to the parties' previous course of dealing, makes summary disposition of this case inappropriate.").

### 1.    *Confiscation of 2006 Bonus Payment*

SG's specific arguments concerning the 2006 bonus payment are nonsensical. Thus, SG argues that the RIC and Fred "were not intended to be included in the routine calculation of Net P&L under the DFP Formula" (SG Br. 17)—yet Levion originally was *paid* on these transactions. (Ex. 10B, SG 00003569 (Mustier confirming that RIC/Fred bonus was "taken on a gross up figure *in the [DFP] bonus pool calculation as it should be"*) (emphasis added))

In any event, Levion's claim is based on SG's confiscation of 2006 compensation— earned from other trades entirely—to punish Levion for a possible *future* IRS settlement on RIC and Fred. Notably, even SG did not believe that it could retroactively change the parties' agreement, or charge costs to DFP before they had actually been incurred. (Ex. 2E, SGE00015270 (discussing potential change in charge to DFP Net P&L and stating "If the situation has changed today we can probably change this but it will have to be for 06 (paid 07).") Further, the DFP P&L had *never* been charged for an item before it had hit DFP's "bottom line"; SG witnesses conceded that *there was no impact* on SG's books, and likely would be none (Ex. 9C, SGE 00009415 (Shapiro noting that much of the potential liability under future IRS

requalification of RIC/FRED "should be able to be offset")), let alone a negative impact on DFP's P&L. (Ex. 12E, SGE 00005185; SG's punitive intent is confirmed by its failure to confiscate compensation from others involved in these trades (56.1 Opp. ¶ 220). SG's *ipse dixit* efforts to justify its improper behavior (SG Br. 17) cite to literally nothing (much less anything in the agreement that would have permitted the confiscation). *See Weiner v. Diebold Group, Inc.*, 173 A.D.2d 166, 167, 568 N.Y.S.2d 959 (1st Dep't 1991) (citing New York's "longstanding policy against the forfeiture of earned wages").

      2.      ***The NDF Claim***

*First*, SG's reliance on the "absence" of any document reflecting SG's commitment to include these trades in the DFP P&L misstates the record: the few contemporaneous documents SG produced show that DFP *was* to be compensated for the NDFs. (Ex. 13D, SG 00005676-77 (noting need to "grant DFP an economic adjustment (for the determination of their bonus pool"); Ex. 12E) This contemporaneous evidence is confirmed by Levion's testimony. (Levion Decl. ¶¶ 42-43; *see also* Schroeder Decl. ¶ 9)

*Second*, SG argues that under the trades' terms "SG was not owed $400 million on those transactions" (SG Br. 20)—yet SG's own records show the value to SG of the trades. (56.1 Opp. ¶ 171) And SG's discussion of Levion's affidavits in the Hedge Fund litigation which are assertedly "contradictory" or "inconsistent" (SG Br. 20-21) entirely misses the point: Levion explained at length (Ex. 15A, Levion Dep. 215-221) how the affidavits he submitted in the Hedge Fund litigation—which have nothing to do with how the trade terms contemporaneously created a $400 million benefit for SG or the internal compensation credit for that benefit—are entirely consistent with his current claim (specifically, the asymmetry in the swap agreements permitted SGNY at the same time on a Disruption Event to hold Vostok liable for its obligation

to SGNY, while cancelling SGNY's obligation to the hedge funds, a structure which SG noted at the time represented "an excellent job negotiating a documentation which has effectively protected SG's interests").

### 3.    The TOBP Claim

*First,* and contrary to SG's conclusory statement (SG Br. 17), Levion's TOBP compensation *was* part of the parties' agreement. The Compensation Principles did not include a specific provision for TOB, because the program began later in 1994. The parties agreed that Levion would receive 40 percent of TOB's contribution to the DFP pool, as reflected in writings from 2000 forward and bonus payments made to Levion over the next decade, and (until SG changed course) the parties included the pre-tax dollar value of DFP's tax trades through a non-discretionary mathematical calculation. For example, for a general corporate tax rate of 35%, the gross up was $X/.65$, so that tax savings of $1 million would be equivalent to $1.538 million pre-tax dollars.

*Second,* SG's contention that Levion had no right to dictate SG's tax positions is a red herring. As the document cited by SG itself states, Levion noted that "how aggressive or unaggressive the bank wanted to be with regard to how it filed its taxes should not have an impact…on [DFP's] compensation." (SG Br. 18)  SG could and did take tax positions; what it could *not* do, however, is agree with DFP to create a tax savings program, agree to (and thereafter allocate to DFP) a compensation percentage, recognize the program's value and permit it to expand—only to then refuse to honor the compensation agreement. *Cf. Gallegos,* 2008 WL 4279526 (denying summary judgment on formula-based compensation claim when plaintiff claimed that defendant improperly manipulated inputs to formula).

