UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

MARTIN LEVION,

                Plaintiff,

   - against -

SOCIÉTÉ GÉNÉRALE,

                Defendant.

---------------------------------------------------------------x

09 CV 5800 (RJS)

## MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT SOCIÉTÉ GÉNÉRALE'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT .................................................................................................. 1

ARGUMENT ................................................................................................................................ 2

I. ASSUMING LEVION HAD A BINDING CONTRACTUAL RIGHT TO RECEIVE A BONUS, THE UNDISPUTED FACTS SHOW THERE WAS NO BREACH ............................................................................................................ 2

    A. SG Had Discretion to Calculate the Net P&L ..................................................... 2

    B. SG Owed Nothing for the NDFs .......................................................................... 4

    C. SG Owed No Bonus to Levion for 2007 ............................................................... 6

II. THE UNDISPUTED FACTS SHOW LEVION WAS AN AT-WILL EMPLOYEE WHO ACCEPTED THE TERMS OF HIS COMPENSATION BY REMAINING IN SG'S EMPLOY .......................................................................... 7

III. LEVION CAN POINT TO NO FACTS EXEMPTING HIM FROM SG'S DISCRETIONARY BONUS POLICY ............................................................................ 9

IV. LEVION'S MOTION TO STRIKE SHOULD BE DENIED ........................................ 11

    A. The Screenshot Was Not Responsive to Levion's Document Requests ................ 11

    B. SG's Production of the Screenshot Was Harmless under Fed. R. Civ. P. 37 ........ 12

    C. Other Relevant Considerations Militate Against Preclusion ............................... 14

CONCLUSION ........................................................................................................................... 15

## TABLE OF AUTHORITIES

Cases: Page

*Am. Stock Exch., LLC v. Mopex, Inc.*,
   250 F. Supp. 2d 323 (S.D.N.Y. 2003) ..................................................................2 n.2

*Arrouet v. Brown Bros. Harriman & Co.*,
   2005 WL 646111 (S.D.N.Y. 2005) .......................................................................2 n.2

*Bey v. City of N.Y.*,
   2010 WL 3910231 (S.D.N.Y. Sept. 21, 2010) ......................................................13, 15

*Bravia Cap. Partners, Inc. v. Fike*,
   2010 WL 3359470 (S.D.N.Y. Aug. 25, 2010) .......................................................8 n.8

*Brown v. The Paul Revere Life Insur. Co.*,
   2001 WL 1230528 (S.D.N.Y. Oct. 16, 2001) ........................................................9 n.10

*Computech Int'l, Inc. v. Compaq Computer Corp.*,
   2002 WL 31398933 (S.D.N.Y. Oct. 24, 2002) ......................................................5

*Currier v. United Techs. Corp.*,
   2003 WL 22799669 (D. Me. Nov. 21, 2003) .......................................................12 n.13

*Ferrari v. Keybank Nat'l Ass'n*,
   2009 WL 35330 (W.D.N.Y. Jan. 5, 2009) ............................................................10 n.12

*Gary Price Studios v. Randolph Rose Coll'n Inc.*,
   2006 WL 2381817 (S.D.N.Y. Aug. 16, 2006) .......................................................12, 14

*Gayle Martz, Inc. v. Sherpa Pet Grp., LLC*,
   651 F. Supp. 2d 72 (S.D.N.Y. 2009) .....................................................................13

*Huntington Dental & Med. Co. v. Minn. Mining & Mfg. Co.*,
   1998 WL 60954 (S.D.N.Y. Feb. 13, 1998) ...........................................................5

*Knudsen v. Quebecor Printing (U.S.A.) Inc.*,
   792 F. Supp. 234 (S.D.N.Y. 1992) ........................................................................8 n.8

*Morgenstern v. County of Nassau*,
   2008 WL 4449335 (E.D.N.Y. Sept. 29, 2008) ......................................................14

*Nat'l Molding Corp. v. Newell Rubbermaid, Inc.*
   2004 WL 5717865 (E.D.N.Y. Sept. 29, 2004) ......................................................14

*Nosal v. Granite Park LLC*,
   269 F.R.D. 284 (S.D.N.Y. 2010) ...........................................................................12 n.13

## TABLE OF AUTHORITIES
(continued)

Page

*Orlik v. Dutchess Co.*,
   2010 WL 1379776 (S.D.N.Y. Mar. 25, 2010) ................................................................ 11, 15

*Outley v. City of N.Y.*,
   837 F.2d 587 (2d Cir. 1988) ............................................................................................. 15

