UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────────

No. 09 Civ. 5800 (RJS)

───────────────────

MARTIN LEVION,

Plaintiff,

VERSUS

SOCIÉTÉ GÉNÉRALE,

Defendant.

───────────────────

OPINION AND ORDER
September 30, 2011

───────────────────

RICHARD J. SULLIVAN, District Judge:

Plaintiff Martin Levion brings this diversity action against his former employer, Société Générale ("SG"), for failure to pay him an annual performance bonus after he quit his job in 2007. Specifically, Plaintiff alleges that he and SG negotiated a contract providing him with an annual non-discretionary bonus, and that SG breached that contract when it reduced his expected 2006 bonus and refused to pay him a "pro rata" bonus for 2007 after he resigned. Plaintiff also claims that SG breached the compensation agreement by failing to include revenues from particular transactions. Additionally, Plaintiff makes claims under New York Labor Law § 193 and common law based on SG's alleged failure to pay him performance bonuses.

SG has moved for summary judgment on all of Plaintiff's claims. For the reasons set forth below, Defendant's motion is granted.

I. BACKGROUND

A. Facts[1]

Defendant Société Générale hired Plaintiff in 1990 as a Vice President in Treasury. (Decl. of Norman Simon, dated October 19, 2010, Doc. No. 33 ("Simon Decl."), Ex. 2A; Def. 56.1 ¶ 1.) In time,

───────────────────

[1] The following facts are taken from the pleadings, the parties' Local Rule 56.1 Statements, the affidavits submitted in connection with the instant motions, and the exhibits attached thereto. The facts are undisputed unless otherwise noted. Where one party's 56.1 Statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact.

Plaintiff became Managing Director of an SG group that dealt with fixed income derivatives, credit derivatives, municipal finance, derivatives marketing, and structured tax products. (Simon Decl., Ex. 2A; Compl. ¶ 12.) The group, which was originally referred to as Interest Rate Derivatives, or "IRD," became known as Derivatives and Financial Products, or "DFP," and was part of SG's Debt and Finance Division ("DEFI"). (Def. 56.1 ¶¶ 27, 4.) DEFI was headed by Pierre Schroeder from 1999 to 2003 and by Paolo Taddonio from 2004 to July 2008. (*Id.* ¶ 5, 7.) Jean-Pierre Mustier headed DEFI at the global level. (*Id.* ¶ 8.)

At the time of his hiring in June 1990, Plaintiff received an offer letter from SG indicating that his salary would be "$5,192.31 bi-weekly [roughly $135,000 annually] . . . subject to an annual review on the anniversary of hire." (Simon Decl., Ex. 2A.) The letter also provided a guarantee that "the bank [would] provide [him] with a Bonus for 1990 performance, payable in early 1991 of not less than $100,000.00." (*Id.*) The record is silent as to any compensation issues between the parties in the years immediately following Plaintiff's hiring. In 1994, Plaintiff and his then supervisor, Schroeder, executed a written document entitled "Compensation Principles for IRD New York" ("Compensation Principles" or the "1994 Agreement"). (Decl. of Ariel Cannon, dated December 1, 2010, Doc. No. 41 ("Cannon Decl."), Ex. 1A; Def. 56.1 ¶ 27.) Among other things, the Compensation Principles contemplated a method for calculating bonuses for Plaintiff and the rest of the DFP group (the "DFP Formula"). (Cannon Decl., Ex. 1A; Decl. of Pierre Schroeder, dated November 24, 2010, Doc. 42 ("Schroeder Decl.") ¶ 4.) Specifically, the Compensation Principles provided that Plaintiff and his group were to share in a bonus pool based on certain percentages of DFP's net profit and loss, or "Net P&L" (Def. 56.1 ¶¶ 29-30), which was to be defined "per the attached spreadsheet and the following rules."[2] (Cannon Decl., Ex. 1A.) The 1994 Agreement further provided that Plaintiff, as "[t]he Manager of SGNY IRD[, would] receive 25% of the amounts given by the preceding formulas, plus any additional discretionary amount, *for 1994 and 1995*." (*Id.* (emphasis added))

The record indicates that between 1994 and Plaintiff's resignation in March 2007, no new agreement was executed by the parties. Nevertheless, Plaintiff and his group continued to receive bonuses roughly in keeping with those paid in 1994 and 1995, in accordance with the DFP Formula. (*See* Cannon Decl., Ex. 1B, 1C, 1D, 1E, 1G, 2A, 2B, 3A, 3B.) Like many professionals in the financial services industry, Plaintiff received a fixed regular salary during the year, as well as a bonus in the first quarter of the following year that typically dwarfed his salary. (Simon Decl., Ex. 10A.) Thus, from 2001 to 2006, when Plaintiff's base salary remained fixed at $250,000 per year, Plaintiff's bonus was approximately $7 million for 2000, $12.7 million for 2001, $6 million for 2002, $6.5 million for 2003, $4.8 million for 2004, $6.9 million for 2005, and $5 million for 2006. (*Id.*)

The undisputed record indicates that during this time period, Plaintiff's bonus was, for the most part, formula-based and derived largely from DFP's Net P&L, which was first calculated by DFP, confirmed and approved by SG's Accounting Group, and then passed along to SG management. (Def. 56.1 ¶¶ 32-33, 35-36; Pl. 56.1 ¶¶ 147-152.) Nevertheless, the record also reflects that Plaintiff's compensation arrangement

---

[2] Neither party has produced the spreadsheet or rules.