*Third*, it is now clear that the excuses SG offered for withholding full TOBP compensation were baseless. It appears that the TOBP benefits put SG into AMT status in the first place (creating the benefit that all SGNY operations were taxed at a lower rate) (Ex. 9A, at SGE 00001916); that SG was, in fact "using" those TOB deductions at the time (56.1 Opp. ¶¶ 186-87); and that the TOBP generated NOLs (reflected on SG's tax returns) that could be carried forward to offset taxable income *for 20 years*. (56.1 Opp. ¶ 187; Exs. 9A, 7B) Thus, all of the TOBP income generated by the DFP Group was in fact "used" by SG before and after 2003.

SG's motives for withholding this compensation are also now clear: SG simply took money due Levion and reallocated it others in SG management (*e.g.*, Ex. 8B (DEFI "consider[ed] various ways anyway to reduce the benefits of TOBP in DFP bonus pool anyway (while keeping it in DEFI [management]"); Ex. 7F, SG 00004257 ("the 61.7 M is SG AMER total tax economy paid to DEFI of which 36 M is credited to DFP for TOBP and the remainder just to DEFI/DIR"); Ex. 7F, SGE 00004258 ("we need an urgent conf call to validate the [TOBP] figures because we don't want all the figures in DFP")), while attempting to conceal its conduct from Levion (Ex. 8A, SGE 00015255 ("we have not disclosed to DFP the way the remuneration of the TOBP is agreed between us to keep flexibility on this issue.")))

### 4.    *The 2007 Compensation Claim*

Levion generated over $230 million for SG in the first three months of 2007. SG refused to pay Levion for these earnings because of (a) its "policy" of not paying "pro-rata" bonuses; and (b) DFP's poor results after SG drove Levion and his team from SG. SG is wrong.

*First*, employers *cannot* withhold earned compensation, and employers *cannot* contract with employees to violate this policy. SG cites no authority permitting an employer to withhold money based on a "bonus pay date," where the reason for the employee's departure was the

employer's breach of a *different* payment obligation. Relatedly, under the prevention principle, a party cannot invoke the failure of a condition precedent where it acted to prevent that condition from occurring. *E.g., A.H.A. Gen. Constr., Inc. v. N.Y. City Housing Auth.,* 92 N.Y.2d 20, 31, 677 N.Y.S.2d 9, 15 (N.Y. 1998) ("a party cannot insist upon a condition precedent, when its non-performance has been caused by himself"). SG drove Levion out by (among other things) moving him contrary to their agreement and improperly confiscating his 2006 compensation. It cannot rely on the consequences—Levion's departure—to withhold his 2007 compensation. *Spanos v. Skouras Theatres Corp.*, 364 F.2d 161, 169 (2d Cir. 1966) (en banc) (Friendly, J.) (party "will not be permitted…to escape from liability for not rendering his promised performance by preventing the happening of the condition on which it was promised.") (internal quotations marks and citation omitted).

*Second*, the sole "evidence" SG cites for the "policy" is the unauthenticated screen shot, along with a few "advices" relating to years other than 2006. Here, again, however, Levion had a *separate* compensation agreement with SG; there were good reasons why the supposed "policy" did not apply to DFP (for example, many DFP trades were multi-year programs whose profits were realized automatically at the beginning of each year); and SG's Taddonio himself noted that *"prorate bonus might be required."* (Ex. 8I) *See generally Rabus v. Silentradio*, No. 90 Civ. 5037 (JFK), 1992 WL 84586, at *2 (S.D.N.Y. Apr. 13, 1992) (denying summary judgment on "murky record" relating to "the intent of the parties concerning payment terms for any residual commissions that plaintiff was to receive").

*Third*, the notion that Levion should be penalized for the ineptitude of the remaining, un-managed DFP staff is absurd. (SG Br. 11-12 n.3) DFP's year-end results are irrelevant here.

IV.     **LEVION'S LABOR LAW CLAIMS SHOULD NOT BE DISMISSED**

SG's argument that Levion's Labor Law claims must fail is premised on the demonstrably false contention that his compensation was wholly discretionary. (*See supra* Section I) To the contrary, Levion's bonus is properly characterized as wages—and subject to the strong policy against forfeiture embodied in New York law.