*Presser v. Key Food Stores Co-Op., Inc.*,
   2006 WL 2038508 (E.D.N.Y. Jul. 19, 2006),
   *aff'd*, 316 Fed. Appx. 9 (2d Cir. Mar. 17, 2009) ................................................................ 11

*U.S. Info. Sys., Inc., v. Int'l Bhd. of Elec. Workers Local Union*,
   2006 WL 2136249 (S.D.N.Y. Aug. 1, 2006) ....................................................................... 9

*United Magazine Co. v. Murdoch Mags. Distrib., Inc.*,
   393 F. Supp. 2d 199 (S.D.N.Y. 2005) ........................................................................... 2 n.2

Statute:

Fed. R. Civ. P. 37 ......................................................................................................................... 12

KL3 2810995.1

## PRELIMINARY STATEMENT

Levion misapprehends that "SG's central claim is that [he] had no compensation agreement." (Op. 1).[1] SG took no such position, and instead argued that the undisputed facts belie any agreement "providing him *with an entitlement to a 'non-discretionary bonus'*" (Br. 1 (emphasis added)). DFP may have had a compensation agreement, but it did not (other than 1994-95) provide Levion a bonus guarantee. None of the evidence is to the contrary.

Even assuming Levion had a continuing contractual right to receive a bonus, summary judgment must be awarded to SG. Levion does not claim he was denied a bonus, but rather that it was deficient. But there is no genuine dispute that SG had final say over the calculation of the base against which percentages in the DFP Formula were applied, effectively giving SG discretion to set the bonus amount. Further, since it is undisputed that SGNY received nothing on the NDF transactions and that the final 2007 Net P&L was negative, Levion's NDF and pro rata bonus claims fail because even under the DFP Formula he was entitled to nothing.

Further, there is no genuine fact dispute that Levion was an at-will employee. As a matter of law, he consented to changes made to the terms of his compensation, including the iterations of the spreadsheets he maintains were incorporated in the DFP Formula, by accepting his bonuses and not resigning. Levion also produces no evidence showing he was exempt from SG's discretionary bonus policy. To the contrary, his Compensation Advices show that he was subject to the policy, which vested SG with discretion to allocate to him an individual bonus from DFP's group pool, and required that he be employed on the pay day to receive such bonus.

---

[1] "Op." refers to Levion's brief; "R.St." refers to his Response to SG's 56.1 St. and "Ex." to his exhibits; "Br." refers to SG's opening brief; "Dcl." and "Tr. refer to declarations and transcripts, respectively. Other abbreviations are defined as in SG's Br.

Underscoring its fatal effect on his claims, Levion seeks to preclude SG from relying on a Screenshot of its policy produced with its summary judgment motion. His motion to strike is baseless since the Screenshot's substance was disclosed in discovery.

## ARGUMENT

### I. ASSUMING LEVION HAD A BINDING CONTRACTUAL RIGHT TO RECEIVE A BONUS, THE UNDISPUTED FACTS SHOW THERE WAS NO BREACH

Assuming (without conceding) that Levion had an agreement providing him a continuing right to a bonus, based on the undisputed facts SG did not commit a breach.

#### A. SG Had Discretion to Calculate the Net P&L

Levion concedes that "[e]very year SG applied the agreed-upon percentages to the Net P&L." (Dcl. ¶ 20). He disputes only the calculation of that base. But there is no genuine dispute that SG had the right to finalize the Net P&L. SG did not argue that it could "calculate the Net P&L as it unilaterally decided," or that it was "free to include (or not include) DFP transactions in the DFP Net P&L," as Levion contends. (Op. 18). Rather, SG maintained it is undisputed that when an irresolvable dispute arose between DFP and SG concerning the calculation of the Net P&L — elements of which were subjective, in particular the credit for tax savings on the TOBP — SG, acting through its accounting department ("ACFI"), had final say.

SG's position is confirmed by Levion even as he nominally "disputes" it.[2] He concedes that "ACFI resolved disputes with regard to the 'computation' of Net P&L." (R.St.