2

"evolved as [DFP's] business evolved." (Simon Decl., Ex. 5 at 54:19-21; Def. 56.1 ¶ 44; Pl. 56.1 ¶¶ 146, 155.) Thus, Plaintiff at times received higher percentages of the bonus pool than that set forth in the 1994 Compensation Principles. (Pl. 56.1 ¶ 43; Cannon Decl., Ex. 1D, 1E.) In addition, the Net P&L – which formed the basis of Plaintiff's bonus – came to include revenue from projects that were not mentioned in the 1994 Agreement. (Decl. of Martin Levion, dated December 1, 2010, Doc. No. 43 ("Levion Decl.") ¶ 15; Pl. 56.1 ¶¶ 123, 181; Def. 56.1 ¶ 46.)

One such project, which was initiated by DFP in the late 1990s, involved DFP's entry into a series of Non-Deliverable Forward ("NDF") transactions related to the Russian ruble. (Def. 56.1 ¶ 105; Compl. ¶ 36.) These transactions involved contracts between SG and hedge funds, and SG and its Russian affiliate, and were designed as a hedge against Russian government bonds. (Def. 56.1 ¶¶ 105, 107.) Although there is no mention of the NDF transactions in the 1994 Agreement or in any iteration of the DFP Formula, e-mails and correspondence from 1998 to 1999 indicate that SG management expected DFP to be credited for these deals. (Cannon Decl., Ex. 13A, 13B, 13C, 13D; Def. 56.1 ¶ 123.)[3]

Another project not contemplated by the Compensation Principles related to a series of transactions known as "RIC" transactions, in which SG restructured certain bonds, sold the remaining product at a substantial discount, and then took the difference between the face value of the instruments and the price at which they were sold as a deduction for tax purposes. (Def. 56.1 ¶ 62; Simon Decl., Ex. 6 at 242:2-24.) Yet another project not mentioned in the 1994 Agreement involved a transaction known as "FRED," which was a balance sheet transaction that resulted in a tax savings for SG. (Def. 56.1 ¶ 66; Simon Decl., Ex. 6 at 246:6-24.) Nevertheless, savings that resulted from the RIC and FRED transactions were calculated as revenues for DFP and included in the Net P&L for Plaintiff's bonus pool in 1996, 1997 and 2002. (Def. 56.1 ¶¶ 65, 70.)

Beginning in 2004, the RIC and FRED transactions came to be scrutinized by the IRS as part of an extensive audit. (Def. 56.1 ¶ 72.) Put simply, the IRS disagreed with the tax position that SG, through DFP, had taken with respect to those transactions. In time, SG agreed to a settlement with the IRS that required SG to restate its tax savings and pay a penalty. (Def. 56.1 ¶¶ 73-74.) The IRS settlement effectively unraveled the transactions that had formed a significant part of DFP's prior years' P&L and bonus pool. As a result, SG management decided

---

[3] As discussed below, because of an asymmetry in the contracts executed between the parties in the NDF transactions, when the ruble declined in value, SG would only be obligated to pay the hedge funds upon payment from the Russian affiliate. (Def. 56.1 ¶ 108.) Thus, after a market decline, if "DFP [had] been allowed to execute the documents as written, [SG New York] would have been in a position to have collected the $400 million . . . from Moscow . . . [based on the asymmetry between the contracts]" with SG and the hedge funds and the Russian affiliate. (Simon Decl., Ex. 6 at 194:4-12.) The hedge funds brought suit against SG for payment of the $400 million, and litigated the issue for several years. (Compl. ¶ 40.) Plaintiff asserts that "SG asked [him] to wait until the conclusion of the Hedge Fund litigation to compute compensation credit to DFP for the NDFs . . . ." (Pl. 56.1 ¶ 172.) The record indicates that Schroeder "advised [Plaintiff] that, due to related litigation with the two hedge funds, the compensation effect of those transactions could only take place when this litigation was complete." (Schroeder Decl. ¶ 9.) Plaintiff then requested compensation for the NDF transactions in 2004, after the conclusion of the litigation. (Cannon Decl. Ex. 13E.) Ultimately, SG management forgave the Russian affiliate's obligation to SG New York and retained the $400 million benefit in Paris. (Pl. 56.1 ¶ 169.)

3

to consider the financial impact of the RIC and FRED requalifications when calculating Plaintiff's bonus for 2006, ultimately reducing Plaintiff's expected bonus of $8.5 million by $3.5 million. (Def. 56.1 ¶ 77.) Plaintiff addressed concerns regarding the reduction of his bonus to Mustier in an e-mail, objecting that "[he had] always been paid based on the actual P&L [that DFP had] generated during the applicable year" and that there was "no precedent for reducing . . . individual bonuses." (Cannon Decl., Ex. 5B.) Mustier responded by informing Plaintiff that "[t]here is nothing in our agreement that prevents us from charging you or your bonus pool for a major adverse regulatory consequence in one of your deals. It surely cannot be that you only share in the profits from a transaction but never in the losses they have incurred." (*Id.*)

In January 2007, Plaintiff was informed that his 2006 bonus would be reduced to reflect the requalifications of the RIC and FRED transactions. (Cannon Decl., Ex. 5B.) Additionally, SG decided to relocate DFP from its office space near Plaintiff's home in Connecticut to SG's principal offices in New York City. (Def. 56.1 ¶ 9) Unhappy with these decisions, Plaintiff resigned on March 20, 2007. (Simon Decl., Ex. 2B) In his resignation letter, Plaintiff demanded compensation that he claimed SG owed him, including a pro rata portion of his 2007 bonus and return of $3.5 million that was "improperly deducted" from his 2006 bonus. (*Id.*) When SG did not respond, Plaintiff brought this suit. (Pl. 56.1 ¶ 16.)