Under *Truelove v. Northeast Capital & Advisory, Inc.,* 95 N.Y.2d 220, 224 , 715 N.Y.S.2d 366, 368 (N.Y. 2000) (SG Br. 22), compensation constitutes "earned wages" unless it is "dependent solely upon [the] employer's overall financial success" or is "entirely discretionary." Here, Levion was paid a fixed percentage of DFP's—*not* SG's—Net P&L, and his compensation was *not* contingent on any minimum level of revenues by SG. (56.1 Opp. ¶ 145) Further, Levion's bonus was also based on objective criteria. *Fiorenti v. Central Emergency Physicians, P.L.L.C.,* 187 Misc. 2d 805, 808-09, 723 N.Y.S.2d 851, 855 (N.Y. Sup. Ct. Nassau Co. 2001) (formula-based bonus which "[took] into account…the individual's proportional contribution," was "a compensation scheme…predicated upon…employee's personal productivity and the objective success of the venture—not the employer's discretion or any subjective standard" and "a contractual right of the employee."); *see also Schutty v. Pino,* No. 95 CIV. 1526 (LMM), 1997 WL 363812, at *3 (S.D.N.Y. July 1, 1997) (bonus "determined by a fixed formula based upon the gross fees earned by the firm for that year" constituted "wages" within Labor Law).

V.     **LEVION'S UNJUST ENRICHMENT AND IMPLIED COVENANT CLAIMS SHOULD NOT BE DISMISSED**

Curiously for a party disputing the contract, SG argues that an unjust enrichment claim may not be maintained because "there is a valid agreement between the parties covering the same subject matter." (SG Br. 24) However, New York law is clear that "if there is a bona fide

24

dispute as to the existence of a contract…a plaintiff may proceed upon a theory of quasi contract as well as contract." *Foster v. Kovner,* 44 A.D.3d 23, 29, 840 N.Y.S.2d 328, 333 (1st Dep't 2007) (citation omitted); *see also Curtis Properties Corp. v. Greif Cos.,* 236 A.D.2d 237, 239, 653 N.Y.S.2d 569, 571 (1st Dep't 1997) (same).  SG cannot have it both ways—aggressively disputing the contract while simultaneously precluding Levion from pursuing alternative claims for the tremendous value he created for SG.

SG's motion on Levion's alternative claim for breach of the implied covenant must also be denied.  The covenant is "a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract," *India.com, Inc. v. Dalal*, No. 07-09440-cv, 2009 WL 1119612, at *2 (2d Cir. Apr. 28, 2009) (internal quotation marks and citation omitted).  If, as SG claims, there was no express provision covering these transactions, the covenant would nonetheless bar SG from so defeating the parties' mutual expectations.  *Id.* (implied covenant breach despite no breach of contract); *Chase Manhattan Bank, N.A. v. Keystone Distrib., Inc.,* 873 F. Supp. 808, 815-16 (S.D.N.Y. 1994) (dismissing contract claim but upholding implied covenant claim).  Moreover, even if Levion were an at-will employee, an implied covenant claim would still exist because SG deprived Levion of the fruits of *his own* efforts, rather than the Bank's overall performance.  *See Knudsen v. Quebecor Printing (U.S.A.) Inc.,* 792 F. Supp. 234, 238-40 (S.D.N.Y. 1992) (citing *Wakefield v. Northern Telecom, Inc.,* 769 F.2d 109, 111-12 (2d Cir. 1985)).

## VI.   SG SHOULD BE PRECLUDED FROM RELYING ON A PURPORTED WRITTEN BONUS POLICY

Pursuant to Fed. R. Civ. P. 16 and 37, Levion requests that the Court strike its Exhibit 7 and preclude SG from relying on any "written discretionary bonus policy."

A.     **The Screen Shot Was Responsive to Plaintiff's Document Requests and Should Have Been Produced**

The screen shot (Simon Decl. Ex. 7) purports to be a page from an employee handbook on SG's intra-net, intended to show SG's written discretionary "performance bonus" policy.  In its Initial Disclosures, SG disclosed that it possessed "documents relating to employment and compensation policies at SG…."  (Cannon Decl. ¶ 6)  Accordingly, Levion requested, *inter alia,* "[a]ll Documents related to compensation for the DFP Group" (Request No. 1); "[a]ll Documents related to Mr. Levion's compensation" (Request No. 2); and "[a]ll Documents related to the payment to, potential payment to, or decision not to pay, Mr. Levion a bonus based on the profit generated by the DFP Group in 2007" (Request No. 33).  SG objected to the breadth of these requests, but agreed to produce "compensation agreements with Levion" (Response No. 1); "responsive documents sufficient to show Levion's compensation history" (Response No. 2); and "responsive documents to the extent such documents exist" (Response No. 33).

Contrary to SG's position that Exhibit 7 was "not responsive," it indisputably falls into at least one (if not all) the categories SG agreed to produce.  For example, SG asserts in its brief that "SG's discretionary bonus policy renders [Levion's] claim for a 2007 pro rata bonus untenable" (SG Br. 11)—*admitting* that Exhibit 7 is "related to the…decision not to pay Levion a bonus based on the profit generated by the DFP Group in 2007."  It should have been produced in response to Request No. 33.