---

[2] Levion's R.St. "disputes" many material facts with assertions that refute his own sworn testimony (e.g., R.St. ¶¶ 32; 41; 47; 107; 119). This is improper because "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that contradicts the affiant's previous deposition testimony." *Arrouet v.*

KL3 2810995.1

¶ 37). This is precisely SG's point. ACFI was an intermediary between Levion and Mssrs. Mustier and Taddonio during the Net P&L reconciliation process. (St. ¶ 35). Where Levion disagreed with that calculation, ACFI set the final number on behalf of SG management. By having discretion to set the Net P&L, SG determined the base against which all of the DFP Formula's percentages were applied. Levion is correct that ACFI was "responsible for determining the accuracy of the bank's books and records." (R.St. ¶ 37). But Mr. Grover made clear in uncontradicted testimony that ACFI also finalized "management reporting of" DFP, including, for example, the "TOB gross-up" figure used in the calculation of the bonus base. (Simon Supp. Dcl. Ex. 8 at 43-44). The undisputed facts show SG had final discretion to resolve disputes over and finalize the Net P&L, and thus indirectly to set Levion's compensation (under

---

*Brown Bros. Harriman & Co.*, 2005 WL 646111, at *3 (S.D.N.Y. Mar. 18 2005) (citation omitted). Other purported "disputes" are based on his own self-serving and conclusory assertions (*e.g.*, R.St. ¶¶ 52; 53; 58; 115; 120; 129), which also are not sufficient to defeat summary judgment. *See United Mag. Co. v. Murdoch Mags. Distrib., Inc.*, 393 F. Supp. 2d 199, 211 (S.D.N.Y. 2005) ("[A] self-serving affidavit that merely reiterates conclusory allegations in affidavit form is insufficient to preclude summary judgment. . . ."). Finally, the R.St. (at ¶¶ 130-228) sets forth duplicative and additional facts that, while in dispute, are not material and thus do not affect SG's right to summary judgment. *Cf. Am. Stock Exch., LLC v. Mopex, Inc.*, 250 F. Supp. 2d 323, 328 n.8 (S.D.N.Y. 2003). ("Although the parties deny many of the statements contained in the opposing party's Rule 56.1 Statement of Material Facts, these factual disputes are not 'material' and therefore do not preclude resolution of the summary judgment motions.").

his theory), which was between 3% and 3.25% (depending on the year) "of DFP's Net P&L." (Levion Dcl. ¶¶ 12-13).[3]

Levion baselessly argues that the "rules" in the DFP Formula change this analysis. (Op. at 18). Tellingly, he does not cite any rule contradicting SG's discretion to finalize the base. The absence of such a rule is underscored by the contrast with an agreement later drafted by DFP with outside counsel but abandoned, which proposed that "any dispute between the Bank and Levion as to the calculation of the Pool" be "resolved by arbitration." (Simon Supp. Dcl. Ex. 2D at ¶ 7(b); Ex. 6 (Levion Tr.) at 121-24; R.St. ¶ 48). The DFP Formula contained no such rule, nor any other dictating how disputes over the base should be resolved.

**B.   SG Owed Nothing for the NDFs**

Levion's NDF Claim is premised on the allegation that SGNY was not paid $400 million from SG's Vostok affiliate due to an improper write-down by SG-Paris. (Op. 5). Assuming (without conceding) that were true, SG committed no breach. By Levion's own theory, neither SGNY nor DFP received any of the $400 million. Applying the DFP Formula's percentages to zero yields zero, and no money is due Levion under his contract interpretation.[4]

Nor has Levion adduced any evidence for a fact finder reasonably to conclude that SG owed him a commitment to credit DFP with $400 million. There is no evidence that he

---

[3]   The sole document supposedly "refut[ing] SG's position" (Op. 18 (citing Ex. 6A)) does not at all. Rather, it acknowledges ACFI's role "[s]pecifically on the T[OBP] side, to try and retain some tax impact, which sole focus is the contribution to the bonus of DFP."

[4]   Levion's claim is premised on the notion that DFP could benefit from SG's intra-affiliate losses. This strains credulity, particularly since the DFP Formula requires that "[t]he Goals of the Bank, Management and individuals should be coincident." (Ex. 1-A, at 1).

had a right to be paid on the NDFs for anything other than the value of the "small 'spread'" he affirmed was SG's "sole profit." (R.St. ¶ 128; Ex. 13C (noting "reversal of the spread earned" on NDFs "since this profit was never realized").[5] He asserts he had an oral agreement, but cannot remember with whom, and neither Mr. Mustier nor Mr. Taddonio has any such recollection. (R.St. ¶¶ 125-26). His former supervisor, Pierre Schroeder, declares nothing more than he "discussed" with Levion a request for compensation "related to" the NDFs — conspicuously omitting whether it included a sum in the nature of $400 million — and advised that any "compensation effect" could take place only when the NDF Litigation was over. (Dcl. ¶ 9). This vague "discussion" is not sufficiently definite to establish a contract. *See Computech Int'l, Inc. v. Compaq Computer Corp.*, 2002 WL 31398933, at *2 (S.D.N.Y. Oct. 24, 2002) (dismissing oral contract claim where essential terms were left open); *Huntington Dental & Med. Co. v. Minn. Mining & Mfg. Co.*, 1998 WL 60954, at *3 (S.D.N.Y. Feb. 13, 1998) (same). Further, Mr. Schroeder concedes that he was "no longer at the Bank" at the conclusion of the litigation (Dcl. ¶ 10), and thus cannot speak to whether any benefit was then realized by SG.[6]