### B. Procedural History

Plaintiff filed the Complaint on June 24, 2009, and alleges that SG breached his employment contract by withholding $3.5 million from his 2006 bonus, by failing to pay a pro rata bonus for 2007, and by not properly accounting for profits generated by NDF and other transactions in prior years' bonuses. The Complaint also asserts claims under New York Labor Law § 193 and brings common law claims for breach of the covenant of good faith and fair dealing and unjust enrichment related to his bonuses.

Defendant answered the Complaint on August 14, 2009, and after extensive discovery in the United States and Europe, moved for summary judgment on October 19, 2010. On December 1, 2010, Plaintiff moved to preclude consideration of a document related to SG's discretionary bonus policy on the grounds that the document was not produced during discovery. Briefing on both motions was completed by January 7, 2011.

### II. LEGAL STANDARD

The standard for summary judgment is well settled. Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of proving that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has met its burden, the nonmoving party "must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (internal citations and quotation marks omitted).

In ruling on a motion for summary judgment, the court must resolve any ambiguity in favor of the nonmoving party. *Amnesty Am. v. Town of W. Hartford*, 361

4

F.3d 113, 122 (2d Cir. 2004). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments . . . ." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). As a result, summary judgment will not issue where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. However, "a complete failure of proof concerning an essential element of the nonmoving party's case" renders summary judgment proper. *Celotex*, 477 U.S. at 323.

III. DISCUSSION

A. Motion to Preclude

Plaintiff moves to strike and preclude SG from relying on a screen shot of SG's purported company-wide bonus policy on the grounds that this document was not produced during discovery. (Pl. Mem. 25-29.) Defendant argues that the screen shot of SG's "entre-net" discussing its underlying bonus policy was not responsive to Plaintiff's document requests and, even if it was, its nonproduction caused Plaintiff no prejudice because the underlying content of the discretionary policy was provided in discovery. (Def. Reply 11-15.)

Having reviewed Plaintiff's document requests, the Court is persuaded that Plaintiff's document requests were broad enough to encompass the document and that Defendant should have produced the bonus policy screen shot during discovery. However, it is difficult to see how Plaintiff has been prejudiced by the late production. From the outset of this litigation, SG has maintained that bonuses were discretionary with management. Nevertheless, because the Court has not considered the screen shot in granting Defendant's motion for summary judgment, Plaintiff's motion to preclude is denied as moot. *See Fifty-Six Hope Road Music Ltd. v. UMG Recordings, Inc.*, No. 08 Civ. 6143 (DLC), 2011 WL 3874859, at *2 (S.D.N.Y. Aug. 31, 2011) (denying as moot plaintiffs' motion to exclude evidence allegedly withheld during discovery when certain claims were barred by the statute of limitations); *Auscape Int'l v. Nat'l Geographic Soc'y*, 409 F. Supp. 2d 235, 237 (S.D.N.Y. 2004) (finding no need to reach defendants' motion to preclude certain evidence when summary judgment was granted in defendants' favor).

B. Breach of Contract Claims

1. Wrongful Deduction of $3.5 Million

Plaintiff's first cause of action alleges that SG breached his employment contract when it improperly withheld $3.5 million from Plaintiff's expected 2006 bonus. Under New York law, "entitlement to a bonus only exists where the terms of the relevant contract require it." *Vetromile v. JPI Partners, LLC*, 706 F. Supp. 2d 442, 448 (S.D.N.Y. 2010). Thus, the absence of such a contract would be fatal to Plaintiff's claim. "To create an enforceable contract under New York law, there must be 'a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.'" *Piven v. Wolf Haldenstein Adler Freeman & Herz LLP*, No. 08 Civ. 10578 (RJS), 2010 WL 1257326, at *4 (S.D.N.Y. Mar. 12, 2010) (quoting *Express Indus. and Terminal Corp. v. N.Y. State Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999). The fundamental precept of contract interpretation is that agreements are construed in accord with the parties' intent, "as expressed in the unequivocal language

they have employed." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000). "'Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.'" *In re Delta Airlines Inc.*, 313 F. App'x 430, 434 (2d Cir. 2009) (quoting *Seiden Assocs. Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)). By contrast, contract language is "unambiguous when it has a definite and precise meaning and where there is no reasonable basis for a difference of opinion." *Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997). "[T]he fact that one party may have a different interpretation of the language does not make it any less plain." *Harris Trust and Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 970 F.2d 1138, 1147 (2d Cir. 1992).

Plaintiff's first cause of action alleges that Plaintiff entered into a contract with SG "in 1990, when he accepted employment." (Compl. ¶ 49.) According to the Complaint, that contract "provided that [Plaintiff] would receive an annual non-discretionary bonus, which would be tied to the P&L of the DFP Group." (*Id.*) However, the terms of the June 6, 1990 letter belie that assertion. Indeed, although the 1990 letter clearly guarantees Plaintiff a bonus, that guarantee is expressly limited to 1990. (Simon Decl., Ex. 2A ("[T]he bank will provide you with a Bonus for 1990 performance, payable in early 1991 of not less than $100,000.00.").) The letter says nothing whatsoever about tying the bonus to the "P&L of the DFP Group," which had not yet been created, nor does it suggest in any way that the guarantee of a 1990 bonus was a guarantee for future years.