Furthermore, SG intentionally delayed producing the document until after *both* the discovery cut-off and the pre-motion conference.  SG mentioned the "written" policy for the first time on August 20, 2010:  "Plaintiff would receive a purely discretionary bonus, if any, as part of his yearly compensation, consistent with SG's written bonus policy."  (Cannon Decl. ¶ 3 (summarizing SG Pre-Motion Letter 1))  After reviewing SG's production for such a policy, on

September 14, 2010 we requested the Bates range from SG.  As shown on the footer of Exhibit 7, SG printed out the document on September 14, 2010—presumably in response to this request—but waited until October 19, 2010, after the September 16 pre-motion conference and the day that SG filed its summary judgment motion, to produce it.  (*Id.* ¶ 4)

Under Rule 16(f), the Court may "issue any just orders" if a party fails to obey a scheduling order; under Rule 37(c), the Court may sanction a party for failure to provide information required by Rule 26(a), including a sanction of preclusion, "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *Texas Instruments Inc. v. Powerchip Semiconductor Corp.,* No. 06 Civ. 2305 (SHS)(RLE), 2007 WL 1541010, at *10 (S.D.N.Y. May 24, 2007) (ordering preclusion of responsive documents produced after discovery closed).  The party in violation of its discovery obligations bears the burden of demonstrating its failure was based on either "substantially justification" or "harmlessness." *Lesser v. Wildwood,* No. 01 Civ. 4209 (RWS), 2003 WL 22228757, at *2 (S.D.N.Y. Sept. 29, 2003).  In making this determination, courts consider four factors:  (1) the party's explanation for failure to comply with the discovery order; (2) the importance of the precluded evidence; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance. *Design Strategies, Inc. v. Davis,* 228 F.R.D. 210, 212 (S.D.N.Y. 2005). Each of those factors favors preclusion here.

**B.      SG's Failure to Produce the Screen Shot Was Not Substantially Justified**

SG agreed to produce "compensation agreements with Levion" as well as documents relevant to its denial of the 2007 bonus payment.  Not only do SG's intentional delays in producing Exhibit 7 suggest bad faith, but SG's own arguments as to why it was "substantially justified" leave no doubt as to its motivations.

SG informed the Court that "Plaintiff did not seek documents concerning any SG policy…and SG therefore did not search its internal website for such material" until SG was "preparing for its motion for summary judgment." (Cannon Decl. ¶ 9 (October 23, 2010 SG Letter at 1)) This explanation is contradicted by SG's Initial Disclosures, in which SG admits it is aware of "documents relating to…compensation policies." It is also inconsistent with SG's claim that the policy was disclosed by Mustier in his deposition. Mustier testified that Levion's compensation agreement was "14% minimum guaranteed," but that Mustier could "pay less than 14 % if I was forced to by extraordinary events"—hardly a reference to any policy at all, let alone a written one, which he could not identify even when pressed. (Ex. 15B, Mustier Dep. 49:8-9; 52:18-53:3) But if Mustier did disclose the policy, SG knew about it no later than March 19, 2010, the deposition date, but apparently did not look for the "policy" at that time either. And if SG's previous disclosures were sufficient to put Levion on notice about the policy, then it would not be prejudiced by preclusion of Exhibit 7 as unnecessary.

### C. Levion Was Prejudiced By SG's Withholding Tactic

The discovery sought by Levion followed SG's representation to this Court at the Preliminary Conference that SG did not intend to dispute the existence of an agreement, only the extent to which Levion's claims were governed by the agreement. (Cannon Decl. ¶ 3) SG now argues that there was no agreement at all because of the purported bonus policy set forth in Exhibit 7. Because SG did not produce Exhibit 7 during discovery, Levion did not know that there was any document, or policy, that SG would contend negated his agreement. Thus, he was unable to question any witnesses on relevant issues, such as the years the policy was in place; whether Levion had been advised of, or agreed to, the policy; or the relationship between this

policy and any compensation agreements between SG and other employees.  (SG itself did not question Levion about the policy, despite its view that it is a central issue.)

SG's conduct is just the type of "gamesmanship" Rule 37(c)(1) was intended to prevent, and it would be patently unfair to allow SG to introduce the written bonus policy for the first time on summary judgment. *Nosal v. Granite Park LLC,* No. 07 Civ. 1977 (FM), 2010 WL 3257912, at *5 (S.D.N.Y. July 2, 2010); *Currier v. United Technologies, Corp.,* No. Civ. 02-107-PH, 2003 WL 22769669, at **2, 5 (D. Me. Nov. 21, 2003) (precluding defendant from using at trial documents that should have been produced in response to plaintiff's document requests).