Moreover, the undisputed facts eviscerate the NDF Claim's underpinnings. Levion asserts that "DFP contracted for SGNY's right, at *DFP's* election after [a] Disruption Event, to declare SGNY's obligation to pay the Hedge Funds terminated while requiring Vostok pay SGNY under different provisions set forth in the contracts — the asymmetry referenced in the Complaint . . . ." (Op. 5). First, there is not a shred of evidence that DFP had such discretion. Rather, on the face of the relevant NDF Contract (Simon Dcl. Ex. 15 (Int. Ex. F)),

---

[5] SG's records do not reflect a $400 million value on the NDFs as he suggests. (Op. 20).

[6] Nor can Mr. Schroeder speak to Levion's other claims, all of which relate to bonuses received after 2003, the year Mr. Schroeder left SG. (Dcl. ¶ 1).

had a right to be paid on the NDFs for anything other than the value of the "small 'spread'" he affirmed was SG's "sole profit." (R.St. ¶ 128; Ex. 13C (noting "reversal of the spread earned" on NDFs "since this profit was never realized").[5] He asserts he had an oral agreement, but cannot remember with whom, and neither Mr. Mustier nor Mr. Taddonio has any such recollection. (R.St. ¶¶ 125-26). His former supervisor, Pierre Schroeder, declares nothing more than he "discussed" with Levion a request for compensation "related to" the NDFs — conspicuously omitting whether it included a sum in the nature of $400 million — and advised that any "compensation effect" could take place only when the NDF Litigation was over. (Dcl. ¶ 9). This vague "discussion" is not sufficiently definite to establish a contract. *See Computech Int'l, Inc. v. Compaq Computer Corp.*, 2002 WL 31398933, at *2 (S.D.N.Y. Oct. 24, 2002) (dismissing oral contract claim where essential terms were left open); *Huntington Dental & Med. Co. v. Minn. Mining & Mfg. Co.*, 1998 WL 60954, at *3 (S.D.N.Y. Feb. 13, 1998) (same). Further, Mr. Schroeder concedes that he was "no longer at the Bank" at the conclusion of the litigation (Dcl. ¶ 10), and thus cannot speak to whether any benefit was then realized by SG.[6]

Moreover, the undisputed facts eviscerate the NDF Claim's underpinnings. Levion asserts that "DFP contracted for SGNY's right, at *DFP's* election after [a] Disruption Event, to declare SGNY's obligation to pay the Hedge Funds terminated while requiring Vostok pay SGNY under different provisions set forth in the contracts — the asymmetry referenced in the Complaint . . . ." (Op. 5). First, there is not a shred of evidence that DFP had such discretion. Rather, on the face of the relevant NDF Contract (Simon Dcl. Ex. 15 (Int. Ex. F)),

---

[5] SG's records do not reflect a $400 million value on the NDFs as he suggests. (Op. 20).

[6] Nor can Mr. Schroeder speak to Levion's other claims, all of which relate to bonuses received after 2003, the year Mr. Schroeder left SG. (Dcl. ¶ 1).

SGNY — not DFP — is defined as "Party A," (*id.* at 1) the entity that could direct certain actions by "Party B" (Vostok) (*id.*) upon a "Disruption Event" (*id.* at § 5(a)). Further, § 5(a) does not "require[e] Vostok to pay SGNY" (Levion Dcl. ¶ 42), but rather provides options, including allowing Vostok to retain money owed to SGNY until "the Non-Transferability Event has ceased," which SGNY elected. (*Id.* at Int. Ex. I, p. 2 (noting "BSGV holds the USD owed to SGNY")). Second, § 5(a) is not the relevant provision because the Disruption Event constituted more than a "Non-Transferability Event," but also amounted to an "Inconvertibility Event" and a "Nationalization Event." (R.St. ¶ 118). Consequently, under §5(d), an "Additional Termination Event" occurred and a separate provision, § 5(e), controlled. Section 5(e) does not reflect the asymmetry alleged in the Complaint because it is materially identical to a corresponding provision governing the effect of an "Additional Termination Event resulting from the occurrence of a Nationalization Event" in the SG-Hedge Funds NDF Contracts. (Simon Dcl. Ex. 14 (Int. Ex. D) at § 4(e)). Under § 5(e), Vostok's obligation to pay SGNY was subject to its ability to access sufficient assets, and if not, its obligation to pay was cancelled. In light of this provision, Vostok, due to its precarious status (Op. 5), owed SGNY "zero or close to zero," just as SGNY owed "zero or close to zero" to the Hedge Funds. (St. ¶ 121; Br. 20-21).