Perhaps mindful of this clear error in the Complaint, Plaintiff now attempts to amend his Complaint by recharacterizing his contract in terms of the 1994 Compensation Principles. Thus, according to Plaintiff's 56.1 Statement, the parties "updated their compensation agreement" in 1994, through the Compensation Principles, "which [were] signed by [Plaintiff] and Mr. Schroeder, confirmed the framework for [Plaintiff's] compensation[,] . . . provided greater detail concerning DFP's bonus methodology [and] governed the compensation paid to DFP and [Plaintiff] for more than a decade." (Pl. 56.1 ¶ 137; *compare* Compl. ¶¶ 19-23.). Once again, however, Plaintiff has mischaracterized the document in question. In fact, the "Compensation Principles" clearly and unequivocally set forth various "Elements of Incentives," of which a relevant term provides, "The Manager of SGNY IRD [Plaintiff] will receive 25% of the amounts given by the preceding formulas, plus any additional discretionary amount, *for 1994 and 1995*." (Cannon Decl., Ex. 1A (emphasis added).) By its very terms, the Compensation Principles guarantee Plaintiff a bonus for 1994 and 1995, and those years only. Nothing in the language of the contract indicates that Plaintiff was guaranteed a bonus in subsequent years or that the 1994 Agreement was meant to be extended indefinitely. Put simply, Plaintiff's assertion that the 1994 Agreement provided him with a guaranteed bonus based on the DFP Formula in subsequent years is contradicted by the plain language of the 1994 Agreement.

Plaintiff's argument that "reference to 1994-95 [in the Compensation Principles] applied to the phrase 'additional discretionary amounts'" (Pl. 56.1 ¶ 40), is wholly at odds with the actual language of the Compensation Principles. Indeed, Plaintiff's reading of the contract would effectively edit the second comma out of the

6

sentence, something courts are not free to do. *See MBIA Ins. Corp. v. Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A.*, No. 09 Civ. 10093 (RJS), 2011 WL 1197634, at *11 (S.D.N.Y. Mar. 25, 2011) ("'[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'" (quoting *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (App. Div. 2004)); *see also Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) ("[T]he court should not find the contract ambiguous where the interpretation urged by one party would 'strain[] the contract language beyond its reasonable and ordinary meaning." (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 141 N.E.2d 590, 593 (N.Y. 1957)). Equally unavailing is Plaintiff's resort to extrinsic evidence for the proposition that both he and Schroeder intended for the Compensation Principles to extend beyond the 1994-95 time period. (Pl. 56.1 ¶ 138, 140; Levion Decl. ¶ 20; Schroeder Decl. ¶ 6.) Because the Court finds the 1994 Agreement to be unambiguous, the Court need not – and should not – look to evidence beyond the "four corners" of the document to inform its meaning. *See Kamfar v. New World Rest. Group, Inc.*, 347 F. Supp. 2d 38, 48-49 (S.D.N.Y. 2004) ("Where the agreement is unambiguous, a court may not admit extrinsic evidence and interprets the plain language of the agreement as a matter of law."); *see also RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) ("Where a contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence." (internal quotations and citations omitted)).

Having predicated his argument on the 1994 Agreement being indefinitely in effect, notwithstanding its unequivocal acknowledgement that Plaintiff's bonus was guaranteed for *only* 1994 and 1995, Plaintiff has not even attempted to argue that the parties reached an express binding agreement to extend or modify the terms of the 1994 Agreement beyond 1995. At most, Plaintiff invites the Court to ramble through a forest of emails, testimony, draft agreements, and correspondence, none of which demonstrates the existence of a definite contract between the parties. Indeed, although it is certainly the case that "parties are free to enter into a binding contract without memorializing their agreement in a fully executed document," *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1986), Plaintiff does not allege such an unwritten agreement and refers explicitly to a signed agreement. (*See* Compl. ¶ 20 ("Mr. Levion and Soc Gen management negotiated a contract (the "Contract") . . . that consisted of a comprehensive formula . . . signed by both Mr. Levion and Soc Gen management, which incorporated the annual profit and loss statement . . . .")) Nor do any of the facts alleged by Plaintiff alter the conclusion that the 1994 Agreement was the last contract executed by the parties.[4]

---

[4] Further, if Plaintiff is now implying that subsequent communications created a binding oral modification to the 1994 Agreement, extending it beyond its explicit durational terms, he should have raised this theory well before this stage. Indeed, "[b]ecause a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment." *Insinga v. Cooperatieve Centrale Raiffeisen Borenleenbank B.A.*, No. 03 Civ. 7775 (RJH), 2005 WL 2345293, at *10 (S.D.N.Y. Sept. 20, 2005) (quoting *Beckman v. U.S. Postal Service*, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000)).

7

For instance, Plaintiff points to an August 9, 2000 email between Schroeder and Mustier in which the two men discussed a "proposed new bonus system for DFP," which reflected Plaintiff's request to increase the DFP Group's "minimum guaranteed" from 12% to 14-18%. (Cannon Decl., Ex. 1C.) Plaintiff also refers to an October 2000 memorandum, which stated that SG Management and Plaintiff had "come to an agreement covering all outstanding [compensation] issues for the next few years." (*Id.*, Ex. 1D.) One day later, however, a "not completely finalised" version of a "term sheet detailing [SG's] proposed compensation agreement with Martin Levion for the years 2000 to 2003" was circulated. (*Id.*, Ex. 1E.) The Complaint makes no reference to such an agreement, and the record is silent as to whether the proposed agreement was ever adopted. Similarly, Plaintiff attaches two "DECC/AMER Bonus System" updates from 2000 and 2002, which purportedly detailed bonus provisions regarding the DFP Group, including a note stating that the manager of the DFP desk, Plaintiff, would receive 25% of the total amount calculated by application of the preceding formulas, as well as discussion of the "[a]mount guaranteed to the salespeople." (*Id.*, Ex. 3A, 3B.) Once again, the pleadings and submissions of the parties are silent as to whether and when such an agreement was reached. In March 2003, Schroeder sent Mustier and others an email discussing Plaintiff's dissatisfaction with his bonus compensation and proposing a "bonus system" that evidently would serve as an "agreement for 2003, 2004 & 2005." (*Id.*, Ex. 2A.) Later, Schroeder sent the same parties an e-mail with the subject line "Compensation Agreement with DFP for 2003 and 2004," in which Schroeder outlined the method for bonus calculation and contemplated confirming the terms with Plaintiff "in coordination with Legal." (*Id.*, Ex. 2B.) Once again, there is no indication in the pleadings or the record as to whether or how those negotiations were concluded. An email from 2004 debates the "bonus rate," saying that it was "prescribed as 14% - 15%." (*Id.*, Ex. 1G.) Also before the Court is a September 2005 e-mail, attaching a "Cash Bonus Plan for Employees of the Derivatives and Financial Products Group," which purported to "restat[e] a cash bonus plan that has been in effect for a number of years." (*Id.* Ex. 2C.) That agreement had numerous blank spaces, missing material terms, and was never signed. (*Id.*)