Furthermore, SG's reliance on Mustier's testimony and the production of Compensation Advices to constitute disclosure of the "policy" (Cannon Decl. ¶ 5) is nonsensical.  As set forth above, if anything, Mustier *disclaimed* the existence of a written policy (the word "policy" does not appear in his transcript) and the Advices either make no reference at all to discretionary bonuses, or refer to only a portion of a deferred compensation plan allocation as a "discretionary supplement"—supporting Levion's claim that the remainder of the bonus was non-discretionary. (*See, e.g.,* Simon Decl. Ex. 10A, at SG 00000052)  The conspicuous *lack* of evidence of a written policy is the reason SG introduces Exhibit 7 on this motion.

### D.      The Four Factors Mandate Preclusion

Each of the relevant factors weighs in favor of preclusion.  *First,* SG's explanation for its discovery violation simply does not hold water.  *Second,* SG relies heavily on the purported discretionary bonus policy, highlighting the unfairness of allowing SG to introduce it on summary judgment.  *Third*, Levion has been prejudiced because he has been deprived of the opportunity to obtain *any* information about this written bonus policy.  *Fourth,* SG ensured that a continuance would be impractical by producing the document months after the discovery cut-off.

In short, SG's failure to comply with its discovery obligations substantially prejudiced Levion, and fully justifies the sanction of preclusion. Thus, the screen shot should be stricken from the record and SG should be precluded from relying on any written bonus policy.

### Conclusion

For the reasons set forth above, SG's motion for summary judgment should be denied and Levion's motion to strike SG's Exhibit 7 should be granted, along with all other such further relief as the Court may deem just and proper.

Dated: New York, New York
      December 1, 2010

                                        DEWEY PEGNO & KRAMARSKY LLP

                                        By:_____
                                            Thomas E.L. Dewey (TD-6243)
                                            Ariel P. Cannon (AC-5082)
                                            Keara A. Bergin (KB-0831)

                                      220 East 42nd Street
                                      New York, New York 10017
                                      (212) 943-9000 (Phone)
                                      (212) 943-9000 (Fax)

                                      *Attorneys for Plaintiff*

# APPENDIX OF UNREPORTED CASES

 LexisNexis®

LEXSEE 2003 U.S. DIST. LEXIS 27894

**JAMES Y. XU, Plaintiff, -against- J.P. MORGAN CHASE & CO., Defendant.**

**01 Civ. 8686 (WHP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 27894*

**September 24, 2003, Filed**

**COUNSEL:** [*1] For James Y. Xu, Plaintiff: Jeffrey Lew Liddle, LEAD ATTORNEY, Liddle & Robinson, LLP, New York, NY.

For J.P. Morgan Chase, Defendant: Melissa R. Gold, LEAD ATTORNEY, J.P. Morgan Chase Legal Department, New York, NY; Robert S. Whitman, LEAD ATTORNEY, Seyfarth Shaw L.L.P., New York, NY.

**JUDGES:** WILLIAM H. PAULEY III, United States District Judge.

**OPINION BY:** WILLIAM H. PAULEY III

**OPINION**

[EDITOR'S NOTE: THE ORIGINAL SOURCE CONTAINED ILLEGIBLE WORDS AND/OR MISSING TEXT. THE LEXIS SERVICE WILL PLACE THE CORRECTED VERSION ON-LINE UPON RECEIPT.]

*ORDER*

WILLIAM H. PAULEY III, District Judge:

Plaintiff James Y. Xu sues his former employer, J.P. Morgan Chase & Co. ("JP Morgan Chase")/ alleging breach of an express oral contract and/or an implied-in-fact contract with him because of the failure to pay him a bonus for calendar year 2000. Xu also asserts claims under the doctrine of *quantum meruit* and the New York Labor Law. Currently before this Court is JP Morgan Chase's motion for summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure*. For the reasons set forth below, the motion is denied.

*BACKGROUND*

In October 1994, Xu was hired by a predecessor of JP Morgan Chase as a senior research analyst in the capital [*2] markets derivatives group, a part of the Global Markets Group. (Def. 56.1 Stmt. P 1.) As a result of his employment in the Global Markets Group, Xu was eligible to participate in JP Morgan Chase's incentive plan for officers of its Global Markets division (the "Incentive Plan"). (Def. 56.1 Stmt. PP 35, 40-43.) The Incentive Plan, which did not contain a set formula for determining the amount of any individual employee's bonus, prohibited its beneficiaries from participating "in any other annual bonus plans," and required as a condition of payment that the employee be "actively employed" on the date the bonus was paid. (Affidavit of Glory B. Simone, dated June 14, 2002 ("Simone Aff.") Ex. C: The Incentive Plan, at PP 3.1, 4.4.) In addition, the Incentive Plan vested absolute discretion in JP Morgan Chase to determine, *inter alia*, whether to pay a bonus at all. (Simone Aff. Ex. C P 7.1 ("The Compensation Committee's interpretation of the [Incentive Plan] or determination of any award granted thereunder shall be final and binding on all Participants, including a determination ... to adjust, defer or completely eliminate the payment of any award hereunder . . . ."); *see also* P 7.2 ("The [*3] Compensation Committee . . . may amend or terminate the [Incentive Plan] as deemed necessary.").)