### C. SG Owed No Bonus to Levion for 2007

Even if Levion could apply the DFP Formula after his resignation (which he could not), he avers that in the event of a negative pool, he would receive nothing. (Dcl. ¶ 20 ("Assuming application of the formula resulted in a positive bonus pool, SG was not permitted to pay [him] nothing")). There is no genuine fact dispute that bonuses were paid annually and not on a pro rata basis. (*Id.*; R.St. ¶ 57). Nor does Levion genuinely dispute that the 2007 annual DFP pool was negative. (R.St. ¶ 59). Even if he received a pro rata share, its value is zero.

KL3 2810995.1

## II. THE UNDISPUTED FACTS SHOW LEVION WAS AN AT-WILL EMPLOYEE WHO ACCEPTED THE TERMS OF HIS COMPENSATION BY REMAINING IN SG'S EMPLOY

The undisputed evidence shows that Levion was an at-will employee. He cites no language in any agreement restricting SG's right to fire him or otherwise providing him a fixed duration of employment. His reliance on documents reflecting various arrangements for how he and DFP would be paid for certain years (Op. 15) only underscores the changing nature of his compensation and does not alter his status as an at-will employee.

Levion notes that if "there was a compensation agreement, the 'at-will' doctrine would not permit SG flagrantly to disregard it." (Op. 16). But that is not what happened here, as set forth above. Further, he concedes that if his employment was at-will, he consented as a matter of law to prospective changes to the terms of his employment. (*Id.*; *see also* Br. 13-15). Levion argues that his claims for additional compensation here are based on retroactive changes to his compensation terms, but the undisputed evidence is to the contrary. For example, he asserts that "[b]eginning no later than 2003, DFP's compensation for TOBP was reduced based upon SG's representations that it was 'not using' all the tax benefits TOBP was generating . . . by imposing a cap (*2003 onward*)." (Dcl.¶ 36 (emphasis added)). Because he remained in SG's employee following that time, he is deemed to consent to this changed term and is foreclosed from contesting the TOBP Tax Gross Up amount for subsequent years now as a matter of law.[7]

---

[7]   Levion dismisses the Tax Gross Up as a "purely mathematical calculation," (Dcl. ¶ 35), but it was based on the tax benefits *actually conferred* by the TOBP. Levion has no basis for asserting that he, and not SG, could compute tax savings actually generated and used. Further, although Levion argues "that the TOBP generated NOLs . . . that could be

KL3 2810995.1

Further, Levion repeatedly disputes that "the formula applicable to and used for [his] compensation is limited to the words of the 'Compensation Principles,'" and argues that it also "incorporated spreadsheets [that] were used for all subsequent years to determine the amount due [him]." (R.St. ¶ 27; *see also id.* ¶¶ 28-31). He avers that these "spreadsheets [were] used to generate DFP bonuses for 1994 through March 2007." (Dcl. ¶ 16). Accordingly, each year's spreadsheet reflected the prospective terms to be applied to Levion's yet-to-be paid bonus. In light of Levion's decision to accept subsequent payment and remain employed, he is deemed to have agreed to SG's calculation of his compensation as reflected in the annual spreadsheets.

Finally, no implied obligation of good faith and fair dealing attaches to at-will employment contracts. (*See* Br. 24).[8] Thus, even if SG's representation that it was not using all the TOBP tax savings was false or if SG "reduc[ed] [] DFP TOBP compensation [as] a means secretly to redistribute compensation to others at SG," as Levion alleges (Op. 7; 22) — neither of which is the case — he has no actionable grievance. Likewise, his claims that SG had "significant resentment towards" him, and was motivated to "'break DFP'" (Op. 4; 8) — apart

---

[8]  carried forward to offset taxable income for 20 years" (Op. 22), this is irrelevant because the tax savings were not realized in the years for which he received bonus compensation.