Despite the references to "agreements," "bonus systems," and "plans," the record does not show – and Plaintiff does not allege – that these discussions or proposals *ever* resulted in a new enforceable agreement. There is no indication that any agreement other than the 1994 Agreement was ever executed. Nor has Plaintiff pleaded an oral contract. (*See* Compl. ¶ 20 ("Mr. Levion and Soc Gen management negotiated a contract . . . that consisted of a comprehensive formula . . . *signed* by both Mr. Levion and Soc Gen management . . . ." (emphasis added)). The record indicates that the parties knew how to craft a binding written agreement when they wanted to; they did so with regard to Plaintiff in 1990 and 1994, and again in 2007 for DFP Group members who stayed at SG after the Group moved to Manhattan in 2007 and Plaintiff and others had quit the firm. (Levion Decl. ¶ 32.) The choice not to craft such an agreement – or to abandon drafts of such an agreement – indicates that the parties ultimately did not intend to be bound by an enforceable contract. In fact, Plaintiff himself admitted that an attempt to memorialize his compensation arrangement in 2004 was abandoned after SG and Plaintiff "jointly concluded that the

8

flexibility of the current arrangement was superior." (Levion Decl. ¶ 23.)

In the face of this evidence and logic, Plaintiff makes several arguments, none of which is availing but which nevertheless serve to highlight Plaintiff's fundamental misunderstanding of contract law. First, Plaintiff makes much of the fact that his bonus was "formula-based" and not subjectively determined. But this observation, even if true, does nothing to alter the non-contractual nature of his bonus compensation. Whether based on a formula, seniority, a committee, or a Ouija board, Plaintiff's bonus was never guaranteed, other than in 1990 and 1994. In the absence of such a contractual arrangement, Plaintiff cannot claim that he was entitled to a particular bonus.

Second, Plaintiff insists that his bonus was "consistently" granted in conformity with the DFP Formula and that the decision to hold back $3.5 million was "unprecedented" during his tenure at SG. Once again, this assertion – even if true (and there is much in the record to demonstrate that Plaintiff's bonus calculation was an "evolving" process that ultimately included many factors not set forth in the DFP Formula (Simon Decl., Ex. 5 at 54:19-21)) – does nothing to alter the non-contractual nature of Plaintiff's bonus arrangement. A guaranteed bonus in year one, followed by comparable bonuses in years two and three, does not create an entitlement to an equal bonus in years four and beyond. As noted above, "entitlement to a bonus only exists where the terms of the relevant contract require it." *Vetromile*, 706 F. Supp. 2d at 448. Absent a guarantee, Plaintiff's expectations concerning his 2006 bonus were just that – expectations, which are not the equivalent of a contract. He was an at-will employee whose ultimate recourse to an unsatisfactory bonus was to walk away. This is precisely what he did in 2007, and it would be difficult to say that Plaintiff was ill-served by an at-will arrangement that paid him more than $50 million dollars in the span of less than a decade.

Of course, characterizing Plaintiff as an at-will employee does not mean that he had no say in the financial terms of his continued employment. Like any at-will employee, Plaintiff had considerable leverage in negotiating compensation with his employer. As long as Plaintiff was producing for the bank, SG had every incentive to pay Plaintiff what was necessary to retain him, up to the limit of what the market would bear for a replacement. Conversely, Plaintiff had an incentive to stay at SG as long as his total compensation was greater than what he could make elsewhere, taking into account transaction costs and non-monetary incentives, such as having office space in Connecticut, near his home. Neither party needed a contract to preserve its interests. Indeed, the decision to forego the certainties, and restrictions, of a formal contract in favor of the greater flexibility afforded by an at-will arrangement can hardly be considered irrational.

Because the 1990 Letter and 1994 Compensation Principles constitute the only contractual guarantees between Plaintiff and SG, and because those bonus guarantees are expressly limited to the years 1990, 1994, and 1995, Plaintiff has failed to demonstrate the existence of a contract that would have entitled him to a bonus in 2006.[5]

---

[5] Even if the 1994 Agreement were extended all the way to 2007, there is nothing in that Agreement to suggest that management was not free to subtract from DFP's P&L the anticipated costs of a regulatory action that unraveled a transaction that Plaintiff had championed, and been compensated for, in the past. Nothing in the Compensation Principles can be read

Accordingly, Plaintiff's claim for an additional $3.5 million must fail.