In July 1997, Xu began working as an exotic options trader on JP Morgan Chase's derivatives trading desk, which was also in the Global Markets Group. (Affidavit of James Y. Xu, dated July 12, 2002 ("Xu Aff.") P 10; Def. 56.1 Stmt. P 2.) In April 1998, JP Morgan Chase replaced its derivatives trading desk [ILLEGIBLE TEXT] three independent trading desks -- the exotic options [ILLEGIBLE TEXT] desk, the generic options

Case 1:09-cv-05800-RJS    Document 40    Filed 12/01/10    Page 40 of 42

Page 2
2003 U.S. Dist. LEXIS 27894, *

trading desk, and the [ILLEGIBLE TEXT] swaps trading desk. (Xu Aff. P 11.) JP Morgan Chase [ILLEGIBLE TEXT] Xu in charge of the exotic options trading desk, where he [ILLEGIBLE TEXT] to Simon Lack, head of JP Morgan Chase's North American [ILLEGIBLE TEXT] rate derivatives trading group. (Xu Aff. PP 11-12; Def. [ILLEGIBLE TEXT] Stmt. P 3.) In August 1999, JP Morgan Chase appointed Even [ILLEGIBLE TEXT] to succeed Lack as head of the North American interest [ILLEGIBLE TEXT] derivatives trading group, (Def. 56.1 Stmt. P 10.) In 1998 [ILLEGIBLE TEXT] 1999, JP Morgan Chase paid Xu a base salary of $ 135,000, and [ILLEGIBLE TEXT] of $ 340,000 in 1998 and $ 665,000 in 1999. [1]

> 1   Xu's [*4] authority to manage the exotic options trading [ILLEGIBLE TEXT] was revoked by JP Morgan Chase in November 1998, but Xu was turned to a managerial role on that desk in August 1999. (Def. [ILLEGIBLE TEXT] Stmt. Si 6; Pl. 56.1 Stmt. P 6. )

Xu claims that in early 2000, Bulent Osman, the manager the generic options trading desk, told him that Berntsen and even Cohen, the manager of the structured products trading [ILLEGIBLE TEXT] to which Xu and Osman belonged, had agreed to calculate man's bonus for fiscal year 2000 pursuant to a specific [ILLEGIBLE TEXT] (Xu Aff. P 18.) More particularly, Xu claims Osman [ILLEGIBLE TEXT] him that Berntsen and Cohen had agreed to pay Osman either or 10% of the sum of his trading revenue plus 20% of client venue -- 3% if the sum totaled less than $ 10 million, and 10% the sum was greater than $ 10 million. (Xu Aff. P 18.) Xu contends that he approached Cohen on the trading floor two days after his conversation with Osman and requested that his bonus be calculated in the same manner (Xu Aff. P 19.) According to Xu, Cohen agreed to pay Xu a fiscal year 2000 bonus pursuant to the same formula described by Osman, namely 8-10% of the sum of his trading revenue [*5] plus 20% of client revenue. (Xu Aff. P 20.) Xu maintains that he confirmed this formula with Berntsen a few days later, because Cohen said that Berntsen made the final decisions concerning bonuses for senior traders in the structured products trading group. (Xu Aff. P 20-22.) JP Morgan Chase disputes Xu's version of these events, arguing that no such oral agreement exists.

In August 2000, JP Morgan Chase informed Xu that it was removing him from the exotic options trading desk, and returning him to a research role. (Xu Aff. P 26; Def. 56.1 Stmt. PP 11, 18.) Management advised Xu that his removal from the exotic options trading desk was due to complaints from internal salespeople and marketers, as well as difficulties interacting with others, a lack of confidence in his business judgment and for violation of personal stock trading policies. (Def. 56.1 Stmt. PP 11-13; Pl. 56.1 Stmt. PP 11-13.)