Levion's reliance on *Knudsen v. Quebecor Printing (U.S.A.) Inc.*, 792 F. Supp. 234, 240 (S.D.N.Y. 1992) (Op. 25) is inapposite because it involved a limited exception to the at-will doctrine for earned sales commissions, and of dubious precedential value. *Bravia Cap. Partners, Inc. v. Fike*, 2010 WL 3359470, at **6-7 (S.D.N.Y. Aug. 25, 2010) (questioning continued validity of reasoning in *Knudsen*). Further, Levion ignores that his claim for breach of the implied covenant must be dismissed because it is based on the same facts and seeks the same relief as his breach of contract claim. (*See* Br. 23).

from being based on documentary excerpts both taken out of context and distorted[9] — should be rejected as a matter of law because of his status as an at-will employee.[10]

### III. LEVION CAN POINT TO NO FACTS EXEMPTING HIM FROM SG's DISCRETIONARY BONUS POLICY

Levion erroneously contends that SG "purely as an evidentiary matter" has failed to establish the existence of its discretionary bonus policy in the form of its 1-page Screenshot. (Op. 13). The Screenshot is properly authenticated because it was produced during discovery and bears indicia of authenticity, including SG's corporate logo. *E.g., U.S. Info. Sys., Inc., v. Int'l Bhd. of Elec. Workers Local Union*, 2006 WL 2136249, at *5-7 (S.D.N.Y. Aug. 1, 2006) ("argument that the process of discovery provides an implicit guarantee of authenticity is wellfounded"). In order to dispel any doubt, SG has provided a Certification of Authenticity.

Levion conflates a policy with its written manifestation. There is ample evidence of SG's policy in the record. Mr. Mustier testified that bonuses were subject to management discretion, and — contrary to Levion's contention (R.St. ¶ 23) — SG could decide to pay him nothing in a hypothetical situation. (Simon Dcl. Ex. 3 at 53 ("[A]s it is pure [] pure discretion, I could decide to pay nothing. . . ."); *see also* p. 13 below). Further, while he glosses over this

---

[9] Among Levion's many mischaracterizations is his assertion that Mr. Mustier was convicted on insider trading charges. (Dcl. ¶ 6). He was not; to the contrary, French prosecutors dropped all charges against him. See http://www.businessweek.com/news/2010-07-20/mustier-insider-trading-probe-is-dropped-by-paris-prosecutors.html.

[10] Nor are these allegations relevant to Levion's breach of contract claims. *E.g., Brown v. Paul Revere Life Insur. Co.*, 2001 WL 1230528, at *6 (S.D.N.Y. Oct. 16, 2001) ("In general, motive is immaterial to a claim for breach of contract.") (citation omitted).

KL3 2810995.1

fact, Levion's Compensation Advices provided that he must be employed on the pay date to receive his bonus. (Simon Decl. Ex. 10A (at n.*)). This language was included notwithstanding the DFP Formula, and belies Levion's bald-faced assertion that he was exempt from SG's policy.

Levion also wrongly argues that SG's "own files indicate that there *was* no such policy" (Op. 14) based on his conflation of a formula-based *group bonus pool* and an *individual bonus award*. He relies on an email (Ex. 4B) that distinguishes between a "discretionary pool" and "formula pools" to support his argument that he had an individual bonus guarantee. But the use of formulas to derive a group bonus pool is a separate issue from whether and in what amounts members of that group will be allocated individual bonus awards from the pool, which is a management decision. (*See* Br. 4; Simon Decl. Ex. 3 (Mustier Tr.) at 53 ("[W]e had guidelines, in order to calculate the *bonus pool* of the various groups and within [that pool] the *allocation* of two *individuals* was a *pure discretion* on my side.") (emphasis added).[11] Levion has adduced no evidence that he had a right to an *individual* bonus for the years at issue.[12]

---

[11] Similarly, Levion's argument that the "14% with 1% 'discretionary'" framework in the DFP Formula would be "a senseless distinction if the *entire* 15% were . . . discretionary" (Op. 14) reflects his failure to distinguish between the calculation of group pools, which used that framework, and individual bonus allocations, which did not. His erroneous conflation of these concepts also is evident in his citation of documents discussing DFP's formula as evidence he had an individual bonus guarantee. (Op. 11-12).

[12] Even under his interpretation, Levion's bonus is not based solely on his own performance, but rather on that of DFP as a whole. It thus does not constitute "wages" under N.Y. Labor Law. *See Ferrari v. Keybank Nat'l Ass'n*, 2009 WL 35330, at *13 (W.D.N.Y. Jan. 5, 2009) (formula-based compensation plan reflecting combination of

## IV. LEVION'S MOTION TO STRIKE SHOULD BE DENIED

Underscoring that SG's discretionary bonus policy is devastating to his claims, Levion goes to great lengths to preclude it. His arguments are baseless.