2. Failure to Pay 2007 Bonus

Plaintiff also alleges that SG "breached its duty under the Contract" by not paying him a pro rata portion of a bonus based on the DFP Group's Net P&L at the time of his departure in March 2007. (Compl. ¶ 58.) Plaintiff argues that SG's refusal to pay a bonus based on the profits earned by the DFP Group through March 2007 was "contrary to the terms of the parties' agreement." (*Id.*) This count fails for all the same reasons Plaintiff's first count fails: there simply was no contract or legally enforceable agreement beyond 1995.

Moreover, even if the 1994 Agreement extended to 2007, there is nothing in the language of the Agreement to suggest that Plaintiff was guaranteed a pro rata bonus to be paid a year after he had resigned from SG. In the absence of a contractual requirement, "'[a]n employee's entitlement to a bonus is governed by the terms of the employer's bonus plan.'" *O'Dell v. Trans World Entm't Corp.*, 153 F. Supp. 2d 378, 397 (S.D.N.Y. 2001) (quoting *Hall v. United Parcel Serv. Of Am., Inc.*, 555 N.E.2d 273, 279 (N.Y. 1990)). The undisputed facts indicate that SG's general policy with regard to bonuses was that employees must be currently employed at SG, and must not have submitted their resignation, in order to receive a bonus.[6] The language of the Compensation Advices given to Plaintiff each year confirms this policy: in order to receive a cash bonus, an employee had to be "actively employed by SG . . . on the payment date specified in this Advice . . . and [he must not have] given notice of termination on or prior to the above mentioned payment date . . . ." (Simon Decl., Ex. 10A.) Because Plaintiff resigned in from SG in March 2007, he cannot claim a pro rata bonus, which would have been payable a year after he left the bank.

Finally, Plaintiff's assertion that he was entitled to a pro rata bonus based on the DFP Group's Net P&L at "*the time of [his] departure from Soc Gen in March 2007*" defies both logic and the language of the 1994 Agreement. (Compl. ¶ 58.) As noted above, the 1994 Compensation Principles determined bonuses on the basis of "Net P&L." There is no dispute that "Net P&L" was a year-end calculation that involved input from the manager of DFP, the Accounting Department, and senior management. (Levion Decl. ¶ 17; Pl. 56.1 ¶ 35-37). By year-end 2007, DFP had actually lost money, such that the Net P&L was negative. (Simon Decl., Ex. 10B.) Thus, even if Plaintiff were entitled to a pro rata bonus notwithstanding his resignation, his bonus would have been zero. The suggestion that an employee could quit the firm in March in order to lock in present gains, and avoid future losses, when the true "*Net* P&L" for the year was negative would create perverse incentives for individuals and the bank. Absent clear language evidencing such an intent, the Court will not

---

to "prevent . . . [SG] from charging [Plaintiff] for a major adverse regulatory consequence in one of [his] deals." (Cannon Decl., Ex. 5B.) Mustier's position that "surely [it] cannot be that [Plaintiff] only share in the profits from a transaction but never in the losses they have incurred" is completely consistent with the terms of the 1994 Agreement, were it still in effect in 2007.

[6] In reaching this conclusion, the Court does not rely on the screenshot at issue in Plaintiff's Motion to Preclude. Rather, the Court looks to the Compensation Advices and testimony. (Simon Decl., Ex. 3 at 48:14-24; 52:22-53:25; Ex. 10A; Def. 56.1 ¶ 52; Pl. 56.1 ¶ 57.)

presume that the parties contracted for such an illogical and ultimately mischievous result.

In light of the foregoing, the Court finds that Plaintiff is not entitled to a pro rata bonus for 2007.

### 3. Failure to Compensate for NDF and TOBP Transactions

Plaintiff's third and fourth counts involve SG's alleged failure to provide Plaintiff with specific compensation from the NDF[7] and TOBP[8] transactions. Again, these claims fail because Plaintiff has not presented sufficient evidence to demonstrate that there was a valid contract between himself and SG that extended beyond the clear durational terms of the 1994 Agreement.

To the extent that Plaintiff suggests that he had a separate agreement with SG management to be compensated based on the proceeds from the NDF transaction at the conclusion of the hedge fund litigation, his claim fails for the same reason that his previous claims fail: he simply does not produce evidence of a valid enforceable agreement guaranteeing such compensation. The record indicates that SG management contemplated compensating the DFP Group for these transactions. (Cannon Decl., Ex., 13A, 13B, 13C, 13D.) The record also shows that Plaintiff inquired about compensation for the NDF transactions in 2004 after the conclusion of the litigation (*Id.*, Ex. 13E), and that Plaintiff had many "conversations about this issue" with SG management *(Id.,* Ex. 15A at 190:13-14). The record also shows that Schroeder discussed NDF compensation with Plaintiff and "advised [him] that . . . the compensation effect of those transactions could only take place when this litigation was complete." (Schroeder Decl. ¶ 9.) Clearly, these facts – even taken in the light most favorable to Plaintiff – do not amount to an enforceable contract. At most, Plaintiff had an agreement with SG management to further discuss compensation issues regarding the NDF transactions. Such an agreement to further negotiate will not support Plaintiff's breach of contract claim. *See Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (N.Y. 1981) ("[I]t is rightfully well settled in the common law of contracts in this State that a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable."); *see also Gould v. Lightstone Value Plus Real Estate Inv. Trust, Inc.*, 301 F. App'x. 97, 100 (2d Cir. 2008) ("[A]n agreement to agree . . . [is] unenforceable as an illusory promise." (citing *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 95 (2d Cir. 2007)).

Likewise, Plaintiff's claims for breach of contract related to TOBP fail because Plaintiff has not presented sufficient evidence of a contractual guarantee to compensation based on TOBP. Plaintiff refers to e-mails exchanged between SG

---

[7] After years of litigation with the hedge funds, SG settled with the Moscow affiliate and forgave the $400 million debt to DFP, thus precluding those funds from being calculated in DFP's Net P&L for bonus compensation purposes. (Pl. 56.1 ¶ 169.)