On November 28, 2000, JP Morgan Chase advised Xu that his employment was being terminated, and that he would receive a standard severance package plus a payment of $ 365,000. Xu characterizes that payment as an offer of a "bonus for fiscal year 2000" (Xu Aff. P 39), while JP Morgan Chase describes [*6] it as a "special payment ... in exchange for a release of claims" (Def. 56.1 Stmt. P 85). Whatever the proper characterization, it is undisputed that Xu refused the offer, and never received the $ 365,000. (Xu Aff. P 47.) Xu was put on a "60-day non-working notice" on November 29, 2000, and was formally terminated from JP Morgan Chase's payroll system on January 25, 2001. (Xu Aff. PP 40-42 & Ex. B: Termination Letter ("your position will be eliminated and your employment will be terminated on January 25, 2001").) Xu argues that, pursuant to the formula agreed to by Cohen and Berntsen, JF Morgan Chase owes him a bonus of $ 1,846,260 for the fiscal year 2000.

## DISCUSSION

Summary judgment must "be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* The party moving for summary judgment bears the burden of establishing the absence of any "genuine issue as to any material fact." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* Any ambiguities must [*7] be resolved in favor of the non-movant, *see Celotex Corp. v. Catrett, 477 U.S. 317, 330 n.2, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986),* and "all justifiable inferences are to be drawn in his favor." *Liberty Lobby, 477 U.S. at 255.* If the moving party meets its initial burden, the non-movant must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1996).* The non-movant must "set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e).*

JP Morgan Chase asserts that summary judgment is appropriate with respect to Xu's claim for breach of an express contract because the terms of the Incentive Plan govern the subject matter of employee bonuses, and Xu was not due a bonus under the Incentive Plan because: (1) he was not "actively employed" on the date that bonuses were paid; and (2) the Incentive Plan provides that bonuses are completely discretionary. Further, JP Mor-

gan Chase argues that Xu's claims based on a breach of an implied-in-fact contract and *quantum meruit* are barred because an express agreement, namely the Incentive Plan, governs the same subject matter, thereby preempting  [*8] any claim in quasi-contract or *quantum meruit* under New York law. Finally, JP Morgan Chase argues that summary judgment is appropriate for Xu's New York Labor Law claim because bonuses are not wages under *New York Labor Law § 190.*

With respect to Xu's claim for breach of an express contract, J? Morgan Chase misperceives Xu's argument. Xu does not claim that JP Morgan Chase breached the terms of the Incentive Plan, although he does contest JP Morgan Chase's assertion that he was not "actively employed" on the date bonuses were paid, as well as its contention that the Incentive Plan granted it "absolute discretion" to determine bonuses. (Pl. Opp. at 12-15.) Rather, Xu alleges a breach of "an explicit agreement by Xu's managers to pay Xu a certain percentage of the revenue he generated as bonus compensation." (Pl. Opp. at 12.) Therefore, Xu argues that the terms of the Incentive Plan, and whether Xu was due a bonus under it, are immaterial.

Xu correctly asserts that the central factual issue in this case -- whether Cohen and Berntsen orally agreed to pay Xu a bonus pursuant to a certain formula -- is disputed. (Pl. Opp. at 2.) This alone precludes this Court from granting defendant's motion.  [*9] JP Morgan Chase attempts to avoid this result by arguing that the existence of an express contract, namely the Incentive Plan, preempts any oral agreement concerning bonuses that Xu, Berntsen and Cohen may have entered into, and therefore the factual dispute is not "material." According to JP Morgan Chase, the terms of the Incentive Plan hold that "participation in the [Incentive Plan] precludes participation in any other annual bonus plans" (Desimone Aff. Ex. C P 3.1), and provides that any bonus award is within its absolute discretion. This Court agrees with JP Morgan Chase chat it retained absolute discretion to determine whether to pay Xu a bonus under the Incentive Plan. It is this very discretion, however, that is fatal to JP Morgan Chase's preclusion argument.

"It is axiomatic that a promise to pay incentive compensation is unenforceable if the written terms of the compensation plan make clear that the employer has absolute discretion in deciding whether to pay the incentive." *O'Shea v. Bidcom, Inc., No. 01 Civ. 3855 (WHP), 2002 U.S. Dist. LEXIS 13225, 2002 WL 1610942, at *3 (S.D.N.Y. July 22, 2002);* accord *Lam v. American Exp. Co., 265 F. Supp. 2d 225, 237 (S.D.N.Y. May 23, 2003); Tsegaye v. Impol Aluminum Corp., No. 01 Civ. 5943 (LMM), 2003 U.S. Dist. LEXIS 1397, 2003 WL 221743, at *8 (S.D.N.Y. Jan. 30, 2003);*  [*10] *Culver v. Merrill Lynch & Co., Inc., No. 94 Civ. 8124 (LBS), 1995 U.S.*