### A. The Screenshot Was Not Responsive to Levion's Document Requests

Contrary to Levion's rhetoric that SG engaged in "gamesmanship" and acted in "bad faith" (Op. 27; 29), the Screenshot was not produced earlier because it was not responsive to his requests and thus was not a focus of SG's collection efforts. Levion did not seek *any* SG policy, much less the bonus policy, and SG therefore did not search its internal website for such material. The document requests that he invokes did not seek general policies, but rather material specific to DFP or Levion. SG's responses made clear that they were understood as such. (*See* Simon Supp. Dcl. Ex. D at Nos. 1 (agreeing to produce "compensation agreements with *Levion* . . . documents sufficient to show the *DFP Group's* P&L and the *DFP Group* Bonus Pool"; and documents "related to P&L discussions regarding negotiations and calculations with respect to the *DFP Group*"); 2 (same for "documents sufficient to show *Levion's* compensation history"); and 33 (same for documents concerning "decision not to pay, *Mr. Levion* a bonus based on the profit generated by the *DFP Group* in 2007") (emphases added).

SG's actions were "substantially justified" under Rule 37(c)(1). *See Presser v. Key Food Stores Co-Op., Inc.*, 2006 WL 2038508, at *2 (E.D.N.Y. Jul. 19, 2006), *aff'd*, 316 F. App'x. 9 (2d Cir. Mar. 17, 2009) (denying preclusion of letters attached to affidavit in support of summary judgment motion where they "were not the subject of any discovery request"); *cf. Orlik*

individual, team and company performance did not constitute "wages"). In any event, this claim is defeated by SG's discretion in awarding bonuses. (*See* Br. 22). SG's policy and the DFP Formula also foreclose Levion's unjust enrichment claim. (*See* Br. 25).

*v. Dutchess Co.*, 2010 WL 1379776, at *2 (S.D.N.Y. Mar. 25, 2010) (given "absence of language in Plaintiffs' discovery demands specifying" state manuals, "Court cannot say that Defendants' failure to produce the state manuals at an earlier time was the result of bad faith").[13]

### B. SG's Production of the Screenshot Was Harmless under Fed. R. Civ. P. 37

SG's production of the Screenshot was harmless under Rule 37(c)(1) because there "is no prejudice to the party entitled to the disclosure." *Gary Price Studios v. Randolph Rose Coll'n Inc.*, 2006 WL 2381817, at *2 (S.D.N.Y. Aug. 16, 2006) (citations omitted).

SG took the position throughout discovery that individual bonus awards were discretionary. In responding to Levion's Requests to Admit, SG denied both that "Bonus Payments were non-discretionary" and that "the Contract did not require Mr. Levion be employed at the time Bonus Payments were made to receive his bonus." (Simon Supp. Dcl. Ex. A at Nos. 6, 25). Mr. Mustier testified that bonus awards are subject to management discretion:

> I had this question about the payments of bonus for every individual within the SGCIB side except when we had a legal commitment, for instance, when we had the minimum guaranteed bonus to pay for somebody we hired . . . [W]e had guidelines, in order to calculate the bonus pool of the various groups and within the allocation of two individuals was a pure discretion on my side.

---

[13] Levion cites *Nosal v. Granite Park LLC*, 269 F.R.D. 284 (S.D.N.Y. 2010) in support of his "gamesmanship" allegation, which emphasizes that preclusion is a "harsh sanction" to be "imposed with caution." *Id.* at 289. The other case he relies on involved egregious circumstances not present here. *See Currier v. United Techs. Corp.*, 2003 WL 22799669, at *5 (D. Me. Nov. 21, 2003) (defendant "produce[d] for the first time some 600 pages of presumably complex financial documents on the eve of trial," which the plaintiff had "diligently pursued" and "the Court previously ordered .., produce[d].").

> So theoretically, you know, as it is a [matter of] pure discretion I
> could decide to pay nothing to somebody. . . .

(Simon Supp. Dcl. Ex. B at 52; *cf.* Screenshot "Senior management decides each year whether to pay bonuses and, if so, how much is available."). This discretion applied to Levion specifically:

> [If] I say I have discretion I have discretion. . . . So in a very
> theoretical case which is unlikely to materialize because we were
> trained to pay individuals based on what we perceived as their
> performance, you know, theoretically I could pay [Levion] zero . . .