[8] From 1999 to 2004, DFP pursued a project known as the "Tender Option Bond Program" ("TOBP"), whereby SG established trusts through which the bank converted long-term municipal bonds into a short-term money market instrument. (Def. 56.1 ¶ 86.) One of the collateral benefits of the TOBP was significant tax savings to SG. (Def. 56.1 ¶ 84.) Although the DFP Formula did not contain provisions about the TOBP, correspondence referring to drafts of a compensation agreement indicates that Plaintiff was to be paid 40% of TOBP's contribution to the Bonus Pool. (Def. 56.1 ¶ 88; Cannon Decl., Ex. 1E.)

management reflecting an arrangement whereby Plaintiff was to receive 40% of the TOBP bonus pool attributable to the TOBP transactions. In addition to undermining Plaintiff's earlier contract arguments – which are based on a purported agreement to pay him 25% of the Group's Net P&L – these e-mails at most indicate management's arguably surreptitious intention to prevent DFP from realizing the full benefit of TOBP profit. Although Plaintiff makes much of the intrigue surrounding this drama, he fails to recognize that such communications do little to establish the existence of an enforceable contract with Plaintiff. (*See* Cannon Decl., Ex. 5B, 8A, 8B, 8C, 8D, 8E.) The record shows that the parties contemplated forming such an agreement (*Id.*, Ex. 1E, 2A, 2B), and that DFP's Net P&L historically included TOBP proceeds (*Id.*, Ex. 4A, 5A, 5C), but at no point did the parties form a legally enforceable contract. SG may be guilty of an objectionable lack of transparency with regard to TOBP bonus money, but it is not in breach of a contract with Plaintiff.

For these reasons, the Court finds that Plaintiff's third and fourth contract claims also fail.

### C.  New York Labor Law Claims

In addition to his breach of contract claims, Plaintiff alleges that SG violated New York Labor Law, N.Y. Lab. Law § 193, by reducing his 2006 bonus, failing to pay a 2007 bonus, and failing to compensate him for the TOBP revenue. Section 193 provides that "[n]o employer shall make any deduction from the wages of an employee," except under certain enumerated conditions not relevant here. Under the law, "wage" is defined as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." (N.Y. Lab. Law § 190(1)).

"It is settled that [t]he term 'wages,' despite its broad definition does not encompass an incentive compensation plan," such as where an "employee receives a guaranteed salary and may also receive supplemental income based upon the dual performance of the employee and the business or as a result of other factors outside of the employee's control." *Truelove v. Northeast Capital & Advisory Inc.*, 702 N.Y.S.2d 147, 149 (App. Div. 2000) (internal citations and quotation marks omitted). In that vein, New York courts have excluded formula-based compensation plans from the statutory definition of "wages" when such plans are based on factors outside the employee's control. *See Ferrari v. Keybank Nat'l Ass'n*, No. 06-cv-6525, 2009 WL 35330, at *13 (W.D.N.Y. Jan. 5, 2009) (finding that the statutory entitlement to a wage excluded a formula-based compensation plan that reflected combination of individual, team, and company performance). Under New York case law, bonus payments "contingent and dependent, at least in part, on the financial success of the business enterprise," and based on factors "outside the scope of the employee's actual work," are not "wages" under the meaning of Section 193. *Truelove v. Northeast Capital & Advisory, Inc.*, 95 N.Y.2d 220, 223-25 (N.Y. 2000) (citing *Tischmann v. ITT/Sheraton Corp.*, 882 F. Supp. 1358, 1370 (S.D.N.Y. 1995)). In *Tischmann*, the court awarded summary judgment to the employer on the employee's Labor Law claim because the plaintiff's discretionary bonus payment was tied to the overall output of the department, and therefore fell outside the purview of the definition of "wage." 882 F. Supp. at 1370; *see also Hernandez v. Intercos Am., Inc.*, No. 06 Civ. 13314 (GEL), 2007 WL

4458116, at *1 (S.D.N.Y. Dec. 19, 2007) ("Since eligibility under the plan invoked by the plaintiff depends in part on the achievement of corporate goals beyond the control or effort of the plaintiff herself, there is thus no basis for a statutory claim under the New York Labor Law."); *Int'l Paper Co. v. Suwyn*, 978 F. Supp. 506, 514 (S.D.N.Y. 1997) ("Under New York law, 'incentive compensation based on factors falling outside the scope of the employee's actual work is precluded from statutory coverage.'") (quoting *Tischmann*, 882 F. Supp. at 1370)); *Dean Witter Reynolds, Inc. v. Ross*, 429 N.Y.S.2d 653, 658 (N.Y. App. Div. 1980) (finding that incentive pay that depended on the overall output of department did not constitute a "wage"; incentive pay is not a "wage" until it is actually earned and vested).

Plaintiff's claims under New York Labor Law fail as a matter of law because, like the bonus payment in *Tischmann*, his compensation does not constitute "wages" within the meaning of the statute. Although the definition of "Net P&L" is missing from the 1994 Agreement provided to the Court, there is no dispute that "Net P&L" related to revenues of the group as a whole, not simply the efforts of Plaintiff. Plaintiff's bonus payments were dependent on the success of the entire DFP group, which consisted of as many as 27 professionals, including 12 managing directors (Levion Decl. ¶ 32), and were not commissions based purely on his own personal productivity. With regard to TOBP, Plaintiff's bonus payments were also dependent on the tax positions taken by SG as a whole, which were also dependent on factors outside his own personal efforts. Plaintiff was guaranteed a salary – which *does* constitute a "wage" under the meaning of the statute – but his bonus payments were supplemental and dependent on the transactions and revenues generated by DFP.