*Dist. LEXIS 10017, 1995 WL 422203, at *3 (S.D.N.Y. July 17, 1995); Namad v. Salomon Inc., 74 N.Y.2d 751, 753, 543 N.E.2d 722, 545 N.Y.S.2d 79 (1989).* The Incentive Plan unambiguously provides JP Morgan Chase with absolute discretion to determine whether to pay any individual bonuses. (Simone Aff. Ex. C PP 7.1 ("The Compensation Committee's . . . determination of any award . . . shall be final and binding on all Participants, including a determination . . . to adjust, defer or completely eliminate the payment of any award hereunder").) Accordingly, the Incentive Plan is not enforceable as a contract, and therefore does not preclude the existence of a separate oral contract such as the one alleged to have been made in this case, Therefore, JP Morgan Chase's motion to dismiss Xu's claim for breach of the alleged oral contract is denied on the grounds that material questions of fact exist as to whether the alleged oral contract existed, and if so, what its terms were.

The balance of JP Morgan Chase's arguments fail for the same reason. JP Morgan Chase argues that: (1) "[i]t is a fundamental and well-settled principle of New York contract law that an implied-in-fact contract cannot  [*11] arise where there is an express agreement that deals with the same subject matter" (Def. Sum. Judg. Mem. at 18); and (2) "New York law does not permit recovery in *quantum meruit* where an express agreement covers the same subject mater [sic] involved." (Def. Sum. Judg. Mem. at 19 (quoting *Kreiss v. McCown De Leeuw & Co. 131 F. Supp. 2d 428, 437 (S.D.N.Y. 2001)).* However, since the Incentive Plan is not an enforceable contract, material questions of fact exist concerning Xu's implied-in-fact contract and *quantum meruit* claims, *e.g.*, the parties' course of dealing, the reasonableness of Xu's expectations and the reasonable value of his services. Therefore, summary judgment on Xu's claims for breach of an implied-in-fact contract and recovery under *quantum meruit* would be inappropriate. *See Mirchel v. RMJ Sec, Inc., 205 A.D.2d 388, 613 N.Y.S.2d 876, 879 (1st Dep. 1994)* (denying motion for summary judgment on breach of an implied-in-fact contract claim in the absence of an operative bonus agreement on grounds that "[t]he course of dealing between the parties evinces an implied promise that . . . bonus payments constitute a part of plaintiff's compensation."); *GSGSB, Inc. v. New York Yankees, 862 F. Supp. 1160, 1170 (S.D.N.Y. 1994)*  [*12] (noting that "[t]he elements of a claim for *quantum meruit* are (1) plaintiff rendered services to defendant; (2) defendant accepted those services; (3) plaintiff expected compensation; and (4) the reasonable value of the services," and holding that "[t]he question of whether a party had a reasonable expectation of receiving compensation is an issue of fact for the jury").

Finally, JP Morgan Chase's argument that summary judgment is appropriate on Xu's New York Labor Law

claim because bonuses do not constitute wages under *§ 190(1)* is unavailing. JP Morgan Chase is correct that "[u]nder New York law, incentive compensation based on factors falling outside the scope of the employee's actual work is precluded from statutory coverage." *Tischmann v. ITT/Sheraton Corp., 882 F. Supp. 1358, 1370 (S.D.N.Y. 1995); accord Quirk v. Am. Mgmt. Sys., Inc., No. 01 Civ. 6813 (RO), 2002 U.S. Dist. LEXIS 22678, 2002 WL 31654966, at *2 (S.D.N.Y. Nov. 22, 2002)* (granting summary judgment to defendants on plaintiff's New York Labor Law claim because plaintiff's "incentive compensation was based only partially on his own performance"); *International Paper Co. v. Suwyn, 978 F. Supp. 506, 514 (S.D.N.Y. 1997)* (holding that where incentive  [*13] compensation is based on factors outside an individual employee's performance, and bonus was not guaranteed as a term of employment, incentive compensation did not constitute wages under New York Labor Law). However, if the alleged oral agreement be-

tween Xu and his supervisors controls, and the terms are as Xu described, Xu's bonus formula was based entirely on his own performance, and did not depend on any factors outside the scope of his actual work. (Xu Aff. P 20.) If so, such a "bonus" payment would be more akin to a "commission," and therefore covered under the New York Labor Law. *See Reilly v. Natwest Mkt. Grp. Inc., 181 F.3d 253, 265 (2d Cir. 1999)* (holding that plaintiff's "pay was guaranteed under the Percentage Bonus formula to be a percentage of the revenues he generated, and was not left to [the defendant's] discretion. . . . [Therefore the] Percentage Bonus falls comfortably within the definition of a 'commission' that is expressly included within the Labor Law's definition of 'wages'"). As noted above, the central material facts in this case -- the existence and terms of the alleged oral agreement -- are in dispute. Therefore, JP Morgan Chase's motion for summary judgment  [*14] on Xu's New York Labor Law claim is denied.