(*Id.* at 55). Mr. Mustier further testified that bonuses are based on factors including individual, team and bank performance. (*Id.* at 56; *cf.* Screenshot ("The amount of any discretionary performance bonus is determined primarily by your job performance and the performance of your department and the Firm for the calendar year.")). Further, Levion acknowledged that his own Compensation Advices stated, "The cash bonus is payable only if [] you are actively employed by SG . . . on the payment date . . . ." (Simon Supp. Dcl. Ex. C (at n.* & Levion Tr. 234-35); *cf.* Screenshot ("To receive a bonus, you must be employed by SG on the day it's paid and not have given notice of a pending resignation.")).

Moreover, Levion was employed by SG for over 15 years, during which time he had access to SG's Employee Handbook containing its bonus policy. Indeed, his offer letter stated he was "entitled to all the Bank's benefits as discussed in Bank Policies. . . ." (Simon Dcl. Ex. 2A). He thus should be charged with knowledge of the policy. *Cf. Bey v. City of N.Y.*, 2010 WL 3910231, at *5 (S.D.N.Y. Sept. 21, 2010) ("Plaintiffs should have been equally aware of [] Court records" not produced and thus "cannot plausibly claim they were 'sandbag[ed]' by the court records Defendants have submitted in support of their motion. . . .").

Because the content of SG's discretionary policy was provided during fact discovery, Levion suffers no prejudice on account of a document reflecting this same substance not being produced earlier, and preclusion is neither warranted nor appropriate. *Cf. Gayle Martz,*

*Inc. v. Sherpa Pet Grp., LLC*, 651 F. Supp. 2d 72, 80-81 (S.D.N.Y. 2009) (noting that duty to supplement discovery is required only where "information has not otherwise been made known to the other parties during the discovery process" and rejecting argument that plaintiff should be precluded from reliance on documents not previously produced where "information that [plaintiff] might have provided in supplements to its discovery responses was at all times known to Defendants"); *Morgenstern v. County of Nassau*, 2008 WL 4449335, at **2-3 (E.D.N.Y. Sept. 29, 2008) (affidavits submitted in support of summary judgment from witnesses not identified in defendants' initial disclosures should not be precluded where witnesses' identities were disclosed in depositions and plaintiff was "well aware" of their respective roles in case).[14]

### C. Other Relevant Considerations Militate Against Preclusion

Other relevant factors considered by courts under Rule 37 also militate against preclusion. *See, e.g., Gary Price Studios*, 2006 WL 2381817, at *2 (setting out factors). The importance of the precluded evidence cuts in SG's favor because its bonus policy is a defense warranting dismissal of Levion's complaint. *See Nat'l Molding Corp v. Newell Rubbermaid, Inc.*, 2004 WL 5717865, at **4-5 (E.D.N.Y. Sept. 29, 2004) (agreeing with Defendants that belatedly produced document was "indispensable part of their defense," that "to preclude the Defendants from using [document] . . . would be seriously detrimental to the Defendants' case," and that this factor therefore "weighs in favor of the Defendants"); *see also Outley v. City of N.Y.*, 837 F.2d 587, 591 (2d Cir. 1988) ("Because the evidence of these witnesses was so

---

[14] SG referred to its policy in its August 20 pre-motion letter. Nearly a month later, Levion requested the policy, which SG produced concurrently with its motion. Levion complains that SG did not produce the Screenshot immediately upon receipt of his letter, but does not explain why that would have mattered given that discovery was long closed.

important, only extreme misconduct on the part of the plaintiff or extreme prejudice suffered by the defendants would justify the extraordinary sanction of preclusion in this case.").

Finally, even if Levion learned of the bonus policy for the first time when the Screenshot was produced, which is implausible on its face, he had sufficient time to address it in his opposition. Indeed, he was granted an additional two weeks to submit his papers. This factor too favors SG, particularly given the Screenshot's brevity. *See Bey*, 2010 WL 3910231, at *5 ("even if Defendants' failure to produce [] documents during discovery did prejudice Plaintiffs, such prejudice would have been remedied by the fact that Plaintiffs had more than sufficient time to review and respond" to them); *Orlik*, 2010 WL 1379776, at *2 (no preclusion where "Plaintiffs received the manuals on April 15, 2009, with plenty of time to utilize them in filing their May 22, 2009 opposition to Defendants' Motion for Summary Judgment").

## CONCLUSION

SG requests that the Court grant its motion and deny Levion's motion to strike.

Dated:   New York, New York
         January 7, 2011

                                        KRAMER LEVIN NAFTALIS & FRANKEL LLP

                                        By: _____
                                            Kevin B. Leblang
                                            Norman C. Simon
                                            Jade A. Burns
                                        Attorneys for Defendant Société Générale