Thus, absent a contract guaranteeing such a bonus, Plaintiff's Labor Law claims must be dismissed.

### D.  Good Faith and Fair Dealing

As an alternative argument, Plaintiff alleges that SG breached the implied covenant of good faith and fair dealing when it reduced his 2006 bonus, failed to pay him a bonus for 2007, and improperly compensated him for the NDF and TOBP transactions. (Compl. ¶¶ 92-94.)

Under New York law, a covenant of good faith and fair dealing is implicit in all contracts. *Tractbel Energy Mktg.,* 487 F.3d at 98. However, the covenant of good faith cannot be used to impose obligations that were not explicitly part of the agreement; instead, a party's obligation under the covenant of good faith and fair dealing is "derivative of its contractual obligations." *Bear Stearns Inv. Prods., Inc. v. Hitachi Auto. Prods., Inc.*, 401 B.R. 598, 628 (S.D.N.Y. 2009). In other words, in order to make a claim for breach of the covenant of good faith and fair dealing, there must be a contract in the first place. As discussed above, there simply was no contract between Plaintiff and SG that entitled him to a bonus for 2006 and 2007. Absent such an agreement, Plaintiff cannot prevail on his claim for breach of the covenant of good faith and fair dealing other than under the 1990 and 1994 Agreements.

Furthermore, it is well-settled that New York law does not recognize this cause of action with regard to at-will employees. *Murphy v. Am. Home Prod. Corp.*, 58 N.Y.2d 293, 304-05 (N.Y. 1983). Plaintiff has not alleged that he was anything other than an at-will employee; the fact that he left SG abruptly in 2007 belies any claim to the

13

contrary. Thus, Plaintiff's claim for breach of implied obligations cannot survive.

### E.  Unjust Enrichment

Plaintiff's final claim is that SG was unjustly enriched when it failed to compensate Plaintiff for his efforts. Plaintiff alleges that he conferred a benefit on SG by providing it significant tax savings opportunities, and that SG retained the benefit without properly compensating Plaintiff. (Compl. ¶¶ 97-99.)

To prevail on an unjust enrichment claim, a plaintiff must prove that the defendant received a benefit at the plaintiff's expense and that retention of that benefit would be unjust. *Thayer v. Dial Indus. Sales, Inc.*, 189 F. Supp. 2d 81, 91 (S.D.N.Y. 2002).   However, the law is clear that a plaintiff may not allege that his former employer was "unjustly" enriched at his expense when the employer compensated the plaintiff by paying him a salary. *Marmilowicz v. The Hartford Fin. Servs. Group*, No. 11 Civ. 539, 2011 WL 2936013, *12 (CM) (DCF) (S.D.N.Y. July 14, 2011) (incentive compensation was designed to reward exceptional employees by supplementing their salaries, and therefore employee's unjust enrichment claim failed).

Like the unsuccessful plaintiff in *Marmilowicz*, Plaintiff was compensated for his work at SG with a salary. Plaintiff has not indicated that the services he provided SG exceeded the scope of his duties as a Managing Director of DFP.   Because Plaintiff has failed to present evidence – or even allege – that his salary did not constitute reasonable value for the services he provided to SG, his claim under unjust enrichment theory also fails. *See also Hughes v. Standard Chartered Bank, PLC*, No. 09 Civ. 4595 (PKC), 2010 WL 1644949, at *8-9 (S.D.N.Y. Apr. 14, 2010) (granting employer's motion to dismiss claim for bonus where plaintiff's complaint did not allege that he rendered services to his employer that were beyond the scope of his duties and that the salary did not constitute the reasonable value for the services rendered).

### IV. CONCLUSION

At the end of the day, Plaintiff's Complaint is an elaborate effort to recharacterize his relationship with SG. But such an after-the-fact recharacterization is not permissible. At all times, Plaintiff had considerable market power as an at-will employee in the lucrative and rarified field of derivative transactions and structured products.  Like hundreds of other such specialists, he engaged in an annual dance for bonus compensation, the outcome of which determined whether he stayed with his current employer or moved to greener pastures elsewhere. He was an unrestricted free agent with impressive options.  For approximately 16 years, the at-will arrangement worked to his advantage. He made literally tens of millions of dollars in bonuses during that time. In 2007 he was unhappy with his bonus – a mere $5 million – prompting him to quit.  Whether his unhappiness was justified or unjustified (the record is unclear as to whether Plaintiff has found comparably lucrative work in his field or in an equally remunerative activity, such as pitching for the Yankees), Plaintiff has clearly offered no basis in law that would entitle him to the bonus money he now seeks.

Accordingly, for the reasons set forth above, Plaintiff's Motion to Preclude is denied, Defendant's Motion for Summary Judgment is granted, and Plaintiff's claims

are dismissed. The Clerk of the Court is respectfully directed to terminate the motions located at Doc. Nos. 32 and 39, and close this case.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: September 30, 2011
      New York, New York

\* \* \*

Plaintiff is represented by Ariel Purnell Cannon, Thomas Dewey, Chi-Ru Jou, and Keara Bergin of Dewey, Pegno & Kramarsky, LLP, 777 Third Avenue, New York, N.Y. 10017.

Defendant is represented by Jade Burns, Kevin Leblang, and Norman Simon of Kramer Levin Naftalis & Frankel, LLP, 1177 Avenue of the Americas, New York, N.Y. 10036.

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10-3-11
```

15